## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DENNEMEYER & CO., LLC,    ) | |
|      ) | |
|     Plaintiff,   ) | |
|      ) | |
|     v.    ) | Civil Action No._____ |
|      ) | |
| RALPH G. SCHROEDER   ) | |
| 10 S420 South Drew   ) | |
| Burr Ridge, IL 60527   ) | |
|      ) | |
|     Defendant.   ) | |

## NOTICE OF REMOVAL TO UNITED STATES DISTRICT COURT

Defendant, Ralph G. Schroeder ("Schroeder"), by his attorneys, Adrian Mendoza of Lillig & Thorsness, Ltd. and Jeremy S. Simon of Thompson, Loss & Judge, LLP., and pursuant to 28 U.S.C. §1441, seeks removal of this action from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia. In support thereof, Defendant states as follows:

1.    Schroeder is named as a Defendant in an action styled *Dennemeyer & Co., LLC v. Ralph G. Schroeder,* Civil Action Number 06-8839. This action was filed in the Superior Court of the District of Columbia on December 12, 2006.

2.    Schroeder is a citizen of the State of Illinois. (See affidavit of Ralph G. Schroeder, Exhibit "A").

3.    Plaintiff Dennemeyer & Co., LLC is a limited liability company organized under the laws of the Commonwealth of Virginia and has its principal place of business in Columbia, Maryland.

4.      This is a civil action for which the District Courts of the United States have original jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. §1332(a).   The amount in controversy between the parties exceeds the sum or value of seventy-five thousand dollars ($75,000.00) exclusive of interest and costs. (See affidavit of Ralph G. Schroeder, Exhibit "A").

5.      Pursuant to the provisions of 28 U.S.C. § 1441 et seq., Defendant has the right to remove this action from the Superior Court for the District of Columbia to the United States District Court for the District of Columbia.

6.      On December 12, 2006, Plaintiff's counsel provided a courtesy copy of the Complaint in this action to Defendant's counsel by facsimile.  This Petition for Removal is timely as required by 28 U.S.C. §1446 in that it is filed within thirty (30) days after notice of this action

7.      Pursuant to 28 U.S.C. §1446, Defendant is filing with this pleading a copy of all pleadings provided to him by Plaintiff's counsel in the Superior Court action.   Copies of all such papers are attached.  (See Plaintiff's pleadings attached hereto as Group Exhibit "B").

8.      Pursuant to 28 U.S.C. § 1446(d), Defendant will give notice promptly, upon filing of this Notice of Removal, to all parties of record and to the Clerk of the D.C. Superior Court.

9.      Dennemeyer & Co., LLC and Schroeder are currently parties to a lawsuit pending in the District Court for the Northern District of Illinois involving substantially the same contractual interpretation issues as raised in this case.   That case, entitled *Ralph G. Schroeder v. Dennemeyer & Co., LLC*, Case No. 06 C 6854 was originally filed on November 16, 2006 in the Circuit Court for the Eighteenth Judicial District, County of DuPage, State of Illinois and seeks a declaration of Schroeder's rights and award of monies owed Schroeder by Dennemeyer & Co., LLC.   Dennemeyer & Co., LLC was served with Summons in that action on November 29, 2006.  (Exhibit "C").

2

10.     On December 12, 2006, Dennemeyer & Co., LLC, through the same counsel, filed a Notice of Removal of Schroeder's Complaint from Illinois State Court to the District Court of the Northern District of Illinois, and that action currently is pending in that federal court. (Exhibit "D").

Wherefore, Defendant prays that this action be removed to this Court pursuant to 28 U.S.C. § 1441.


Dated:  December 13, 2006                    Respectfully submitted,


                                             _____
                                             Jeremy S. Simon, D.C. Bar No. 447956
                                             THOMPSON, LOSS & JUDGE LLP
                                             Two Lafayette Centre
                                             1133 21st Street, NW
                                             Suite 450
                                             Washington, DC  20036
                                             Telephone:  (202) 778-4060
                                             Facsimile:  (202) 778-4099

                                             Of Counsel
                                             Adrian Mendoza
                                             LILLIG & THORSNESS, LTD.
                                             1900 Spring Road
                                             Suite 200
                                             Oak Brook, IL 60523
                                             Telephone: (630) 571-1900
                                             Facsimile: (630) 571-1042

                                             Counsel for Ralph G. Schroeder

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of December 2006, I caused to be served a true and correct copy of the foregoing by facsimile and first-class mail, postage pre-paid, to the party listed below.

Todd A. Bromberg
Wiley Rein & Fielding LLP
1776 K. Street, NW
Washington, D.C. 20006

Counsel for Dennemeyer & Co., LLC

Jeremy S. Simon

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DENNEMEYER & CO., LLC,                    )
                                         )
      Plaintiff,                          )
                                         )
      v.                                  )    Case No._____
                                         )
RALPH G. SCHROEDER                        )
                                         )
      Defendant.                          )

### AFFIDAVIT OF RALPH G. SCHROEDER

Ralph G. Schroeder, being first duly sworn on oath, deposes and states that if he were called to testify, he would do so to the best of his knowledge and belief as follows:

1.      I am a citizen of the State of Illinois and reside in the Village of Burr Ridge, County of Cook, State of Illinois.

2.      I was previously employed by Defendant Dennemeyer & Co., LLC pursuant to an Executive Employment Agreement, a copy of which is attached as Exhibit A to Plaintiff's Complaint. To the best of my knowledge, Dennemeyer & Co., LLC is a limited liability company organized under the laws of the Commonwealth of Virginia.

3.      On October 16, 2006 I terminated my employment with Dennemeyer & Co., LLC pursuant to Section 7(f) of the Executive Employment Agreement (Good Reason). At that time I made certain written monetary demands of Dennemeyer & Co., LLC owed to me under the terms of the Executive Employment Agreement, in the total amount of $180,202.00. To date, Dennemeyer & Co., LLC has failed to pay these amounts.

4.      On or about November 16, 2006 I caused to be filed in the Circuit Court for the Eighteenth Judicial District, County of DuPage, State of Illinois a Complaint naming Dennemeyer & Co., LLC as a defendant and seeking a declaration of rights and award of monies due me.

5.      Dennemeyer & Co., LLC's Verified Complaint seeks a declaratory judgment setting



forth the rights of the parties under an Asset Purchase Agreement and under the Executive Employment Agreement. In addition, Dennemeyer & Co., LLC claims in its Verified Complaint to be entitled to receive as damages the value of all salaries, bonuses, commissions and benefits paid to me during the time I allegedly violated certain duties owed to Defendant.

6.      Based upon the information known to me including Plaintiff's Verified Complaint and the amounts owed me by Dennemeyer & Co., LLC, I have a good faith belief that the amount in controversy between Dennemeyer & Co., LLC and Ralph G. Schroeder exceeds $75,000.00.


FURTHERMORE AFFIANT SAYETH NAUGHT

_____
/ Ralph G. Schroeder

SUBSCRIBED and SWORN
to before me this 13 day of December, 2006.
State of Notary Massachusetts

_____
NOTARY PUBLIC


**Jamie L. Ryan**
NOTARY PUBLIC
COMMONWEALTH of MASSACHUSETTS
MY COMMISSION EXPIRES
July 26, 2013

2

EXHIBIT B



## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

DENNEMEYER & CO., LLC
Vs.
RALPH SCHROEDE

C.A. No.    2006 CA 008839 B

### INITIAL ORDER

## ORIGINAL

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued by the judge to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(o).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to:  Judge GERALD I FISHER
Date:   December 12, 2006
Initial Conference: 9:30 am, Friday, March 16, 2007
Location:   Courtroom 519
        500 Indiana Avenue N.W.
        WASHINGTON, DC  20001

12/13/2006    11:04    WILEY REIN & FIELDING → 650 571 1842    NO.540    P04

CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

**ORIGINAL**

DENNEMEYER & CO., LLC

*Plaintiff*

VS.

RALPH G. SCHROEDER

*Defendant*

Civil Action No. **JU08839-06**

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

Todd A. Bromberg

Name of Plaintiff's Attorney

1776 K. St. NW

Address

Washington, DC 20006

202-719-7357

Telephone

By _____
Deputy Clerk

DEC 1 2006

Date December 11, 2006

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(1)-4378a. 78

NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

**IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*.**

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### OFFICE OF THE JUDGE IN CHAMBERS

TO: _Ralph Schroede_    CASE NO.: _06 CA 8839_

### NOTICE OF HEARING

You are hereby notified that there will be a hearing on Plaintiff's request for

a Temporary Restraining Order (T.R.O.) against you, on

_12/14/06_ , at _230_ a.m./p.m. at
<span>(date)</span>     <span>(time)</span>

D.C. SUPERIOR COURT, 500 Indiana Avenue, N.W., Room 4220, 4th floor.

If you wish to be heard, your presence is required.

WHITE - DEFENDANT    CANARY - PLAINTIFF    PINK - COURT FILE

FORM SO-2084/AA. 08

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

DENNEMEYER & CO., LLC,

               Plaintiff,

      v.

RALPH G. SCHROEDER,

               Defendant.

Civil Action No. _____

## VERIFIED COMPLAINT

COMES NOW plaintiff, DENNEMEYER & CO., LLC ("Dennemeyer" or "Plaintiff"), and for its Complaint against Defendant RALPH G. SCHROEDER ("Schroeder" or "Defendant"), states as follows:

### PARTIES

1.    Plaintiff Dennemeyer is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business in Columbia, Maryland. Dennemeyer is in the business of intellectual property asset management.

2.    Defendant Schroeder is a citizen of the State of Illinois.

### JURISDICTION AND VENUE

3.    This Court has jurisdiction and venue over Schroeder by consent. Section 15(h) of the Executive Employment Agreement, to which Defendant Schroeder is a signatory, establishes that this Court has jurisdiction and venue over any court dispute arising from that Executive Employment Agreement.

### FACTS

4.    Dennemeyer is an intellectual property management company, providing the highest quality intellectual property services to law firms and corporations throughout North America. It has offices in three American cities and has both national and international clients.

5.    Vinsoft Solutions, Inc. ("Vinsoft") was a company that developed intellectual property management software. Vinsoft's key employees were Schroeder, President and Chief Intellectual Property Strategist, Harish Sethuraman, Vice President of Development, and Hema Kadali, Chief Executive Officer. Through his employment with Vinsoft, Schroeder gained insight into the software required for intellectual property management and dealt largely with the utilization of this software in the market.

6.    On or about July 2003, Schroeder approached Dennemeyer about purchasing Vinsoft. The companies entered into negotiations and began to finalize the details of the purchase. Before the final purchase agreement was signed between the two companies, Schroeder left his position at Vinsoft to accept employment at Dennemeyer.

7.    On or about November 6, 2003, Schroeder accepted employment as President of Dennemeyer by signing an Executive Employment Agreement, attached as Exhibit A.

8.    Upon joining Dennemeyer, Schroeder became an integral part in the workings of the company. Schroeder immediately became a key player in the company because of his authority as President, his extensive knowledge of the Vinsoft software, and was provided with unlimited access to Dennemeyer's strategic insight pertaining to the company's clients and projects. Schroeder was instrumental in completing the sale of Vinsoft to Dennemeyer.

9.    At Dennemeyer, Schroeder was able to combine the technical software expertise he obtained from employment at Vinsoft with Dennemeyer's reputation and clients to position

himself favorably within the industry. Schroeder utilized Dennemeyer's product and marketing image to gain the favor of the industry. Dennemeyer funded Schroeder's travel to various conferences and industry meetings, where Schroeder gained individual exposure and recognition.

10.    As President, Schroeder had unlimited access to all of Dennemeyer's projects, client lists, business strategies, product knowledge and information. He was involved in the largest and most important business deals and in all key decisions made by Dennemeyer. Dennemeyer invested significant resources in cultivating Schroeder's expertise in the business.

11.    On February 5, 2004, Vinsoft's assets were purchased by Dennemeyer pursuant to the Vinsoft Asset Purchase Agreement, attached as Exhibit B.

12.    The Vinsoft Asset Purchase Agreement provided for a payment of one million dollars ($1,000,000) at Closing, a second payment of five hundred thousand dollars ($500,000) at the one year anniversary of the Closing Date, and a third payment of five hundred thousand dollars ($500,000) at the two year anniversary of the Closing Date. Exhibit B, § 2.1.

13.    Upon information and belief, multiple payments totaling nearly $446,500 were made directly to Schroeder. While Dennemeyer had requested and preferred that Schroeder sell his Vinsoft stock, Schroeder chose not to do so and remained a shareholder even after leaving his position as Vinsoft Chief Intellectual Property Strategist. In March 2004, Vinsoft paid Schroeder $159,375 and on April 27, 2004, Vinsoft paid Schroeder $53,125. On March 15, 2005, Vinsoft paid Schroeder $115,000. On March 1, 2006, Vinsoft paid Schroeder $119,00.

14.    The Vinsoft Asset Purchase Agreement includes a non-competition agreement that covers Vinsoft's shareholders, officers, directors or employees for two (2) years after the completion of the Payment Schedule or post-employment relationship, whichever is longer. The Payment Schedule was completed on February 5, 2006, which means the non-competition

WRF, LLP FAX CTR        Fax:202-719-7049        Dec 12 2006  9:56        P. 35

provision remains in effect until at least February 5, 2008. As a shareholder when the Vinson Asset Purchase Agreement was signed, Schroeder is bound by the non-competition provision.

15.     Upon information and belief, in the months leading up to his resignation as President of Dennemeyer, Schroeder used Dennemeyer's corporate resources to travel to the offices of Anaqua, a competitor of Dennemeyer, and discussed employment possibilities with that company.

16.     Upon information and belief, during those final weeks as Dennemeyer's President, Schroeder also attempted to gain ownership in Dennemeyer by threatening to leave the company unless he was given stock options.

17.     On October 16, 2006, Schroeder resigned from his position at Dennemeyer.

18.     At the company's request, Schroeder agreed to stay on at Dennemeyer to assist for a brief period while a new president was hired.

19.     During that time, Schroeder stated to Dennemeyer executives that he did not know where he would work next and that he had promised his wife he would take six months off before starting a new position. Additionally, Schroeder's attorney stated in an early November 2006 conversation with Dennemeyer counsel that Schroeder was not working for any other entity at the time and he was uncertain where Schroeder would work next. Upon information and belief, Schroeder was already well into negotiations with Anaqua at the time of these statements.

20.     Upon information and belief, on or about November 18, 2006, Schroeder signed an employment contract with Anaqua, a provider of intellectual asset management services, and one of Dennemeyer's pricing competitors.

21.    Anaqua is one of Dennemeyer's six key competitors in the intellectual property management market.  In addition to Anaqua, Dennemeyer's other top competitors are CPA Software Solutions, CPI Systems, MDC, and Thomson.

22.    Upon information and belief, Schroeder's employment at Anaqua will entail substantially similar duties to those he performed at Dennemeyer.  Additionally, Schroeder profited greatly from his relationship with Dennemeyer, and his extensive knowledge of all aspects of Dennemeyer products, services, client lists, and confidential information, and his use of such information at Anaqua, would result in irreparable harm to Dennemeyer.

23.    Schroeder has extensive knowledge of Dennemeyer's business processes and confidential fiduciary and proprietary information, and will utilize this knowledge on behalf of Anaqua to undermine Dennemeyer in the market.  While at Dennemeyer, Schroeder was extensively involved in formulating the company's pricing strategy to maintain Dennemeyer's competitive edge in the limited and specialized market.  His knowledge will allow him to undermine the company by enhancing Anaqua's competitive pricing to undercut the very pricing strategy he designed at Dennemeyer.

## COUNT I

### (Breach of Contract)

24.    Plaintiff incorporates herein the allegations in paragraphs 1 through 23 of this Complaint.

25.    As a condition of Schroeder's employment with Dennemeyer, he entered into an Executive Employment Agreement with Dennemeyer.

26.    The Executive Employment Agreement to which Schroeder agreed to be bound contained a Non-Competition clause in Section 11.  Under this clause, Schroeder agreed that

during his employment with Dennemeyer and for a three year period thereafter, he would not directly or indirectly, own, manage, operate, control, be employed by (whether as an Executive, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in any business of the same type as any business in which Dennemeyer or any of their subsidiaries or affiliates is engaged on the date of termination.

27.   The actions of Schroeder described herein constitute a breach of this Non-Competition clause of the Executive Employment Agreement.

28.   As a proximate result of such breaches, Dennemeyer has been damaged in an amount in excess of five-thousand dollars ($5,000) to be proven at trial.

29.   In addition, Dennemeyer has suffered, and is continuing to suffer, irreparable harm through the loss of its competitive advantage as a result of Schroeder's breach of the Non-Competition clause of his Executive Employment Summary, for which Dennemeyer lacks an adequate remedy at law.   Therefore, Dennemeyer is entitled to temporary and permanent injunctive relief as set forth in the Prayer for Relief and is furthermore entitled to a declaratory judgment that declares Dennemeyer's rights and Schroeder's obligations under the Non-Competition clause of the Executive Employment Agreement.

## COUNT II

30.   Dennemeyer incorporates herein the allegations in paragraphs 1 through 29 of this Complaint.

31.   The Vinsoft Asset Purchase Agreement provides that all disputes are subject to arbitration. Exhibit B, § 11.4

32.    The actions of Schroeder described herein constitute a breach of this Non-Competition clause of the Executive Employment Agreement. Exhibit B, § 5.9.

33.    Dennemeyer has suffered, and is continuing to suffer, irreparable harm through the loss of its competitive advantage as a result of Schroeder's breach of the Non-Competition clause of the Vinsoft Asset Purchase Agreement, for which Dennemeyer lacks an adequate remedy at law. Therefore, Dennemeyer is entitled to temporary and permanent injunctive relief as set forth in the Prayer for Relief and is furthermore entitled to a declaratory judgment that any dispute over the Vinsoft Asset Purchase Agreement is subject to arbitration.

## COUNT III

### (Breach of Fiduciary Duty)

34.    Dennemeyer incorporates herein the allegations in paragraphs 1 through 33 of this Complaint.

35.    While he was employed by Dennemeyer, Schroeder occupied fiduciary relationships with Dennemeyer.

36.    Schroeder owed—and continues to owe—fiduciary duties to Dennemeyer. These duties include, but are not limited to, the duty to act honestly and with the utmost good faith toward Dennemeyer, the duty to act at all times in the best interests of Dennemeyer, the duty not to misuse, misappropriate, or disclose Dennemeyer's proprietary and confidential information, the duty to refrain from competing with Dennemeyer, the duty to refrain from soliciting Dennemeyer's clients and potential clients for himself and Anaqua, the duty to refrain from soliciting and recruiting Dennemeyer's employees away from Dennemeyer, and the duty to overall exert his best efforts on behalf of Dennemeyer.

37.    Through his actions described herein, Schroeder breached his fiduciary duties to Dennemeyer, and has done so with reckless indifference to the consequences and with conscious disregard for Dennemeyer's best interests.

38.    As a proximate result of such breaches, Dennemeyer has been damaged in an amount in excess of five-thousand dollars ($5,000) to be proven at trial.

39.    Moreover, Dennemeyer is entitled to receive, as damages or restitution from Schroeder, the value of all salaries, bonuses, commissions, and benefits paid to him during the time period that he was breaching his fiduciary duties to Dennemeyer.

## COUNT IV

### (Breach of Duty of Loyalty)

40.    Dennemeyer incorporates herein the allegations in paragraphs 1 through 39 of this Complaint.

41.    While he was employed by Dennemeyer, Schroeder owed Dennemeyer a common law duty of loyalty.

42.    Through his actions described herein, Schroeder breached his duty of loyalty to Dennemeyer, and has done so with reckless indifference to the consequences and with conscious disregard for the best interest of Dennemeyer.

43.    As a proximate result of such breaches, Dennemeyer has been damaged in an amount in excess of five-thousand dollars ($5,000) to be proven at trial.

44.    Moreover, Dennemeyer is entitled to receive, as damages or restitution from Schroeder, the value of all salaries, bonuses, commissions and benefits paid to him during the time period that he was breaching his duty of loyalty to Dennemeyer.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Dennemeyer, by counsel, respectfully requests that this Court enter judgment against Defendant Schroeder and grant it the following relief:

(a)    a declaratory judgment pursuant setting for the rights of the parties under the Executive Employment Agreement and the Vinsoft Asset Purchase Agreement;

(b)    a temporary and permanent injunction that: (i) enjoin Schroeder from breaching the terms of his Executive Employment Agreement; (ii) enjoin Schroeder from breaching the terms of the Vinsoft Asset Purchase Agreement pending final resolution through arbitration; (iii) enjoin Schroeder from disclosing Dennemeyer proprietary information to any person or entity who is not an employee of Dennemeyer

(c)    an award of damages in an amount in excess of five thousand dollars ($5,000) to be proven at trial against Schroeder;

(d)    an award of pre-judgment and post-judgment interest, costs and attorneys fees against Schroeder; and

(e)    an award of such other and further relief as the Court deems just and appropriate under the circumstances.

Q

Respectfully submitted,

Wiley Rein & Fielding LLP

By: _____

Todd A. Bromberg
Garen E. Dodge
William S. Consovoy
Wiley Rein & Fielding LLP
1776 K Street N.W.
Washington, DC  20006
TEL: 202.719.7000
FAX: 202.719.7049

Attorneys for Plaintiff Dennemeyer & Co.
LLC

Dated: December 12, 2006

10

WRF, LLP FAX CTR     Fax:202-719-7049          Dec 12 2006  9:58     P.42

Abs.: DR#REINHOLD#NOWAK;                004B 814694201;          11-Dez-06  3:10;          Seite 1/1

## VERIFICATION

The undersigned Officer of Plaintiff, Dennemeyer & Co., LLC, has read the foregoing

Complaint and hereby certifies that the facts stated therein are true and accurate.

REINHOLD NOWAK

*Director* _____ (position in Dennemeyer)

_____ (Jurisdiction)

I, _____, a Notary Public in and for said State, do hereby certify that _____, personally known to me to be the Affiant and personally known to me to be the same person whose name is subscribed to the foregoing Verification, appeared before me this ___th day of December, 2006, in person, and upon his oath acknowledged that the information set forth in the foregoing Complaint is true and accurate to the best of his information, knowledge and belief.

_____
Notary Public

11

WRF, LLP FAX CTR    Fax:202-719-7049    Dec 12 2006  9:58    P.43

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2006, in accordance with D.C.R. Civ.

P. 4(c), a copy of the foregoing document was served by FACSIMILE AND U.S. FIRST

CLASS MAIL upon the following:

Adrian Mendoza, Esq.
Lillig & Thorsness, Ltd.
1900 Spring Road
Suite 200
Oak Brook, Illinois 60523-1495

_____
Todd A. Bromberg

12

# EXHIBIT A

EXECUTIVE EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is made and entered as of
November ___, 2003 (the "Effective Date"), between DENNEMEYER & CO.,
LLC., located at 829 Seventh Street, N.W., Third Floor, Washington, DC
20001 (the "Company"), and Ralph G. Schroeder (the "Executive").

W I T N E S S E T H

WHEREAS, the Company desires to employ the Executive as President of
the Company's Americas affiliate business and pro tem Worldwide
Director of Marketing and Sales;

WHEREAS, the Company and the Executive desire to enter into the
Agreement as to the terms of his employment by the Company;

NOW THEREFORE, in consideration of the foregoing, of the mutual
promises contained herein and of other good and valuable consideration,
the receipt and sufficiency of which are hereby acknowledged, the
parties hereto hereby agree as follows:

SECTION 1. POSITION/DUTIES

(a) During the Employment Term (as defined in Section 2 below), the
Executive shall serve as the President of the Dennemeyer Americas
Company currently headquartered in Washington DC. In this capacity the
Executive shall have such duties, authorities and responsibilities
commensurate with the duties, authorities and responsibilities of
persons in similar capacities in similarly sized companies, and such
other duties and responsibilities as the Board of Directors of the
Americas Company (the "Board") shall designate that are consistent with
the Executive's position as President of the Americas. The Executive
shall serve under and report to the Americas CEO and Board.

(b) In addition, the Executive shall serve, as pro tem Dennemeyer
Worldwide Director of Marketing and Sales for one year overseeing
marketing and sales activities among and between the Company and
affiliated Dennemeyer offices and businesses.

(c) Commensurate with Executive's position, the Company shall take such
action as may be necessary to appoint or elect the Executive as a
member of the Board of Directors in Washington DC. Executive will
participate in Dennemeyer Luxembourg Board agendas and receive
communications of Luxembourg Board resolutions including meeting
transcripts, and the Americas Company and Luxembourg will consult,
resolve, and undertake with Executive in matters involving Executive's
duties in worldwide marketing and sales. In Executive's capacity as
Company President and Board member and pro tem Worldwide Director of
Marketing and Sales, Company commits to include Executive in all
appropriate internal communications and initiatives related to the
marketing and sales, financial, development, and operational management
of the Company;

(d) During the Employment TERM, the Executive shall devote all of his
business time (excluding periods of vacation and other approved leaves
of absence) to the performance of his duties with the Company and on
behalf of the Company.



(e) During the employment term, Executive shall as President of the Americas be responsible for improving:

- communications among all staff and continued growth in staff responsibility;

- improved monthly departmental status reporting that accurately reflects departmental operations, sales, and costs as well as problems and related solutions;

- a vigorous permanent focus on finances;

- support and assist management of the Vinsoft relationship and project.

(g) Consistent with Executive's fiduciary responsibilities and duties to the Company, the Executive shall not be prevented from holding, either directly or beneficially, an ownership stake in Vinsoft Solutions, Inc., its predecessors, or successors provided Executive continues to respect a non-compete agreement with Dannemeyer, Corp. does not increase his share participation and provided that Vinsoft Business, and provided Vinsoft does not extend some kind of participation and/or influence to a competitor of Dannemeyer. Company acknowledges that such ownership stake is not inherently in conflict with Executive's fiduciary responsibilities and duties to Company. Notwithstanding, if a possible conflict of interest is potentially imminent, Executive must inform Company in writing without delay to discuss the situation. Merely by way of information, Company would prefer if Executive reduced his shares in Vinsoft.

## SECTION 2. EMPLOYMENT TERM

The Executive's term of employment under this Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term") shall be for a term commencing on the Effective Date and, unless terminated earlier as provided in Section 7 hereof, ending on the third anniversary of the Effective Date (the "Original Employment Term"), provided that the Employment Term shall be automatically extended, subject to earlier termination as provided in Section 7 hereof, for successive additional one (1) year periods (the "Additional Terms"), unless, at least 90 days prior to the end of the Original Employment Term or the then Additional Term, the Company or the Executive has notified the other in writing that the Employment Term shall terminate at the end of the then current term. Executive will provide Company with evidence of his qualification as an Illinois Attorney. Company wishes, for Executive to maintain his legal qualifications, and Company will pay Executive's annual restoration fee(s) provided such professional fee(s) payment is in the interest of the Company.

## SECTION 3. BASE SALARY

The Company agrees to pay the Executive an aggregate base salary (the "Base Salary") at an annual rate of not less than US $245,000 (two hundred and forty-five thousand USD), payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly. Beginning in 2005, the Base Salary shall be subject to annual

review by the Board (or a committee thereof) and may be increased, but not decreased, by the Board. At a minimum the Executive base salary shall receive a minimum annual cost of living and merit adjustment of 5% (five percent) of the current annual base salary in 2005 and 2006. Thereafter, unless otherwise agreed in writing with the Company's Board, Executive's annual base salary shall tacitly be increased by 3% (three percent) per annum for the years 2007 and 2009. Thereafter, no automatic increases will be granted to Executive. No increase to Base salary shall be used to offset or otherwise reduce any obligations of the Company to the Executive hereunder or otherwise. The base salary as determined herein from time to time shall constitute "base salary" for purposes of this Agreement. The aggregate base salary will be initially contributed 50/50 America and Luxembourg.

## SECTION 4. BONUSES

In addition to the Base Salary, Executive shall be eligible for the following bonuses:

(a) **Management Shared Net Dividend Ratio Bonus** - Beginning in the calendar year 2006 and each year during the Employment Term, the Executive shall have the opportunity to earn and participate in an annual Shared Net Dividend Ratio Bonus based on achieving positive Net Revenue for the Americas Company. The bonus amount shall be a shared management bonus equal to 17.5% of the total Net Dividend Revenue available for distribution to shareholders for the applicable calendar year. The bonus shall be calculated based on the audited year-end financial results and paid within 60 days of the final audited annual accounts for a fiscal year for the Americas Company.

(b) **Sales Commission Bonus** - Beginning as of the Effective Date and during the Employment Term, the Executive shall be eligible to participate in the Worldwide Company Sales Incentive Program, to be instituted by the Company and if in force at that time. Any Sales Commission Bonus paid to the Executive shall be according to the guidelines and standards applicable to other sales and marketing personnel.

## SECTION 5. BENEFITS

(a) **Benefits Plan** - The Executive shall be entitled to participate in all Executive benefit plans of the Company including, but not limited to, medical coverage, equity, pension, thrift, profit sharing, education, or other retirement or welfare benefits that the Company has adopted or may adopt, maintain or contribute to for the benefit of its senior executives at a level commensurate with his position subject to satisfying the applicable eligibility requirements. Such benefits, in the aggregate, shall be no less favorable than the level of benefits in effect on the Effective Date; provided, however, that in the event there is a reduction of Executive benefits applicable to similar executives generally, nothing herein shall preclude the Company's ability to reduce the Executive's benefits consistent with such general executives' reduction.

(b) **Vacation and Sick Days** - The Executive shall be entitled to paid Vacation and Sick Days in accordance with the Company's policy applicable to senior executives, but in no event less than twenty (20)

days per year (as prorated for partial years), which vacation may be taken at such times as the Executive elects with due regard to the needs of the Company.

(c) **Business and Entertainment Expenses** — Upon presentation of appropriate documentation, the Executive shall be reimbursed in accordance with the Company's expense reimbursement policy for all reasonable and necessary business and entertainment expenses incurred in connection with the performance of his duties hereunder. Such reimbursement shall include reasonable expenses related to travel, lodging and extraordinary living costs between the Executive's current residence and Company's offices. As long as Executive is not a local resident to the main American office, Executive will make reasonable economies in commuting and accommodations that will be paid by the American company.

**SECTION 6. RELOCATION**

The Executive will, if determined by the Boards, be requested to fulfill the Executive's duties, relocate to the vicinity of the Company's principal U.S. headquarters within a time frame mutually agreed upon between the Executive and the Boards (the "Relocation Period") and with reasonable consideration for Executive's ability to sell his current residence. The Executive shall be entitled to reasonable relocation benefits in accordance with the Company's relocation policy and such additions thereto as mutually agreed to by the Executive and the Boards (or a committee thereof). All amounts payable under this Section shall be subject to the Executive's presentment to the Company of appropriate documentation.

**SECTION 7. TERMINATION**

The Executive's employment and the Employment Term shall terminate on the first of the following to occur:

(a) **Death**. This Agreement shall automatically terminate upon the death of the Executive, and upon such event, the Executive's estate shall be entitled to receive the amounts specified as if termination had occurred Without Cause (as defined below).

(b) **Disability**. If the Executive is fully unable to perform the essential duties required of him under this Agreement, with or without accommodation, because of illness, incapacity, or physical or mental disability, this Agreement shall remain in full force and effect and the Company shall pay all compensation required to be paid to the Executive hereunder, unless the Executive is fully unable to perform the duties required of him under this Agreement for an aggregate of 180 days (whether or not consecutive) during any 12-month period during the Employment Term, in which event this Agreement, including, but not limited to, the Company's obligations to pay any salary or other compensation or to provide any privileges under this Agreement, shall terminate at the end of the 180 days of aggregate disability.

(c) **Cause**. The Company may terminate the Executive's employment during the Employment Term with "Cause" as that term is defined below. In the event of termination pursuant to this Section with Cause, the Company shall deliver to the Executive written notice setting forth the

Confidential

basis for such termination, which notice shall specifically set forth the nature and circumstances of the Cause which is the reason for such termination. Termination of the Executive's employment hereunder shall be effective upon delivery of such notice of termination. For purposes of this Agreement, "Cause" shall mean: (i) the Executive's failure (except where due to a disability contemplated by Section 8(b) hereof) neglect or refusal to perform the essential duties of his position hereunder, which failure, neglect or refusal shall not have been corrected by the Executive within 30 days of receipt by the Executive of written notice from the Company of such failure, neglect or refusal, which notice shall specifically and in detail set forth the nature of said failure, neglect or refusal; (ii) any willful or intentional act of the Executive that has the effect of injuring the reputation or business of the Company or its affiliates in any material respect; (iii) any continued or repeated absence from the Company, unless such absence is (A) approved or excused by the Company CEO or Board of Directors or (B) is the result of the Executive's illness, or incapacity (in which event the provisions of Section 7(b) hereof shall control); (iv) conviction of the Executive of an act of fraud or felony; or (v) the commission by the Executive of an act of fraud or embezzlement against the Company.

(d) Resignation - Unless otherwise provided in Section 7(f) below in the case of a termination of employment for Good Reason, the Executive shall have the right to terminate his employment at any time by giving sixty (60) days notice of his resignation to the Company.

(e) Without Cause - The Company may terminate the Executive's employment during the Employment Term "Without Cause" at any time by giving notice to the Executive. A termination of the Executive's employment "Without Cause" shall mean a termination initiated by the Company for any reason other than Cause or on account of a disability. A termination Without Cause shall be effective immediately upon notice given by the Company to the Executive.

(f) Good Reason - The Executive shall have the right to terminate his employment for Good Reason under the following circumstances: (i) the failure by the Company to pay to the Executive the Salary and Bonus, if any, in accordance with Sections 3 and 4 hereof, except if such alleged payment is legitimately caused by the financial inability to pay; (ii) the failure of the Company to provide the benefits in accordance with Section 5; (iii) a material diminution in the Executive's responsibilities or authority; (iv) failure on the part of the Company to provide reasonable financial and/or human resources necessary to allow business performance success; (v) a requirement that the Executive relocate outside of the United States; or (vi) the failure of any successor to all or substantially all of the business and/or assets of the Company to assume the Agreement. The date of termination for Good Reason under this Section 7(f) shall be the date the Executive's employment under this Section 7(f) shall be the date the Executive gives the Company written notice of a termination for Good Reason setting forth the basis for such termination.

(g) Change of Control - During the 90-day period following a Change of Control, the Executive shall have the right to immediately terminate his employment. A Change of Control shall be deemed to have occurred upon the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act

of 1934, as amended (the "Exchange Act")); or (ii) upon the consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"); or (iii) upon the approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

(h)  Bankruptcy or Debt Related Reorganization — In the case of bankruptcy or debt related reorganization, the Executive shall have the right to terminate his employment effective immediately upon notice.

SECTION 9. OBLIGATIONS AND RIGHTS UPON TERMINATION

(a)  Upon any termination of this Agreement, all of the rights, privileges and duties of the Executive hereunder shall cease, except those for his rights under this Section 9 and his obligations as defined under Sections 9, 10, 11 and 12 hereunder, except that in the case of Termination Without Cause, Termination for Good Reason or Termination Caused by Bankruptcy or Debt-Related Reorganization, Executive's obligations under Section 11 shall not apply.

(b)  Termination for Cause or Upon Voluntary Resignation — In the event (i) that the Executive's employment hereunder terminates for Cause or (ii) the Executive resigns, the Company shall pay to the Executive all amounts accrued but unpaid hereunder through the date of termination in respect of salary, earned bonus(es), unused vacation or un-reimbursed expenses.

(c)  Termination Without Cause — In the event (i) the Executive's employment hereunder is terminated by the Company Without Cause in addition to the amounts specified in Section 9(a) above, the Executive shall be entitled to receive a lump sum cash severance payment equal to eight (8) months of the then current annual base salary as defined in Section 3.

(d)  Termination for Good Reason — In the event the Executive terminates his own employment hereunder for Good Reason, Executive shall be entitled to receive a lump sum cash severance payment equal to eight (8) months of the then current annual base salary as defined in Section 3.

(e)  Termination Following Change of Control — In the event that the Executive resigns within 90 days following a Change of Control pursuant to Section 7(g) hereof, in addition to the amounts specified in Section 9(a) above, the Executive shall be entitled to receive a lump sum cash severance payment equal to twelve (12) months of the then current annual base salary as defined in Section 3. In the special case of Section 7.(g) (iii) liquidation or dissolution, Executive will receive a lump sum cash severance payment equal to three (3) months of the then current annual base salary as defined in Section 3

(f)  Expiration of Employment Agreement — In the event that the Company fails to renew the Employment Term by providing to the Executive a notice of non-renewal pursuant to Section 2 herein the Executive shall receive a lump sum cash severance payment equal to six (6) months of the then current base salary.

(g) Amounts owed by the Company in respect of the salary or reimbursement for expenses under the provisions of Section 8 hereof shall, except as otherwise set forth in this Section, be paid promptly upon any termination.

(h) If the Executive secures employment, any consulting or other similar arrangement during the period that any payment is continuing to the Executive pursuant to the provisions of this Section, then the Company shall not have the right to reduce the amounts to be paid hereunder by the amount of the Executive's earnings from such other employment, consulting or other arrangement.

## SECTION 9. CONFIDENTIALITY.

The Executive agrees that he shall not, directly or indirectly, make available, sell, disclose or otherwise communicate to any person other than in the course of the Executive's assigned duties and for the benefit of the Company, either during the period of the Executive's employment or at any time thereafter, any nonpublic, proprietary or confidential information, knowledge or data relating to the Company, any of its subsidiaries, affiliated companies or businesses, which shall have been obtained by the Executive during the Executive's employment by the Company. The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to the Executive; (ii) becomes known to the public subsequent to disclosure to the Executive through no wrongful act of the Executive or any representative of the Executive; or (iii) the Executive is required to disclose by applicable law, regulation or legal process (provided that the Executive provides the Company with prior notice of the contemplated disclosure and reasonably cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information). Notwithstanding clauses (i) and (ii) of the preceding sentence, the Executive's obligation to maintain such disclosed information in confidence shall not terminate where only portions of the information are in the public domain.

The Executive agrees that his work effort is committed to the profit and benefit of Company. All work done and any information created or used, inasmuch as these are specific to Company's business, are considered the property of Company and confidential.

The Executive agrees that all Company physical and commercial resources, e.g., but not limited to, computer hardware, tools, software, leased lines, telephones, portable devices, modems and other networking devices, credit cards, automobiles, expense and business accounts are strictly the sole property and reserve of Company and may be used for other purposes except those in the interest of the Company. The Executive also understands that it is his professional responsibility to use such resources correctly. Upon request by Company, or latest when this Agreement shall have been terminated, Executive will return to Company all physical and commercial resources that shall have been given into his care.

Executive acknowledges that Company's internal work product and information may be copyrighted, or may contain patents or be patentable, or may contain technological know-how, and/or trade secrets; and that these as well as other intellectual property rights may be reserved for the benefit of Company.



Executive shall respect with discretion all Company's clients, private data, e.g. legal, invention, production, marketing, agent, financial, and business transactions.

Upon request by Company, or latest when this Agreement shall have been terminated, Executive will return to Company - among others - all domains, notes, electronic media, backup media, sources, objects, executables, documents, manuals, etc. that Executive might have had in his possession during the life of this Agreement.

## SECTION 10. NON-SOLICITATION

During the Executive's employment with the Company and for the three (3) year period thereafter, the Executive agrees that he will not, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, knowingly solicit, aid or induce (i) any employee of the Company or any of their subsidiaries or affiliates to leave such employment in order to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or knowingly take any action to materially assist or aid any other such Executive or (ii) any customer entity in identifying or hiring any such Executive or (iii) any customer of the Company or any of its subsidiaries, or affiliates to purchase goods or services then sold by the Company, or any of their subsidiaries or Affiliates from another person, firm, corporation or other entity or assist or aid any other persons or entity in identifying or soliciting any such customer.

## SECTION 11. NON-COMPETITION

The Executive acknowledges that he performs services of a unique nature for the Company that are irreplaceable, and that his performance of such services to a competing business will result in irreparable harm to the Company. Accordingly, during the Executive's employment hereunder and for the three (3) year period thereafter, the Executive agrees that the Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an Executive, consultant, independent contractor or otherwise, and whether or not for compensation) or render services in any form, engaged in any business of the same other entity, in whatever form, engaged in any business of the same type as any business in which the Company or any of their subsidiaries or affiliates is engaged on the date of termination. This section shall not, however, prevent the Executive from (i) securing employment in a position that is consistent with his educational, professional credential, and career experiences, (ii) owning not more than one percent of the total shares of all classes of stock outstanding of any publicly held entity engaged in such business, or (iii) being employed by and/or retaining an ownership position in Visory Solutions, Inc. or its predecessors.

## SECTION 12. NONDISPARAGEMENT

The Executive and the Company agree not to make any public statements or statements to any unassociated third parties that disparage the other party, or in the case of the Company, its respective affiliates, Executives, officers, directors, products or services. Notwithstanding

the foregoing, statements made in the course of sworn testimony in administrative, judicial or arbitral proceedings (including, without limitation, depositions in connection with such proceedings) shall not be subject to this Section 12.

## SECTION 13. GENERAL PROVISIONS

(a) Equitable Relief And Other Remedies - The Executive acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of this Section would be inadequate and, in recognition of this fact, the Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to obtain equitable relief in the form of specific performance, temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

(b) Reformation - If it is determined by the court of competent jurisdiction that any restriction in this Agreement is excessive in duration or scope or is unreasonable or unenforceable under the laws of that jurisdiction, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that jurisdiction.

(c) Survival Of Provisions - The obligations contained in this Section shall survive the termination or expiration of the Executive's employment with the Company and shall be fully enforceable thereafter.

(d) Attorney's Fees - In the event of any dispute arising out of or under this Agreement or the Executive's employment with the Company, if the arbitrator or court of competent jurisdiction, whichever is hearing the matter, determines that the Executive has prevailed on the issues in the arbitration or court proceeding, as the case may be, the Company shall, upon presentment of appropriate documentation, at the Executive's election, pay or reimburse the Executive for eighty-five percent (85%) of all reasonable legal and other professional fees, costs of arbitration and other reasonable expenses incurred in connection therewith by the Executive.

(e) No Assignments - This Agreement is personal to each of the parties hereto. No party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto. The Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company provided the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

(f) Notices - For the purpose of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of delivery if delivered by hand, (ii) on the date of transmission, if delivered by confirmed facsimile, (iii) on the first business day following the date of deposit if delivered by guaranteed overnight delivery service, or (iv) on the fourth business day following the date delivered or mailed

by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:

Ralph Schroeder
10 S 420 Drew Avenue
Burr Ridge, IL 60527

If to the Company:

Donnemeyer & Co. LLC.
929 7TH Street, N.W. 9th FLOOR
Washington, DC 20001

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

(g) **Section Headings; Inconsistency** - The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement and the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall control.

(h) **Severability** - The provisions of this Agreement shall be deemed severable and the invalidity of unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

(i) **Counterparts** - This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instruments.

(j) **Arbitration** - Any dispute or controversy arising under or in connection with this Agreement, other than injunctive relief or damages for breach of Sections 7 (c), 9, 10, 11 and/or 12, shall be settled exclusively by arbitration. The arbitrator will be a former or retired judge. The arbitrator will have the authority to permit discovery and to follow the procedures that he or she determines to be appropriate. The arbitrator will have no power to award consequential (including lost profits), punitive or exemplary damages. The decision of the arbitrator will be final and binding upon the parties hereto. Judgment may be entered on the arbitrator's award in any court having jurisdiction. Each party shall bear its own legal fees and costs and equally divide the forum fees and cost of the arbitrator, except that in the case of a finding in favor of Executive, such legal fees, costs, forum fees and cost of the arbitrator, shall be paid by two thirds by the Company as reasonably determined by the arbitrator's award.

(k) **Indemnification** - The Company hereby agrees to indemnify the Executive and hold him harmless to the fullest extent permitted by law and under the by-laws of the Company against and in respects to any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including reasonable attorney's fees), losses and damages resulting from the Executive's good faith performance of his duties and obligations with the Company.

(l) **Liability Insurance** - The Company shall cover the Executive under directors and officers liability insurance both during and, while potential liability exists for the term of Executive's employment

Confidential                    Page 10 of 12

after the term of this Agreement in the same amount and to the same extent as the Company covers its other officers and directors.

(m) **Miscellaneous** - No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and such officer or director as may be designated by the Company Board and only in respect to the Company. No waiver by either party hereto of, or compliance with, any condition or breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. This Agreement together with all exhibits, if any, hereto sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof has been made by either party which are not expressly set forth in this Agreement. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the District of Columbia, United States of America. Any court dispute arising from this Agreement shall be subject to settlement before the Superior Court of the District of Columbia.

(n) **Representations** - The Executive represents and warrants to the Company that he has the legal right to enter into this Agreement and to perform all of the obligations on his part to be performed hereunder in accordance with its terms and that he is not a party to any agreement or understanding, written or oral, which could prevent him from entering into this Agreement or performing all of his obligations hereunder.

(o) **Withholding** - The Company may withhold from any and all amounts payable under this Agreement such national and/or federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

Confidential                    Page 11 of 12

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first written above.

DENMEYER & CO., LLC
Washington, D.C.

By: John J. Denmeabyer

_____     date

DENMEYER & CO., LLC
Washington, D.C.

By: Paul A. Denmeabyer

_____     date

EXECUTIVE
Burr Ridge, IL

By: Ralph G. Schroeder

_____    11-06-03     date



WRF, LLP FAX CTR        Fax:202-719-7049        Dec 12 2006 10:03        P.58

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into as of February 5, 2004, by and among:

VINSOFT SOLUTIONS, INC., a New Jersey Corporation, with offices at 1195 West Chestnut Street, Suite 2-C, Union, New Jersey 07083-6929, and represented by Hems Kadali, Chief Executive Officer (the "Seller") EIN #22-3684819;

and

DENNEMEYER & COMPANY, S.à.r.l., a limited liability company organized under the laws of Luxembourg, with offices at 55 rue des Bruyères, L-1274 Howald, G.D. of Luxembourg, Trade and Companies Register of Luxembourg registry number B21880 and TVA number LU42405849, and represented by John J. Dennemeyer, General Technical Director (the "Buyer").

## RECITALS

WHEREAS, Seller has been engaged in the business of designing, building, selling and deploying intellectual property management related software and services;

WHEREAS, Buyer is engaged globally in the business of providing state-of-the-art management solutions for legal matters, intellectual property and intellectual assets, and patent annuities portfolio management services and trademark renewal services globally;

WHEREAS, Buyer desires to acquire substantially all of the assets and operations of Seller, and Seller is willing to convey and assign the same on such terms and conditions hereinafter set forth.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual agreements, representations, warranties and covenants set forth below, the parties agree with the legal and binding effect as follows:

## SECTION 1. SALE AND PURCHASE

1.1 TRANSFER OF ASSETS. Subject to the terms and conditions set forth in this Agreement, on the Closing Date, as defined below, Seller shall sell, convey, assign, grant, transfer and deliver to Buyer, and Buyer shall purchase, acquire and receive from Seller, free and clear of all

liens, mortgages, pledges, security interests, restrictions, prior assignments, encumbrances and claims of any kind, nature or character, all of the Seller's rights, title and interest, including all intellectual property rights, in and to all of Seller's assets — except those specified as Excluded Assets — including, but not limited to, the following assets, properties and business as the same shall exist on the Closing Date (the "Purchased Assets"):

(a) Software technology as represented by all design works, object code and source code, owned or transferable by Seller, related to Seller's software products including currently developed, in process and planned software, and as described in APPENDIX A;

(b) System documentation, in either electronic or hard copy form related to Seller's software technology including, but not limited to, requirements, database design, architecture design and installation guide;

(c) Intellectual Property Rights meaning all formal and informal ideas, inventions and know-how that are protected or may be protected under any applicable intellectual property laws related to Seller's products and services including, but not limited to, patents, design rights, trademarks, copyrights and trade secrets;

(d) Brand identity including the pending U.S. registered VINCERT trademark

(e) Sales and marketing materials, including but not limited to, all brochures, web sites, whitepapers and other collateral materials as described in APPENDIX B;

(f) Goodwill meaning all customer lists, relationships, currently pending proposals, marketing materials, and other information related to Seller's technology and business;

(g) Partnerships and other business development agreements that can be transferred by Seller;

(h) Accounts receivable, notes and other receivables arising from the business;

(i) Business records including, but not limited to, all books and records of Seller to the extent relating to the Acquired Assets or the business or operations; and.

(j) Tangible assets and recordings of intangible assets including, but not limited to, computer hardware, software, office furniture, business supplies or other property appurtenant to the business, operations and Purchased Assets as described in APPENDIX C.

**1.2 COMPLETE TRANSFER.** Seller expressly agrees that the sale of the Purchased Assets under this agreement constitutes a complete transfer of all its rights, title and interests with respect to the Purchased Assets and that Seller reserves no rights to market or otherwise transfer the Purchased Assets.

**1.3 EXCLUDED ASSETS.** Notwithstanding the foregoing, Seller does not hereby sell, assign, transfer or convey, and Buyer does not hereby accept or purchase any of the assets, properties, rights, contracts and claims of Seller except for the Purchased Assets, and, without limiting the generality of the foregoing, the following assets, property, rights, contracts and claims of Seller shall not be sold, assigned, transferred or conveyed to Buyer, the detailed listing of which is setout in Appendix D:

(a)  Cash and cash equivalents including any marketable securities or certificates of deposit existing on or prior to the Closing;

(b)  Insurance policies and any proceeds or return of premiums thereunder existing on or prior to the Closing;

(c)  Tax refunds including all claims, rights and interests of Seller in and to any refunds or accrued losses for periods ending on or prior to the Closing;

(d)  Transaction records prepared in connection with the Purchased Assets including bids received from others and analyses related to Seller, Buyer and Purchased Assets;

(e)  All minute books, stock records, corporate seals and treasury stock;

(f)  Those rights relating to deposits and prepaid expenses and claims for refunds and rights to offset in respect thereof, including lease security deposit;

(g)  All personnel records and tax records that Seller is required by law to retain in its possession;

(h)  All rights in connection with and assets of the employee health insurance plan;

(i)  All rights of the Seller under this Agreement and the Transaction Documents (defined in Section 2.2).

**1.4 EXCLUDED LIABILITIES.** Buyer shall not assume or be obligated to pay, perform or otherwise assume or discharge any liabilities or obligations of Seller, whether direct or indirect, known or unknown, or absolute or contingent, except for the Assumed Obligation contained in this Section, all such liabilities and obligations not so assumed being referred to herein as the "Excluded Liabilities", and, without limiting the generality of the foregoing, the following obligations and

Confidential

liabilities relating to the business or operations or Purchased Assets shall not be assumed by the Buyer:

    (a)   Taxes relating to business or operations or Purchased Assets;

    (b)   Any liability or obligation of Seller in respect of indebtedness for borrowed money;

    (c)   Any liability related to Excluded Assets;

    (d)   Any liability or obligations not expressly assumed by Buyer related to employee matters;

    (e)   Any liability or obligation not expressly assumed by Buyer related to intellectual property;

    (f)   Any liabilities or obligations related to previous consulting or other products or services provided by Seller to any third party prior to Closing.

1.5  ASSUMED OBLIGATIONS AND RESPONSIBILITIES. Notwithstanding the Excluded Liabilities contained in this Section, upon the terms and subject to the conditions of this Agreement, Buyer agrees to assume, perform, pay and discharge, in accordance with the respective terms and conditions thereof, the following limited obligations of Seller relating to or arising out of the business or operations of Seller or Purchased Assets (the "Assumed Obligations"). Buyer will assume all operational obligations and responsibilities subsequent to Closing:

    (a)   All liabilities, debts, obligations, judgments, fines, penalties, claims and proceedings relating to the business or Purchased Assets, whether accrued, liquidated, contingent, matured or unmatured, arising out of events occurring after the Closing Date;

    (b)   Accounts payable and accrued payment obligations of Seller to the extent relating to or arising out of the business or operations of Purchased Assets from the Closing Date and thereafter; and

    (c)   All liabilities, debts, obligations, judgments, fines, penalties, claims and proceedings relating to Seller's partnerships, licenses or alliance agreements relating to the business or operations or Purchased Assets as arising out of the Closing Date and thereafter, and as specifically setout in Appendix E;

    (d)   All liabilities of Seller or Hema Kadali arising in connection with the Lease, dated the Twenty-First day of August 2001 between Dimarco Realty Company of 2204 Morris Avenue Suite 307, Union, New Jersey 07083 and Hema Kadali of 8 Hampton St., Basking Ridge, NJ 07920 and Vinsoft Solutions, Inc. 200 Middlesex Tpk, suite 207 Iselin, NJ 09830 for the premises known

as Suite 2-C, Second/Top floor, 1155 West Chestnut St., Union, County of Union, and State of New Jersey and any remnants thereof.

**1.6 Seller Change of Name.** Subsequent to Closing, Seller will take all necessary actions to change its corporate name such as to not interfere with Buyer's acquisition of the Vinsoft brand and trademark. Seller will retain its Employee Identification Number (EIN).

## SECTION 2. PURCHASE PRICE AND CLOSING

**2.1 PURCHASE PRICE; COMPLETE PURCHASE SCHEDULE.** Subject to the terms and conditions of the Agreement, in consideration of the sale, assignment, transfer and conveyance of the Purchased Assets by Seller to Buyer, Buyer shall pay to Seller the Purchase Price of two million dollars (US$2,000,000) as Cash Consideration, in United States Dollars, according to the following schedule, such schedule representing the "Complete Purchase Schedule":

(a) At Closing, Buyer shall pay to Seller one million dollars (US$1,000,000) in cash by wire transfer of immediately available funds as per instructions provided by Seller in advance of the Closing;

(b) At Closing, Buyer shall deliver to Seller a promissory note, secured by a security agreement attached hereto in Appendix F, for one million dollars (US$1,000,000) payable in two installments; first at the one year anniversary of the Closing Date, Buyer shall pay to Seller an installment of five hundred thousand dollars (US$500,000) in cash by wire transfer of immediately available funds as per instructions provided by Seller in advance of the due date; and at the two year anniversary of the Closing Date, Buyer shall pay to Seller the final installment of five hundred thousand dollars (US$500,000) in cash by wire transfer of immediately available funds as per instructions provided by Seller in advance of the due date.

**2.2 TRANSACTION TAXES.** All sales, use, transfer, recording, value added, and other transaction taxes and charges, if any, arising out of the transfer of the Purchased Assets by Seller to Buyer will be borne by the respective responsible party. Buyer and Seller agree to cooperate in obtaining any sales or transfer tax exemptions.

**2.3 CLOSING; CONSUMMATION OF TRANSACTIONS.** Subject to the terms and conditions of this Agreement, the Closing shall take place on such date, as soon as practicable, and at such location as the parties may agree, but no later than February 27, 2004, (the "Closing Date"). At the Closing, Buyer and Seller shall take such actions and execute and,

WRF, LLP FAX CIR      Fax:202-719-7049      Dec 12 2006 10:04   P.63

deliver such agreements, bill of sale, and other instruments and documents (the "Transaction Documents") as necessary or appropriate to effect the transaction contemplated by this Agreement. With regard to Seller's Software Technology Assets and related Documentation, Seller shall provide at Closing a complete copy of the Software Technology source code and all related Documentation including, but not limited to, all test and quality related documentation and customer support feedback, if any. All acts, deliveries and confirmations comprising the Closing, regardless of chronological sequence, shall be deemed to occur contemporaneously and simultaneously upon the occurrence of the last act, delivery or confirmation of such Closing and none of such acts, deliveries or confirmations shall be effective unless and until the last of the same shall have occurred.

## SECTION 3. REPRESENTATIONS AND WARRANTIES OF SELLER

**3.1 ORGANIZATION; POWER; GOOD STANDING.** Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of New Jersey and has all necessary corporate power and authority to carry on the Business as presently conducted, to own and lease the assets which it owns and leases and to perform all its obligations under each agreement and instrument by which it or its assets are bound. Seller is duly qualified to do business as a corporation and is in good standing under the Laws of each jurisdiction in which it conducts business or in which it owns or leases assets. Seller has provided or will provide to Buyer the latest copy of Seller's articles of incorporation, by-laws, and shareholder agreements.

**3.2 AUTHORITY, APPROVAL AND ENFORCEABILITY.** Seller has full legal right, power and authority to enter into and perform its obligations under this Agreement and under all other of Seller's Transaction Documents to which Seller is a party. The execution, delivery and performance by Seller of this Agreement and Seller's Transaction Documents to which Seller is a party have been duly authorized by all necessary corporate and other action by the directors and stockholders of Seller. This Agreement has been duly and validly executed and delivered by Seller, and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms. When executed and delivered as contemplated herein, each of the other Seller's Transaction Documents to which Seller is a party shall constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or Laws affecting the rights of creditors generally.

**3.3 NO CONFLICT.** The execution and delivery by Seller of this Agreement and any other appendices, agreements, instruments and documents to be executed and delivered by Seller pursuant hereto do not, and the

WRF, LLP FAX CTR        Fax:202-719-7049        Dec 12 2006  10:05    P.64

performance and consummation by Seller of the transactions contemplated hereby, and thereby will not conflict with or result in any breach or violation of or default, termination, forfeiture or lien under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach or violation of or default, termination, forfeiture or lien under) any terms or provisions of Seller's charter documents, or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which Seller is a party or to which Seller or the Purchased Assets are subject, in any manner material to the transaction contemplated under this Agreement.

3.4 NO CONSENT REQUIRED.  The execution, delivery and performance of this Agreement and Seller's Transaction Documents do not and will not (in each case, with or without the passage of time or the giving of notice), directly or indirectly:

(a) violate or conflict with the articles of incorporation, bylaws or other organizational documents of Seller or any Law applicable to Seller or by or to which any of the assets to be conveyed to Buyer is bound or subject; or

(b) violate or conflict with, result in a breach or termination of, or constitute a default or otherwise cause any loss of benefit under any material agreement or other material obligation to which Seller or any of its stockholders is a party or by which any of the Intellectual Property Assets are bound, or give to others any rights (including rights of termination, foreclosure, amendment, cancellation or acceleration), in any manner material to the transaction contemplated under this agreement.

3.5 COMPLIANCE WITH LAWS; AUTHORIZATIONS. Seller is, and always has been, operating the Business in compliance in all material respects with all applicable Laws (including, without limitation, all Laws relating to the protection of the environment and the use of hazardous substances), and no Selling Party has received, any notice, Order or other written communication from any Governmental Authority of any alleged, actual violation of or failure to comply with any Law in connection with the Business that would materially affect the transaction contemplated under this Agreement.

3.6 NO LITIGATION OR DISPUTES. Seller has received no written notice of any material claims, actions, suits, proceedings (arbitration or otherwise) or investigations pending before any Governmental Authority, client, customer, partner, employee or other third party, or before an arbitrator or Court of any kind, that involve or affect Seller, any assets or properties of Seller or officer or stockholder of Seller in his, her or its capacity as such, that otherwise relates to or affects the Business, the asset value of the Business, questions any of the transactions contemplated by, or the validity of, this Agreement or any

of the other Transaction Documents or which, if determined adversely, could either individually or in the aggregate have a material adverse effect upon the Intellectual Property, or Seller's ability to perform its obligations under this Agreement or any of the other Transaction Documents.   Seller has not received any written request from any Governmental Authority for information with respect to the transactions contemplated hereby.

3.7 TITLE TO ASSETS; NO LIMITATIONS ON ASSETS.

(a) Seller has good and marketable title to all Purchased Assets and except with respect to that software listed on Appendix C ("Third Party Software"), Seller has free and clear of all liens, encumbrances or other claims of ownership or rights that would, if existing, materially and adversely effect Buyer's ownership of Purchased Assets.   Upon delivery by Seller to Buyer of the Purchased Assets at Closing, Buyer will acquire good and marketable title to the Purchased Assets free and clear of all liens, encumbrances or adverse claims of ownership rights, except for those limitations imposed upon the Third Party Software by Seller's license agreements with the vendors of the Third Party Software;

(b) Seller has not granted rights to manufacture, publish, produce, assemble, license or sell Seller's intellectual property rights or any of Seller's technology to any other entity or Person, and is not bound by any agreement which affects Seller's sole and exclusive right to manufacture, publish, produce, assemble, license, distribute or sell Seller's intellectual property rights, products and services.

(c) With respect to the transfer of rights in and to the Purchased Assets (other than the Third Party Software), Buyer will be subject to no limitations, obligations or restrictions with regard to the further development, sale, license, distribution, or any other form of exploitation of the Purchased Assets, whether in the form transferred to Buyer or after modification.

3.8 INTELLECTUAL PROPERTY.

(a) Seller is the sole owner, or has the exclusive perpetual right to use without consideration or limitation, all Intellectual Property and other proprietary rights of the Purchased Assets, and Seller shall, as part of this transaction, convey, assign, grant, transfer and deliver to Buyer such Purchased Assets free and clear of any Encumbrance, and all such Intellectual Property is licensable and/or may be freely conveyed to Buyer without the consent of any other Person. Seller has not granted or licensed to any Person any rights with respect to the Intellectual Property inconsistent with this Agreement. Upon the consummation of the transactions contemplated hereby, the rights of Buyer in and to any of the Intellectual Property conveyed to Buyer hereunder will not be limited or otherwise adversely affected by reason

of any of the transactions contemplated hereby. To Seller's knowledge, the Intellectual Property does not infringe and Seller has received no written notice that alleges any infringement of any trademark, copyright, patent or other proprietary right of any Person.

(b) Except with respect to the Third Party Software, Seller is not obligated, contingently or otherwise, to pay royalties or license or similar fees to any Person with respect to any Intellectual Property now used or to be distributed by Seller or which is proposed to be used or distributed by Seller.

(c) All employees of Seller involved with the development, implementation, use or marketing of any Seller's Intellectual Property will enter before closing into written agreements assigning to Seller all rights to inventions, patents or eventual patents, improvements, discoveries or information relating to the Vinsoft Intellectual Property listed on Appendix A, and to the knowledge of Seller, no employee or former employee of Seller, or any other Person, owns or has any proprietary, financial or other interest, direct or indirect, in whole or in part, in any of the Vinsoft Intellectual Property.

3.9 PROTECTION OF OWNERSHIP INTEREST. To the best of its knowledge, Seller has not disclosed the software to anyone, including but not limited to any third-party software vendor, in a manner that would materially affect Seller's ownership rights in the intellectual property transferred in accordance with this Agreement. Seller has not taken any action or, to its knowledge, failed to take action that directly or indirectly caused the proprietary information contained in or that are an inherent component of the Vinsoft Intellectual Property to enter the public domain or in any material way affect its value or Seller's absolute and unconditional ownership thereof. No source code or object code of any Vinsoft Intellectual Property is subject to escrow, and the source code has not been disclosed to any third party.

3.10 STATE AND QUALITY OF PURCHASED ASSETS

(a) Seller shall provide Buyer the Purchased Assets in their respective condition as of the Closing Date, and consistent with Seller's conditions of closing, shall ensure no diminution in their quality or value, as represented and warranted in this Section, prior to Closing.

(b) Seller represents and warrants that the Vinsoft Intellectual Property that has been released and the Vinsoft Intellectual Property that is in development has been professionally developed to a standard of quality and performance that, (i) is consistent with Seller's experiences in designing, developing and implementing software systems for corporate customers, and (ii) meets or exceeds the level that would be considered by an objective evaluator in the software development industry as standard to the industry and as set out in the Vinsoft Technical Architecture document;

(c) Seller represents and warrants that the Vinsoft Intellectual Property that has been released is reasonably free from Errors, has been developed according to a methodology that calls for internal testing throughout development although Seller has not beta tested the software and has not installed the software for testing in any customer site; is stable, and will substantially conform to the specifications and functions set forth in Seller's product specifications.

(d) Seller represents and warrants that, to the best of its knowledge and industry capabilities, the Vinsoft Intellectual Property that has been released has been designed and developed in a manner which would not prevent future MICROSOFT CERTIFICATION, although Seller makes no representation or warranty that such MICROSOFT CERTIFICATION has been obtained or could be obtained. To the best of Seller's knowledge, the Vinsoft Intellectual Property and related software technology that has been released, has been designed and developed in a manner consistent with the characteristic of robustness, ease of maintainability and normal software system evolution.

**3.11 REAL PROPERTY; LEASES.** The Seller does not own, and has never owned, any real property. Seller's sole lease obligation relates to the office located in Union, New Jersey, of which a copy of the lease is contained in APPENDIX H.

**3.12 EMPLOYEES AND CONSULTANTS; EMPLOYEE BENEFIT PLANS.** At Closing, Buyer will, contemporaneously with execution of the Closing documents, execute employment agreements or consulting agreements with the then current employees or consultants of Vinsoft as listed in Appendix I. Seller shall, prior to Closing, arrange for the termination of all prior employee or consulting relationships at Closing. Except for Seller's Health Insurance Plan, Seller has no employee benefit plan(s) of Seller or any predecessor employer of any employee, including, but not limited to, employee benefit schemes, incentive compensation plans, bonus plans, pension and retirement plans, vacation, profit-sharing plans (including any profit-sharing plan with a cash-or-deferred arrangement) share purchase and option plans, savings and similar plans, dental, travel, accident, life, disability and other insurance and other plans or arrangements. Seller has not, with respect to any employee, maintained or contributed to, or been obligated or required to contribute to, any retirement or pension plan or any employee benefit plan (other than the Health Insurance Plan).

**3.13 TAXES.** All Taxes, including any State and Federal income, payroll or sales Tax, that are due or will be due, have been or will be paid by Seller for all periods (or portions thereof) prior to and including the Closing Date. Seller and any other person required to file returns or reports of Taxes have duly and timely filed (or will file prior to the

Closing Date or within applicable extension periods; all returns and reports of Taxes required to be filed prior to such date, and all such returns and reports are to the knowledge of Seller true, correct and complete in all material respects. There are no liens for Taxes on any of the Purchased Assets. There are no other outstanding tax liabilities for withholding by Seller for sales tax or payroll taxes (other than those which are not yet due. Seller has complied in all material respects with all record keeping and tax reporting obligations relating to income and employment taxes due with respect to compensation paid to employees or independent contractors providing services to Seller's business. Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code. There is no pending or, to Seller's knowledge, threatened proceedings with respect to Taxes, and Seller has entered into no written agreements for waivers or extensions of statutes of limitations with respect to assessments of Taxes. No agreement or arrangement regarding compensation of any employee providing services to Seller's business provides for any payments which could result in a nondeductible expense to the Buyer pursuant to Section 280G of the Code or an excise tax to the recipient of such payment pursuant to Section 4999 of the Code.

3.14 FINANCIAL STATEMENTS; NO UNDISCLOSED LIABILITIES. The Financial Statements provided by Seller to Buyer, have been prepared for use by Seller's management and are prepared in a manner consistent with Seller's customary internal reports.  No representation is made that such Financial Statements have been audited or reviewed or that they have been prepared in accordance with customary accounting procedures. Seller does not represent or warrant that such Financial Statements are free from error, complete, or that Seller has made any unusual efforts to check or test the data upon which such statements rely; however, Seller has no actual knowledge of any material error in such Financial Statements.

3.15 FULL DISCLOSURE; ALL DOCUMENTATION. Nothing in this Agreement, the Exhibits, Schedules provided by Seller to Buyer contain any materially misstated material fact, nor, to Seller's knowledge, fails to state any material fact necessary to provide a fair disclosure concerning Seller, Seller's business, or the Purchased Assets.

3.16 NO BROKER OR AGENT. Seller has entered into no written or verbal agreements for any brokerage commissions, finder's fees or similar compensation in connection with the transaction contemplated by this Agreement.

SECTION 4. REPRESENTATIONS AND WARRANTIES OF BUYER

4.1 ORGANIZATION; POWER; GOOD STANDING.  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of

Luxembourg, and has all necessary corporate power and authority to carry on the Business as presently conducted, to own and lease the assets which it owns and leases and to perform all its obligations under each agreement and instrument by which it or its assets are bound. Buyer is duly qualified to do business as a foreign corporation and is in good standing under the Laws of each jurisdiction in which it conducts business or in which it owns or leases assets. Buyer has provided or will provide to Seller the latest copy of Seller's articles of incorporation, by-laws, and shareholder agreements.

4.2 AUTHORITY, APPROVAL AND ENFORCEABILITY. Buyer has full legal right, power and authority to enter into and perform its obligations under this Agreement and under all other of Buyer's Transaction Documents to which Buyer is a party. The execution, delivery and performance by Buyer of this Agreement and Buyer's Transaction Documents to which Buyer is a party have been duly authorized by all necessary corporate and other action by the directors and stockholders of Buyer. This Agreement has been duly and validly executed and delivered by Buyer, and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms. When executed and delivered as contemplated herein, each of the other Buyer's Transaction Documents to which Buyer is a party shall constitute the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or Laws affecting the rights of creditors generally.

4.3 NO CONFLICT. The execution and delivery by Buyer of this Agreement and any other appendices, agreements, instruments and documents to be executed and delivered by Buyer pursuant hereto do not, and the performance and consummation by Buyer of the transactions contemplated hereby and thereby will not, conflict with or result in any breach or violation of or default, termination, forfeiture or lien under (or upon the failure to give notice or the lapse of time, or both) result in any conflict with, breach or violation of or default, termination, forfeiture or lien under) any terms or provisions of Buyer's charter documents, or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which Buyer is a party.

4.4 NO CONSENT REQUIRED. The execution, delivery and performance of this Agreement and Buyer's Transaction Documents do not and will not (in each case, with or without the passage of time or the giving of notice), directly or indirectly:

(a) violate or conflict with the articles of incorporation, bylaws or other organizational documents of Buyer or any Law applicable to Buyer or by or to which any of the assets to be owned by Buyer is bound or subject; or

(b) violate or conflict with, result in a breach or termination of, or constitute a default or otherwise cause any loss of benefit

under any material agreement or other material obligation to which Buyer or any of its Stockholders is a party or by which any of the Intellectual Property Assets are bound, or give to others any rights (including rights of termination, foreclosure, amendment, cancellation or acceleration).

4.5 COMPLIANCE WITH LAWS; AUTHORIZATIONS. Buyer is, and always has been, operating the Business in compliance in all material respects with all applicable Laws (including, without limitation, all Laws relating to the protection of the environment and the use of Hazardous Substances), and no Buyer party, officer, director or shareholder has any basis to expect, and has not received, any notice, order or other communication from any Governmental Authority of any alleged, actual or potential violation of or failure to comply with any Law in connection with the Business.

4.6 LITIGATION. There are no claims, actions, suits, proceedings (arbitration or otherwise) or investigations pending before, or, to the knowledge of Buyer, presently threatened or contemplated by, any Governmental Authority, or before an arbitrator of any kind, that involve or affect Buyer, any assets or properties of Buyer or any director, officer or stockholder of Buyer in his, her or its capacity as such, or that otherwise relates to or affects the Business, questions any of the transactions contemplated by, or the validity of, this Agreement or any of the other Transaction Documents or which, if determined adversely, could either individually or in the aggregate have an adverse effect upon the business, or adversely effect Buyer's performance of its obligations under this Agreement or any of the other Transaction Documents.   Buyer has not received any request from any Governmental Authority for information with respect to the transactions contemplated hereby.

4.7 GOVERNMENTAL AUTHORIZATION. Each of Buyer and its subsidiaries, affiliates or associated businesses has obtained each federal, state, county, local or foreign governmental consent, license, permit, grant or other authorization of a Governmental Entity that is required for the operation of Buyer's or any of its subsidiaries, affiliates or associated businesses ("Buyer Authorizations"), and all of such Buyer Authorizations are in full force and effect, except where the failure to obtain or have any of such Buyer Authorizations could not reasonably be expected to have a Material Adverse Effect on Buyer.

4.8 COMPLIANCE WITH LAWS. Each of Buyer and its subsidiaries, affiliates or associated businesses has complied with, are not in violation of, and have not received any notices of violation with respect to, any federal, state, local or foreign statute, law or regulation with respect to the conduct of its business, or the ownership or operation of its business, except for such violations or

failures to comply as could not reasonably be expected to have a Material Adverse Effect on Buyer.

4.9 NO BROKER OR AGENT. There are no claims for brokerage commissions, finder's fees or similar compensation in connection with the transaction contemplated by this Agreement.

4.10 ASSETS PURCHASED IN CURRENT STATE. Buyer represents and warrants that it has diligently examined, used and inspected the Purchased Assets to its satisfaction and that it understands and undertakes the risks associated with purchasing the Vinsoft Intellectual Property in its current state.

SECTION 5. COVENANTS

5.1 ACCESS TO INFORMATION.

(a) Consistent with Seller's Representations and Warranties, Buyer acknowledges that Seller has provided, as part of the Due Diligence process, full and complete access to Seller's business, operations and the Purchased Assets. Notwithstanding, prior and subsequent to the Closing, Seller will provide Buyer additional information as requested and necessary access to Seller's business, operations and Purchased Assets as reasonably necessary to complete the transaction.

(b) At all times following the Closing, each party shall provide the other party (at such other party's expense) with such reasonable assistance, including the provision of available relevant records or other information and reasonable access to and cooperation of any employees, as may be reasonably requested by either of them in connection with the preparation of any financial statement or tax return, any audit or examination by any taxing authority, or any judicial or administrative proceeding relating to liability for Taxes.

5.2 THIRD PARTY CONSENTS. Seller and Buyer shall use commercially reasonable efforts to obtain, within the applicable time periods required, all required consents, waivers, permits, and approvals and to effect all registrations, filings and notices with or to third parties or Governmental Entities which are necessary to consummate the transactions contemplated by this Agreement so as to preserve all rights of, and benefits to, the Buyer in the Purchased Assets.

5.3 CERTAIN NOTIFICATIONS. At all times prior to the Closing, Seller and Buyer shall promptly notify the other party in writing of the occurrence of any event which will result, or has a reasonable prospect of resulting, in the failure to satisfy any of the conditions required for Closing or that materially adversely effect the provisions of this Agreement.

5.4 BEST EFFORTS. The Seller and Buyer shall each use its best efforts (i) to cause to be fulfilled and satisfied all of the conditions to the

Closing, (ii) to cause to be performed all of the matters required of it at the Closing

5.5 SELLER'S CONDUCT OF THE BUSINESS PRIOR TO CLOSING. During the period from the date of this Agreement to the Closing Date, Seller will conduct the Business in its ordinary and usual course, consistent with past practice, and will use all reasonable efforts to preserve intact all rights, privileges, franchises and other authority of the Business and to maintain favorable relationships with licensors, licensees, suppliers, contractors, distributors, customers, and others having relationships with the Business. Seller shall promptly notify Buyer of any material event or occurrence or emergency not in the ordinary course of business, and any material event involving the Business or the Purchased Assets.

5.6 NO OTHER BIDS. Until the earlier to occur of (a) the Closing or (b) the termination of this Agreement pursuant to its terms, neither Seller or Buyer, or any of its officers, directors, employees, agents, attorneys, accountants, advisors or other representatives, will directly or indirectly, pursue negotiations or other business development related activity that would reasonably be considered in conflict with the Agreement. Seller or Buyer, as the case might be, will promptly notify the other party in writing of any material inquiry, proposal or offer relating to the foregoing that is received, including the identity and terms of such inquiry, proposal or offer.

5.7 PUBLIC ANNOUNCEMENTS. On and prior to the Closing Date, Buyer and Seller shall advise and confer with each other prior to the issuance of any reports, statements or releases concerning this Agreement (including the exhibits and schedules hereto) and the transactions contemplated herein. Neither Buyer nor Seller will make any public disclosure prior to the Closing or with respect to the Closing unless both parties agree on the text and timing of such public disclosure; provided, however, that nothing contained herein shall prevent either party at any time from furnishing any information to any Governmental Entity. The text of any public announcements will be reviewed by the parties prior to release.

5.8 POST-CLOSING ACTIONS. Subsequent to the Closing Date, Seller shall, from time to time, execute and deliver, upon the request of Buyer, all such other and further materials and documents and instruments of conveyance, transfer or assignment as may reasonably be requested by Buyer to effect, record or verify the transfer to, and vesting in Buyer or of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, other than Liens imposed or arising under the Assumed Obligations and Responsibilities, in accordance with the terms of this Agreement.

5.9 NON-COMPETITION AGREEMENT.

(a) In consideration of the Buyer entering into this Agreement and acquiring substantially all of Seller's business, operations and the Purchased Assets, Seller shall ensure that none of its shareholders, officers, directors or employees, will for two (2) years after completion of the Payment Schedule or post-employment relationship, which ever is longer: (i) participate, assist or otherwise be directly or indirectly involved or concerned, financially or otherwise, as a member, director, consultant, adviser, contractor, principal, agent, manager, beneficiary, partner, associate, trustee, financier or otherwise in any business or activity whose focus is on the development, marketing and sale or license of software products for the purpose of intellectual property management software or services; or (ii) interfere or seek to interfere, directly or indirectly, with any relationship between Buyer and any client, customer, prospective customer, employee or supplier of Buyer's business;

(b) Seller acknowledges that: (i) the prohibitions and restrictions contained in clause (a) of this Section are reasonable and necessary; and (ii) Seller has full receipt of valuable consideration for agreeing to the covenants in clause (a) of this Section;

(c) Seller and Buyer acknowledge and agree that it will be difficult to compute the amount of damage or loss to Buyer if Seller violated any of their agreements under this Section, that Buyer will be without an adequate legal remedy if Seller violated the provisions of this Section, and that any such violation may cause substantial irreparable injury and damage to Buyer not fully compensable by monetary damages. Therefore, Seller and Buyer agree that in the event of any violation by Seller of this Section, Buyer shall be entitled to (i) to recover from Seller monetary damages, (ii) to obtain specific performance, injunctive or other equitable relief, of either a preliminary or permanent type, and (iii) to seek any other available rights or remedies at law or in equity which may be exercised concurrently with the rights granted hereunder.

(d) Nothing in this Section shall prevent or prohibit Seller, or its shareholders, officers, or directors, subsequent to completion of the Payment Schedule or post-employment relationship, from working generally in the area of IT and systems related consulting, or specifically in providing consulting related services in the intellectual property field for corporations, law firms or other organizations, provided that such work is based on the development of new code for each client, and is not directly or indirectly related to creating an intellectual property software product or service that would compete with Buyer's business. Nothing in this Section shall prevent or prohibit Seller, or its shareholders, officers, or directors, from working with Seller's current clients or prospects.

Confidential                    Page 16 of 1235

## SECTION 6. EMPLOYEE AND CONSULTANT MATTERS

6.1 HIRED EMPLOYEES OR CONSULTANTS. Prior to the Closing, Seller shall terminate existing agreements, contracts or relationships with all employees or consultants not listed in Appendix I. Buyer, after notice to Seller as to the timing and method of contact, shall have the right to contact any or all of the employees or contractors for the purposes of making offers of employment with Buyer (or any Affiliate designated by Buyer) after the Closing Date and receiving written acceptance of such employment (in each case contingent on consummation of the transactions contemplated by this Agreement). Notwithstanding the foregoing, Buyer shall have no obligation to hire any employees of Seller after the Closing Date other than those listed in Appendix I.

6.2 TRANSITION. The employment by Seller of the employees or consultants shall end on or prior to the close of business on the Closing Date and the new employment or consulting arrangement with the employees or consultants by Buyer shall commence at and thereafter 12:01 a.m. on the day after the Closing Date. The terms of employment with Buyer (or Buyer's Affiliates) shall be as mutually agreed to between each employee or consultant and Buyer (or Buyer's Affiliate, as the case may be). Buyer shall have no obligation with respect to payments of salary, compensation, wages, health or similar benefits, commissions, bonuses (deferred or otherwise), severance, stock or stock options or any other sums due to any employee or consultant that accrued before the Closing Date; and from and after the Closing Date, Seller shall have no obligation with respect to payment of salary, compensation, wages, health insurance or similar benefits, commissions, bonuses (deferred or otherwise), severance, stock or stock options or any other sums due to any employee or consultant that accrue after the Closing Date and do not pertain to the employees' or consultants' work with Seller prior to the Closing Date. Seller will be fully responsible for all amounts payable to any employee, including (without limitation) all termination payments, redundancy compensation, severance pay, accrued vacation pay and other amounts payable in respect of the termination of employment of any employee in connection with the sale of the Purchased Assets to the Buyer. In addition, Seller will be fully responsible for all amounts owing to employees or consultants prior to Closing.

6.3 COMPENSATION AND BENEFITS OF TRANSFERRED EMPLOYEES. Coverage for employees under Buyer's compensation and benefit plans and other programs shall commence at 12:01 a.m. on the day after the Closing Date. Buyer shall be free to establish its own employee benefit plans. Buyer shall have no obligation to offer benefit plans of the same type or with terms similar to or better than the terms of Seller's current employee benefit plans; provided, however, Buyer shall offer compensation packages, including salary, bonus, and other benefit plans,

commensurate with the same level of Buyer's current employees. Buyer shall give each employee credit for such employee's years of most recent continuous service with Seller for purposes of determining participation and benefit levels under all of Buyer's vacation policies and benefit plans and programs.

## SECTION 7. CLOSING REQUIREMENTS – CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer under this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions, all or any of which may be waived by Buyer in writing, except as otherwise provided by law:

7.1 REPRESENTATIONS, WARRANTIES; PERFORMANCE; CERTIFICATE.

(a) The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as if such representations and warranties had been made or given again at and as of the Closing Date;

(b) Seller  shall have performed and complied with all of its agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or on the Closing Date; and

(c) Buyer shall have received a certificate, dated as of the Closing Date, signed and verified by an officer of Seller certifying on behalf of Seller to the matters set forth in this Section are true.

7.2 NO PROCEEDINGS OR LITIGATION.

(a) No preliminary or permanent injunction or other order is known to have been issued by any Governmental Entity, nor has any statute, rule, regulation or executive order known to have been promulgated or enacted by any Governmental Entity which prevents the consummation of the transactions contemplated by this Agreement.

(b) No suit, action, claim, proceeding or investigation before any Governmental Entity shall have been commenced and be pending against any of the parties, or any of their respective Affiliates, associates, officers or directors, seeking to prevent the transactions contemplated by this Agreement, including, without limitation, the sale of the Purchased Assets or asserting that the sale of the Purchased Assets would be illegal or create liability for damages or which may have a Material Adverse Effect on the Business or the Purchased Assets.

7.3 DOCUMENTS. This Agreement, any appendices, exhibits and schedules attached hereto, and any other instruments of conveyance and transfer and all other documents to be delivered by Seller at the Closing and all actions of Seller required by this Agreement and the exhibit agreements, or incidental thereto, and all related matters, shall be in



form and substance reasonably satisfactory to Buyer and Buyer's counsel and shall be in full force and effect.

**7.4 GOVERNMENTAL FILINGS.** The Seller shall have made any required filing with Governmental Entities in connection with this Agreement and the exhibit agreements, and any approvals related thereto shall have been obtained or any applicable waiting periods shall have expired. If a proceeding or review process by a Governmental Entity is pending in which a decision is expected, Buyer shall not be required to consummate the transactions contemplated by this Agreement until such decision is reached or rendered, notwithstanding Buyer's legal ability to consummate the transactions contemplated by this Agreement prior to such decision being reached or rendered.

**7.5 NO MATERIAL ADVERSE CHANGE.** There shall have been no material adverse change in the Purchased Assets as of the Closing Date as compared with the date of this Agreement.

**7.6 REQUIRED APPROVAL.** This Agreement and the transactions it contemplates shall have been approved and adopted by Seller's 's Board of Directors and, if applicable, by such vote of the holders of the outstanding shares of Seller's capital stock entitled to vote thereon as is required to approve such transactions, and shall have otherwise been approved as required by law and the charter documents of Seller.

**7.7 TRANSFER DOCUMENTS.** Seller shall have delivered to Buyer the Bill of Sale, and in regard to Intellectual Property, an Assignment and Assumption Agreement, in each case duly executed by Seller, and in the aggregate assigning to Buyer all of Seller's 's right, title and interest, including all Seller's rights in the Intellectual Property, in and to the Purchased Assets free and clear of all liens, other than Liens imposed or arising under this Agreement, the Transaction Documents or the Assumed Obligations and Responsibilities.

**7.8 EMPLOYEES.** Each of the employees of Seller or set forth on APPENDIX I to whom Buyer has offered employment shall have accepted the offer of employment with Buyer and shall have agreed to execute Buyer's standard form of Confidential Information and Assignment of Inventions Agreement and Buyer shall have no reason to believe that each of such Employees would not commence employment with Buyer as of the Closing Date or remain an employee of Buyer for at least six months following the Closing Date.

**SECTION 8. CLOSING REQUIREMENTS – CONDITIONS TO SELLER'S OBLIGATION**

The obligations of Seller under this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions, all or any of which may be waived in writing by Seller, except as otherwise provided by law:

8.1 REPRESENTATIONS AND WARRANTIES; PERFORMANCE; CERTIFICATES.

(a) The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as if such representations and warranties had been made or given again at and as of the Closing Date;

(b) Buyer shall have performed and complied with all of its agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or on the Closing Date;

(c) Seller shall have received a certificate, dated as of the Closing Date, signed and verified by an officer of Buyer on behalf of Buyer certifying that the matters set forth in this Section are true.

8.2 NO PROCEEDING OR LITIGATION.

(a) No preliminary or permanent injunction or other order shall have been issued by any Governmental Entity, nor shall any statute, rule, regulation or executive order be promulgated or enacted by any Governmental Entity which prevents the consummation of the transactions contemplated by this Agreement.

(b) No suit, action, claim, proceeding or investigation before any Governmental Entity shall have been commenced and be pending against any of the parties, or any of their respective Affiliates, associates, officers or directors, seeking to prevent the sale of the Purchased Assets or asserting that the sale of the Assets would be illegal or create liability for damages.

8.3 DOCUMENTS. This Agreement, any other instruments of conveyance and transfer and all other documents to be delivered by Buyer to Seller at the Closing and all actions of Buyer required by this Agreement or incidental thereto, and all related matters, shall be in form and substance reasonably satisfactory to Seller and Seller's counsel.

8.4 GOVERNMENTAL FILINGS. The Buyer shall have made any filing required with Governmental Entities, and any approvals shall have been obtained or any applicable waiting periods shall have expired. If a proceeding or review process by a Governmental Entity is pending in which a decision is expected, Seller shall not be required to consummate the transactions contemplated by this Agreement until such decision is reached or rendered, notwithstanding Seller's legal ability to consummate the transactions contemplated by this Agreement prior to such decision being reached or rendered.

SECTION 9. INDEMNIFICATION

9.1 SURVIVAL OF REPRESENTATIONS AND WARRANTIES. All covenants to be performed prior to the Closing Date, and all representations and

warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the consummation of the transactions contemplated hereby and continue until the second anniversary of the Closing Date (the "Survival Date"); provided that if any claims for indemnification have been asserted with respect to any such representations, warranties and covenants prior to the Survival Date, the representations, warranties and covenants on which any such claims are based shall continue in effect until final resolution of any claims.

9.2 INDEMNIFICATION.

(a) Subject to the limitations set forth in this Section, from and after the Closing Date, Seller shall indemnify and hold Buyer, its Affiliates and their respective officers, directors, members, stockholders, employees and agents (collectively, "Buyer Indemnified Parties") harmless against and in respect of any and all losses, costs, expenses, claims, damages, obligations and liabilities, including interest, penalties (but excluding any attorneys fees and disbursements and costs of investigation and defense) (collectively, "Damages") which any Buyer Indemnified Party may suffer, incur or become subject to arising out of any material breach of any representation or warranty of Seller made in or pursuant to this Agreement or any Transaction Document· provided that Buyer notifies Seller in writing within thirty (30) days of the claim. Seller will undertake to acquire suitable professional liability insurance during the term of this Agreement.

(b) Buyer shall indemnify and hold Seller, its Affiliates and their respective officers, directors, stockholders, employees and agents (collectively, "Seller's Indemnified Parties") harmless against and in respect of any and all Damages which any Seller Indemnified Party may suffer, incur or become subject to arising out of, based upon or otherwise in respect of any inaccuracy in or breach of any representation or warranty of Buyer made in or pursuant to this Agreement or any Transaction Document.

9.3 INTER-PARTY CLAIMS. Any Party seeking indemnification pursuant to this Section (the "Indemnified Party") shall notify the other Party from whom such indemnification is sought (the "Indemnifying Party") of the Indemnified Party's assertion of such claim for indemnification, specifying the basis of such claim ("Claim"). The Indemnified Party will promptly and with due diligence provide all material and supporting evidence and such other information as required by the Indemnifying Party. If the Indemnifying Party, within 15 business days after the receipt of such notice by the Indemnified Party, has not given written notice to the Indemnified Party either announcing its intention to contest such assertion by the Indemnified Party or asserting material absence of information, such assertion by the Indemnified Party shall be deemed provisionally accepted and the Claim

shall be acted upon as if it were deemed a valid Claim. In the event, however, that the Indemnifying Party contests the assertion of a Claim by giving such written notice to the Indemnified Party within such 15 business day period, and if the Parties, acting in good faith, cannot reach an agreement with respect to such Claim within 15 business days after such notice, the contested assertion of the Claim shall be referred to arbitration in New York, New York, in accordance with the then current rules of the American Arbitration Association. The determination made in accordance with such rules shall be delivered in writing to the Parties and shall be final and binding and conclusive on the Parties and the Performance Remedy and/or the amount of the Claim, if any, determined to exist shall be a valid Performance Remedy and/or Claim. Each Party shall pay its own legal, accounting and other fees in connection with such a contest.

9.4 THIRD PARTY CLAIMS.

(a) Each Indemnified Party shall promptly notify the Indemnifying Party of the assertion by any Person of any claim with respect to which the indemnification set forth in this Section relates; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and solely to the extent) the Indemnifying Party is prejudiced thereby. The Indemnifying Party shall have the right, upon notice to the Indemnified Party within 10 business days after the receipt of any such notice, to undertake the defence of or, with the consent of the Indemnified Party, to settle or compromise such Claim. The failure of the Indemnifying Party to give such notice and to undertake the defence of or to settle or compromise such a Claim shall constitute a waiver of the Indemnifying Party's rights under this Section and, in the absence of gross negligence or wilful misconduct on the part of the Indemnified Party, shall preclude the Indemnifying Party from disputing the manner in which the Indemnified Party may conduct the defense of such Claim or the reasonableness of any Performance Remedy and/or amount paid by the Indemnified Party in satisfaction of such Claim.

(b) The election by the Indemnifying Party, pursuant to this Section, to undertake the defense of a third-party claim shall not preclude the Party against which such claim has been made also from participating or continuing to participate in such defense, so long as such Party bears its own legal fees and expenses for so doing.

9.5 Limitation on Amount. Seller shall have no liability (for indemnification or otherwise) and Buyer shall not offset payments under the Promissory Note with respect to claims under Section 9.2 until the total of all damages with respect to such matters exceeds seventy five thousand dollars ($75,000) and then only for the amount by which such damages exceed seventy five thousand dollars ($75,000).

Initial

## SECTION 10. TERMINATION

**10.1 TERMINATION OF AGREEMENT PRIOR TO CLOSING.** This Agreement may be terminated at any time prior to the Closing:

(a) By mutual written consent of both Buyer and Seller; or

(b) By Buyer or Seller, if the other party goes into liquidation, has an application or order made for its winding up or dissolution, has a resolution passed or steps taken to pass a resolution for its winding up or dissolution, becomes unable to pay its debts as and when they fall due, or has a receiver, receiver and manager, administrator, liquidator, provisional liquidator, official manager or administrator appointed to it or any of its assets; or

(c) By Buyer or Seller if any Governmental Entity shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

**10.2 TERMINATION OF AGREEMENT SUBSEQUENT TO CLOSING.**

Should either party be found to have committed a material breach in their warranty or representations, the other party may, at its option, terminate this Agreement upon sixty (60) calendar day's written notice to the other party. Such notice shall identify and describe the default upon which termination is based. The defaulting party shall have sixty (60) calendar days after notice to cure such default which, if cured, shall prevent termination by such uncured default.

**10.3 PROCEDURE AND EFFECT OF TERMINATION.**

In the event of termination of this Agreement by either Buyer or Seller pursuant to this Section, written notice shall be given to the other parties specifying the specific termination provision invoked. In the case of termination, there shall be no liability on the part of Buyer or Seller, or their respective officers, directors, partners or Affiliates, except as a result of any breach of this Agreement by such party or to the extent such party is entitled to specific performance, indemnification or other equitable remedies as defined in this Agreement;

**10.4 TERMINATION FOR BUYER'S FAILURE TO PAY PROMISSORY NOTE.**

(a) If termination is for Buyer's failure to pay on the promissory note, beyond all applicable cure periods, Seller shall have, in addition to any other rights and remedies it may have under this Agreement or at law, the right to return of the Purchased Assets, including the software technology assets in their then current state, free and clear of all claims by Buyer or other liens or encumbrances. Buyer shall cooperate in execution of any documents necessary to

effectuate the transfer of the Purchased Assets to Seller, and shall pay all legal fees and expenses in connection with such transfer. Buyer shall establish at Closing an escrow of the design works, object code and source code included in the Purchased Assets with a third party escrow agent. Such escrow to be governed by an agreement acceptable to both Seller and Buyer providing for release of the escrow to Seller upon default of Buyer on any payment on the Promissory Note beyond applicable cure periods.

(b) Upon termination and return of assets under this Section 10.4, Buyer shall receive an ownership interest in Seller's business equal to 35% of Seller's controlling voting shares plus the following additional non-controlling, non-voting shares:

    (1) If Buyer has paid $1,000,000 of Purchase Price, Buyer shall receive 40% of Seller's non-controlling, non-voting shares.

    (2) If Buyer has paid $1,500,000 of Purchase Price, Buyer shall receive 60% of Seller's non-controlling, non-voting shares.

## SECTION 11. MISCELLANEOUS

**11.1 AMENDMENTS AND WAIVERS.** Any term of this Agreement may be amended or waived with the written consent of the parties or their respective successors and assigns. Any amendment or waiver affected in accordance with this Section shall be binding upon the parties and their respective successors and assigns.

**11.2 SUCCESSORS AND ASSIGNS.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**11.3 GOVERNING LAW; JURISDICTION.** This Agreement shall be construed in accordance with and governed by the Laws of New York and any claim and/or disputes arising in respect to this Agreement shall be settled according to New York Law.

**11.4 DISPUTE RESOLUTIONS: ARBITRATION.**

(a) Any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination or validity thereof, except any request for immediate injunctive relief necessary to prevent disclosure of confidential information, protect intellectual property rights or preserve the status quo pending arbitration hereunder, shall be finally settled in accordance with the commercial arbitration rules of the American Arbitration Association (the "AAA") then obtaining, by

INITIALS

two Arbitrators selected each by one of the Parties knowledgeable in the computer software industry appointed from the list of arbitrators supplied to the parties by the AAA, by a selection procedure determined by the AAA, and where the Arbitrators preferably have been judges. In case of further required mediation, a third Arbitrator agreeable to both Parties may be chosen.

(b) The place of arbitration shall be New York, New York, USA. The Arbitrators shall determine all questions of arbitral procedure, arbitral review, scope of arbitral authority, and arbitral enforcement and further shall determine the rights of the Parties in the event of termination including, but not limited to, interpretation of all termination-related provisions of this Agreement.

(c) The Parties agree that the award of the Arbitrators shall be the sole and exclusive remedy between them regarding any claims, counterclaims, issues or accountings presented or pled to the Arbitrators, that the award shall be made and shall be promptly payable in U.S. Dollars, free of any tax, deduction or offset, and that any costs, fees or taxes instant to enforcing the award shall, to the maximum extent permitted by law, be charged against the Party resisting such enforcement.

(d) The award shall include interest from the date or damages incurred for breach or other violation of this Agreement, and from the date of the award until paid in full, at a rate to be fixed by the Arbitrators.

11.5 FORCE MAJEURE. The Party claiming delay, difficulty, duress, or inability in the performance of any of its obligations under this Agreement by reason of Force Majeure shall use all reasonable endeavours and resources to perform throughout the continuance of Force Majeure.

11.6 COUNTERPARTS. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one instrument.

11.7 TITLES AND SUBTITLES. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

11.8 NOTICES. Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or forty-eight (48) hours after being deposited in the regular mail as certified or registered mail (airmail if sent internationally) with postage prepaid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth on the signature page hereto, or as subsequently modified by written notice.

IF TO BUYER:

URGENT: To ALL Directors
DENNEMEYER & CO. S.à.r.l.
55 rue des Bruyères,
L-1274 Howald, G.D. of Luxembourg,
Facsimile: ++352-499-841-200

Attn: John Dennemeyer or Successor

With a copy to (which shall not
constitute Notice:

Linklaters
Rue Carlo Hemmer 4
L-1734
Luxembourg
Tel: (352) 2608-1
Fax: (352) 2608-8888

IF TO SELLER:

René Kadali
9 Hampton Ct.
Basking Ridge, NJ 07920

With a copy to (which shall not
constitute Notice):

Paul D. Wigg-Maxwell
44 Pittsford Way
New Providence, NJ 07974-2829
Tel: (908) 464-4421
Fax: (908) 464-6046

**11.9 SEVERABILITY.** If one or more provisions of this Agreement are held
to be unenforceable under applicable law, the parties agree to
renegotiate such provision in good faith, in order to maintain the
economic position enjoyed by each party as close as possible to that
under the provision rendered unenforceable. In the event that the
parties cannot reach a mutually agreeable and enforceable replacement
for such provision, then (i) such provision shall be excluded from this
Agreement, (ii) the balance of the Agreement shall be interpreted as if
such provision were so excluded and (iii) the balance of the Agreement
shall be enforceable in accordance with its terms.

**11.10 ENTIRE AGREEMENT.** This Agreement, together with the exhibits and
other documents referred to herein are the product of both of the
parties hereto, and constitute the entire agreement between such
parties pertaining to the subject matter hereof and thereof, and merges
all prior negotiations and drafts of the parties with regard to the
transactions contemplated herein and therein. Any and all other written
or oral agreements existing between the parties hereto regarding such
transactions are expressly canceled.

**11.11 ADVICE OF LEGAL COUNSEL.** Each party acknowledges and represents
that, in executing this Agreement, it has had the opportunity to seek
advice as to its legal rights from legal counsel and that the person
signing on its behalf has read and understood all of the terms and
provisions of this Agreement. This Agreement shall not be construed
against any party by reason of the drafting or preparation thereof.

Confidential                    Page 26 of 8888



11.12 **FEES AND EXPENSES.** Each party shall bear its own fees and expenses (including the fees and expenses of its financial, legal, accounting and other advisors) incurred in the negotiation, documentation and delivery of the Agreement and the transactions

[End of Document – Signature Pages Follow]

This Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

On Behalf of
Dannemeyer & Company S.a.r.l

_John J. Dannemeyer_
General Technical Director

Date: _February 5 2004_

On Behalf of
Vinsoft Solutions, Inc.

_Ravi Kadali_
Chief Executive Officer

Date: _02/05/2004_

WRF, LLP FAX CTR       Fax:202-719-7049       Dec 12 2006 10:12       P.86

# EXHIBIT C

## AFFIDAVIT OF HEMA KADALI

1.     My name is Hema Kadali and I am currently employed by Dennemeyer & Co. ("Dennemeyer").

2.     I was one of the founding partners of Vinsoft Solutions, Inc. ("Vinsoft") and was employed at Vinsoft from in or about July 2001 to March 2004 as Chief Executive Officer.

3.     Ralph Schroeder ("Schroeder") served as President and Chief Intellectual Property Strategist of Vinsoft from in or about February 2003 to November 2003. Mr. Schroeder owned 250 shares of Vinsoft stock, which represented 25% of the Company.

4.     Schroeder left Vinsoft in November 2003 to become the President of Dennemeyer. Schroeder maintained his ownership of his Vinsoft shares following his resignation from Vinsoft.

5.     In March 2004, the assets of Vinsoft were purchased by Dennemeyer through an Asset Purchase Agreement. As part of this purchase, Dennemeyer made multiple payments to Vinsoft. In turn, Vinsoft made payments to Schroeder (and the other shareholders) for his ownership interest in Vinsoft.

6.     These payments were made in numerous installments as follows: In March 2004 Vinsoft paid Schroeder $159,375 and on April 27, 2004, Vinsoft paid Schroeder $53,125. On March 15, 2005, Vinsoft paid Schroeder $115,000. On March 1, 2006, Vinsoft paid Schroeder $119,000. The total sum of all payments made from Dennemeyer to Schroeder as a result of Dennemeyer's purchase of Vinsoft totaled approximately $446,500. A copy of the relevant bank records and Schedule K-1 forms are annexed hereto collectively as Exhibit 1.

7.    Accordingly, Schroeder owned shares at the time of the Vinsoft purchase by

Dennemeyer and received compensation for his ownership interest in Vinsoft through March 1,

2006.

8.    As a component of the Vinsoft Asset Purchase Agreement, Dennemeyer gained full

rights over the assets of Vinsoft and Vinsoft was required to change its corporate name. Therefore,

in the Schedule K-1 forms, Vinsoft is identified as "Vayutech Solutions, Inc."

**I declare under penalty of perjury under the laws of New Jersey that the foregoing is true and
correct to the best of my knowledge.**

Hema Kadali

City: BASKING RIDGE
State: NEW JERSEY

Sworn to before me this _9_ day of _December_ 2006,

_____, Norary Public.
My Commission Expires _February 25, 2011_.

JOAO P. PEREIRA
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES FEBRUARY 25, 2011

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DENNEMEYER & CO., LLC,

      Plaintiff,

      v.

RALPH G. SCHROEDER,

      Defendant.

Civil Action No. _____

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Rule 65(b) of the D.C. Rules of Civil Procedure, Plaintiff DENNEMEYER &

CO., LLC ("Dennemeyer"), by and through its attorneys, respectfully moves this Court to issue a

Temporary Restraining Order enjoining Defendant RALPH G. SCHROEDER ("Schroeder")

from breaching his contractual obligations with Dennemeyer for a period of ten (10) days until a

hearing on a preliminary injunction can be held.

As described more fully in Dennemeyer's Verified Complaint, the exhibits thereto, and

the accompanying Memorandum of Law in Support of the Motion for Temporary Injunction,

Dennemeyer states as follows:

    1.    Plaintiff Dennemeyer is an intellectual property management limited liability

company organized under the laws of the Commonwealth of Virginia. Defendant Schroeder is

the former President of Dennemeyer.

    2.    Upon information and belief, Schroeder has accepted employment with Anaqua, a

leading competitor of Dennemeyer. Upon information and belief, Schroeder's duties with

Anaqua will be substantially similar to his duties with Dennemeyer.

    3.    As part of an Asset Purchase Agreement between Vinsoft, in which Schroeder

1

was a major shareholder, and Dennemeyer, Schroeder is precluded from competing with Dennemeyer for a period of two (2) years. Schroeder also is precluded from competing with Dennemeyer for a period of three (3) years pursuant to his Executive Employment Agreement. Copies of both agreements are appended as exhibits to the Verified Complaint.

4.    As set forth in the accompanying Memorandum of Law: (1) Dennemeyer has a high likelihood of success on the merits of its claim that Schroeder is competing with Dennemeyer in breach of these Agreements; (2) Dennemeyer will suffer immediate and irreparable harm in the absence of a Temporary Restraining Order; (3) neither Schroeder nor any interested party will suffer any harm from the requested equitable relief; and (4) the public interest demands the enforcement of the contractual obligations between Dennemeyer and the Defendant.

5.    Pursuant to Rule 65(b), Dennemeyer has made all reasonable efforts under the circumstances to furnish counsel for Schroeder with notice of this Motion and copies of all pleading and papers filed to date in this action.

6.    Pursuant to Rule 65(c), Dennemeyer respectfully requests that this Court find that no security is required for the issuance of the Temporary Restraining Order as Schroeder will suffer no damage as a result.

WHEREFORE, Plaintiff DENNEMEYER & CO., LLC respectfully requests that this Court issue the proposed Temporary Restraining Order attached hereto.

Dated: December 12, 2006        DENNEMEYER & CO., LLC

By Counsel

2

Respectfully submitted,

Wiley Rein & Fielding LLP

By: _____

Todd A. Bromberg
Garen E. Dodge
William S. Consovoy
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049

Attorneys for Plaintiff Dennemeyer & Co.
LLC

Dated: December 12, 2006

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2006, in accordance with D.C. R. Civ.

P. 4(c), a copy of the foregoing document was served by FACSIMILE AND U.S. FIRST

CLASS MAIL upon the following:

Adrian Mendoza, Esq.
Lillig & Thorsness, Ltd.
1900 Spring Road
Suite 200
Oak Brook, Illinois 60523-1495

_____
Todd A. Bromberg

4

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

DENNEMEYER & CO., LLC,

        Plaintiff,

    v.                           Civil Action No. _____

RALPH G. SCHROEDER,

        Defendant.

## TEMPORARY RESTRAINING ORDER

This matter comes before the Court on the Verified Compliant for Breach of Contract, Declaratory Judgment, Breach of Fiduciary Duty, and Breach of Duty of Loyalty and the Motion for a Temporary Restraining Order by Plaintiff DENNEMEYER & CO., LLC ("Dennemeyer") alongside the supporting affidavit of HEMA KADALI.

Having considered these materials, as well as the arguments by Defendant, RALPH G. SCHROEDER ("Schroeder"), having heard argument of counsel, and being fully advised in the premises, the Court hereby finds that (i) Dennemeyer would be irreparably injured by Defendant's breach of the non-competition clause contained within his Executive Employment Agreement; (ii) Dennemeyer would be irreparably injured by Defendant's breach of the non-competition provision contained within the Asset Purchase Agreement to which Defendant is bound as a Vinsoft Solutions, Inc. shareholder; (iii) Dennemeyer has a substantial likelihood of success on the merits; (iv) the balance of hardships favors issuance of this Temporary Restraining Order; and (v) the public interest supports issuance of the Order.

Therefore, it is hereby:

ORDERED, ADJUDGED and DECREED that the Motion for a Temporary Restraining Order be and hereby is granted for a period of ten (10) days; and it is further

ORDERED, ADJUDGED and DECREED that Defendant RALPH G. SCHROEDER must cease any breach of the non-competition clause of his Executive Employment Agreement with Plaintiff;

ORDERED, ADJUDGED and DECREED that Defendant RALPH G. SCHROEDER must cease any breach of the non-competition clause of the Asset Purchase Agreement to which he is bound as a shareholder of Vinsoft Solutions, Inc.

So ordered this _____ day of _____, 2006.

_____
District of Columbia Superior Court Judge

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DENNEMEYER & CO., LLC,

          Plaintiff,

    v.

RALPH G. SCHROEDER,

          Defendant.

Civil Action No. _____

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Rule 65(b) of the Superior Court Rules of the District of Columbia, Plaintiff

DENNEMEYER & CO., LLC ("Dennemeyer"), by and through its attorneys, submits this

Memorandum of Law in Support of its Motion for Temporary Restraining Order, and states as

follows:

### I.    FACTUAL BACKGROUND

Dennemeyer is an intellectual property management company, providing the highest

quality intellectual property services to law firms and corporations throughout North America. It

has offices in three American cities and has both national and international clients. *See* Compl.

¶ 4. Vinsoft Solutions, Inc. ("Vinsoft") was a company that developed intellectual property

management software. *See* Compl. ¶ 5. Its key personnel were the Defendant in this action,

Ralph G. Schroeder ("Schroeder"), President and Chief Intellectual Property Strategist of

Vinsoft, as well as Harish Sethuraman, Vice President of Development of Vinsoft, and Hema

Kadali, Chief Executive Officer. *See id.* While at Vinsoft, Schroeder specialized primarily in

the software end of the business. *See id.*

1

On or about July 2003, Schroeder approached Dennemeyer to see if the company was interested in purchasing Vinsoft. *See* Compl. ¶ 6. The companies entered into negotiations and began to finalize the details of the purchase. *See id.* Before the final purchase agreement was signed between the two companies, Schroeder left his position at Vinsoft to accept employment at Dennemeyer. *See id.* Schroeder signed his Executive Employment Agreement with Dennemeyer on November 6, 2003. *See* Exhibit A.

Upon joining Dennemeyer, Schroeder immediately became the key player in the inner workings of the company because of his authority as President, his extensive knowledge of the Vinsoft software, and his strategic insight into Dennemeyer clients and projects. *See* Compl. ¶ 8. At Dennemeyer, Schroeder was able to combine the technical software expertise he obtained from employment at Vinsoft with Dennemeyer's reputation and clients to position himself favorably within the industry. *See* Compl. ¶ 9. Schroeder utilized Dennemeyer's product and marketing image to gain the favor of the industry. *Id.* Additionally, Dennemeyer funded Schroeder's travel to various conferences and industry meetings, where Schroeder gained individual exposure and recognition. *Id.*

On February 5, 2004, Vinsoft, represented by Chief Executive Officer Hema Kadali, was purchased by Dennemeyer. *See* Compl. ¶ 11. The Vinsoft Asset Purchase Agreement ("Purchase Agreement") provided for a payment of one million dollars ($1,000,000) at Closing, a second payment of five hundred thousand dollars ($500,000) at the one year anniversary of the Closing Date, and a third payment of five hundred thousand dollars ($500,000) at the two year anniversary of the Closing Date. *See* Exhibit B, § 2.1. Upon information and belief, multiple payments totaling nearly $446,500 were made to Schroeder. *See* Compl. ¶ 13, *see also* Affidavit of Hema Kadali. Specifically, in March 2004, Vinsoft paid Schroeder $159,375 and on April 27,

2

2004, Vinsoft paid Schroeder $53,125. *See* Affidavit of Hema Kadali. On March 15, 2005, Vinsoft paid Schroeder $115,000. *See id.* On March 1, 2006, Vinsoft paid Schroeder $119,000. *See id.; see also* Compl. ¶ 13. Although Dennemeyer had requested and preferred that Schroeder sell his Vinsoft stock, Schroeder chose not to do so and remained a shareholder even after leaving his position as Vinsoft Chief Intellectual Property Strategist. *See* Compl. ¶ 13.

The Purchase Agreement includes a non-competition agreement that covers Vinsoft's shareholders, officers, directors or employees for two (2) years after the completion of the Payment Schedule or post-employment relationship, whichever is longer. *See* Exhibit B, § 5.9(a). The Payment Schedule was completed on February 5, 2006, which means the non-competition provision remains in effect until at least February 5, 2008. *See* Compl. ¶ 14. As a shareholder when the Purchase Agreement was signed, Schroeder is bound by the non-competition provision. *See id.*

As President of Dennemeyer, Schroeder had unlimited access to all projects, client lists, business strategies, product knowledge, and company information. *See* Compl. ¶ 10. He handled most of the Dennemeyer's most lucrative clients and was involved in the biggest and most important business deals and in all key decisions made by Dennemeyer. *See id.* Additionally, Schroeder gained extensive knowledge of all aspects of Dennemeyer products, services, client lists, and confidential information. *See* Compl. ¶ 22. He gained special knowledge and familiarity with Dennemeyer's clients and their requirements. Yet upon information and belief, during his last months as President of Dennemeyer, Schroeder used Dennemeyer's corporate resources to travel to the offices of Anaqua, a direct competitor of Dennemeyer, and discussed employment possibilities with that company. *See* Compl. ¶ 15. During that same time period, upon information and belief, Schroeder also attempted to gain

3

ownership in Dennemeyer by threatening to leave the company unless he was given stock options. *See* Compl. ¶ 16.

On October 16, 2006, Schroeder resigned from his position at Dennemeyer. *See* Compl. ¶ 17. At the company's request, Schroeder agreed to stay on at Dennemeyer to assist for a brief period while a new president was hired. *See* Compl. ¶ 18. During the transition period, Schroeder stated to Dennemeyer executives that he did not know where he would work next and had promised his wife he would take six months off before starting a new position. *See* Compl. ¶ 19. Additionally, Schroeder's attorney stated in a conversation to Dennemeyer counsel that Schroeder was not working for any other entity at the time and he was uncertain where Schroeder would work next. *See id.* Upon information and belief, Schroeder was already well into negotiations with Anaqua at the time of these statements. *See id.* Upon information and belief, three days after the transition period ended, on November 18, 2006, Schroeder signed an employment contract with Anaqua, a provider of intellectual asset management services, and one of Dennemeyer's primary competitors. *See* Compl. ¶ 20.

Upon information and belief, Schroeder's employment at Anaqua would entail substantially similar duties to those he performed at Dennemeyer and would result in irreparable harm to Dennemeyer. *See* Compl. ¶ 22. Schroeder has extensive knowledge of Dennemeyer's business processes and confidential fiduciary and proprietary information, and will utilize this knowledge on behalf of Anaqua to undermine Dennemeyer in the market. *See* Compl. ¶ 23. While at Dennemeyer, Schroeder was extensively involved in formulating the company's pricing strategy to maintain Dennemeyer's competitive edge in the limited and specialized intellectual property management market. *See id.* His knowledge will allow him to undermine the company

by enhancing Anaqua's competitive pricing to undercut the very pricing strategy he designed at

Dennemeyer. *See id.*

## II.    LEGAL ARGUMENT

This Court should grant Dennemeyer's Motion for a Temporary Restraining Order

preventing Schroeder from breaching the terms of: (1) the Purchase Agreement; and (2) his

Executive Employment Agreement.  Superior Court Rule 65(b) authorizes the issuance of a

temporary restraining order against an party when "immediate and irreparable injury, loss, or

damage will result to the applicant . . . ."  The decision to grant or deny preliminary injunctive

relief lies within the "sound discretion of the trial court." *Stamenich v. Markovic*, 462 A.2d 452,

456 (D.C. 1983).

The purpose of a temporary restraining order is to preserve the status quo and to prevent

imminent, irreparable harm pending a hearing on a motion for a preliminary injunction.  *See*

D.C. Superior Court Rule 65(b); *see also Levy v. Arsenault*, 63 A.2d 671, 672 (D.C. 1949).  In

determining whether a temporary restraining order is warranted, the trial court will "consider

whether the moving party has demonstrated: (1) that there is a substantial likelihood that he will

prevail on the merits; (2) that he is in danger of suffering irreparable harm during the pendency

of the action; (3) that more harm will result to him from the denial of the injunction than will

result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will

not be disserved by the issuance of the requested order." *Wieck v. Sterenbuch*, 350 A.2d 384,

387 (D.C. 1976).  These four factors are not considered in isolation from one another, and no one

factor is necessarily dispositive. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d

738, 746 (D.C. Cir. 1995).  Rather, the factors "interrelate on a sliding scale and must be

5

balanced against each other." *Davenport v. International Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999) (citations omitted). Dennemeyer satisfies each element of this four-part test.

**A.     Dennemeyer is Likely to Succeed on the Merits of its Claim.**

     **1.     Schroeder is in Breach of the Purchase Agreement.**

The Purchase Agreement provides that, in exchange for valuable consideration of two million dollars ($2,000,000), none of Vinsoft's

> shareholders, officers, directors or employees, will for two (2) years of the completion of the Payment Schedule or post-employment relationship, which ever is longer: (i) participate, assist or otherwise be directly or indirectly involved or concerned, financially or otherwise, as a member, director, consultant, advisor, contractor, principal, agent, manager, beneficiary, partner, associate, trustee, financer, or otherwise in any business or activity whose focus is on the development, marketing, sale or license of software products for the purpose of intellectual property management software or services; or (ii) interfere or seek to interfere, directly or indirectly, with any relationship between Buyer and any client, customer, prospective customer, employee or supplier of Buyer's business.

Exhibit B, § 5.9. The Payment Schedule was completed on February 5, 2006. *See* Comp. ¶ 14. Upon information and belief, Schroeder remained a shareholder until the final payment was made from Vinsoft to Schroeder in accordance with the Asset Purchase Agreement on March 1, 2006. *See* Affidavit of Hema Kadali ¶¶ 6-7. Accordingly, Schroeder is bound by the terms of the Purchase Agreement. Schroeder's employment with Anaqua is in direct breach of this agreement. The enforceability of this Agreement is governed by New York law. *See* Exhibit B, § 11.3.[1]

---

[1]     The Purchase Agreement provides that substantive breaches should be resolved via arbitration. *See* Exhibit B, § 11.4. The Purchase Agreement also provides, however, that Dennemeyer is permitted to seek injunctive relief. *See id.* § 11.4. Accordingly, as contemplated by the Purchase Agreement, Dennemeyer asks this Court to issue a temporary restraining order, and ultimately a preliminary injunction, to allow arbitration to proceed in the normal course. *See* N.Y. CPLR § 7502(c) (A court may "entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitration that is pending or that is to be

Under New York law, "[w]here . . . there is a sale of a business, involving as it does the transfer of its good will as a going concern, the courts will enforce an incidental covenant by the seller not to compete with the buyer after the sale." *Purchasing Associates, Inc. v. Weitz*, 196 N.E.2d 245, 247 (N.Y. 1963). "This rule is grounded, most reasonably, on the premise that a buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value." *Id.* (citations omitted); *see also Kraft Agency, Inc. v. Delmonico*, 494 N.Y.S.2d 77, 82 (N.Y.A.D. 4 Dept. 1985) (recognizing "legitimate interests of a purchaser of good will in preventing the seller from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value") (citations and quotations omitted).[2]

Such an agreement is enforceable so long as it is "'reasonable,' that is, not more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought." *Purchasing Associates, Inc.*, 196 N.E.2d at 247 (citations omitted); *see also Town Line Repairs, Inc. v. Anderson*, 455 N.Y.S.2d 28, 29 (N.Y.A.D. 2 Dept. 1982) ("Covenants not to compete pursuant to sale of a business are not treated as strictly as those whose sole purpose is to limit employment."). The Purchase

---

commenced inside or outside this state, . . . but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."); *Merck & Co., Inc. v. Technoquimicas S.A.*, No. 01-5345, 2001 WL 963977, *2 (S.D.N.Y. 2001) (unpublished) (explaining that "a plaintiff must also show that he meets the traditional equitable criteria for preliminary relief . . . e.g., a danger of irreparable harm, a likelihood of prevailing on the merits, and a balance of equities in plaintiff's favor").

[2]    This rule applies with equal force to any "owner, partner or major stockholder of a commercial enterprise has sold his interest for an immediate consideration." *Purchasing Associates, Inc.*, 196 N.E.2d at 247 (citations omitted); *see also Shearson Lehman Bros. Holdings, Inc. v. Schmertzler*, 500 N.Y.S.2d 512, 517 (N.Y.A.D. 1 Dept. 1986).

7

Agreement is "reasonable" under New York law as it was manifestly necessary for "the protection of [the company's] legitimate interest in the enjoyment of the asset bought." *Sager Spuck Statewide Supply Co. Inc. v. Meyer*, 710 N.Y.S.2d 429, 432 (N.Y.A.D. 3 Dept. 2000).

The two-year limitation on Schroeder's ability to compete with Dennemeyer is entirely reasonable. *See, e.g., Hay Group, Inc.*, 566 N.Y.S.2d at 617 (enforcing "covenants expressly barring [plaintiffs] from working for a competitor for a period of two years after leaving the company"); *Zinn v. Sacks*, 63 N.Y.S.2d 156, 157 (N.Y.A.D. 1 Dept. 1946) ("The [two-year] covenant was a part of the consideration of the contract for which a large sum of money was paid. The evidence discloses a substantial violation on the part of the defendant. His general course of conduct indicates a deliberate intention to evade compliance with its provisions. The covenant should be enforced according to its terms."). The present case is no exception.

In addition, the Agreement is confined to competition with respect to "intellectual property management software or services"— a sufficiently narrow limitation on competition. *See, e.g., De Long Corp. v. Lucas*, 176 F. Supp. 104, 121 (S.D.N.Y. 1959) (enforcing covenant because "[t]he restriction applied only to the limited, and at that time unique, field in which DeLong was engaged" and thus "Lucas was free during the no-competition period to employ his engineering and business skills freely except in the narrow and limited field of DeLong's activities").[3] As the court explained:

---

[3]    The covenant in *Delong* provided that:

> For a period of two (2) years after the signing of this Agreement not to compete or assist anyone to compete with the First Party in any business related to the Second Party's former employment by the First Party consisting of engineering and sales of docks, barges, platforms and similar equipment for marine and/or oil field use including equipment making use of self-elevating mechanisms, pneumatic, mechanical, manual or otherwise any place in the world.

DeLong had developed and established a unique business in the highly specialized field of self-elevating over-water structures. Lucas ... participated in the development and expansion of DeLong's business at a crucial period. He acquired a wealth of practical experience and technical knowledge concerning the plaintiff's equipment, methods and operations, and was familiar with the highly confidential aspects of the DeLong business, including the developments to overcome practical problems encountered on various projects in which DeLong had been engaged. Moreover, he knew that DeLong was taking steps to acquire patent protection for its equipment and methods and was familiar with the details of the design and practical operation of its development program.

*Id.* at 120-21.

Indeed, as the court explained, Lucas's experience and stature contributed to the enforceability of the covenant: "Lucas was no minor employee engaged in routine tasks. He was well paid and had in addition a substantial stake in the profits of ventures which he himself brought in. Indeed, on the Orinoco job alone he had been paid some $200,000 as his share of the profits." *Id.* at 121. As President of Dennemeyer, Schroeder was in a comparable position. Schroeder was a highly paid corporate executive who profited greatly from his relationship with Dennemeyer and the attendant purchase of Vinsoft. *See* Compl. ¶ 22. Furthermore, he was able to gain intimate knowledge of Dennemeyer's business operations, its clients, and its plans for developments of its business and products. *See id.* Schroeder should not be permitted to use this information to Anaqua's advantage in direct breach of the Purchase Agreement.

Last, the absence of a geographic limitation does not detract from the enforceability of this provision. New York courts have routinely upheld non-competition agreements without geographic limitations where the business involved was national or international in character. *See, e.g., N.W. Ayer & Son, Inc. v. Deare,* No. 98-7867, 1998 WL 811873, *3 (S.D.N.Y. Nov. 18, 1998) (enforcing non-competition agreement because "[e]ven though, the covenants in the non-competition agreements contain no geographic limitation" because the businesses involved

*Id.* at 120-21.

9

"operate[d] on an international level"); *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F. Supp. 547,

559 (E.D.N.Y. 1995) (explaining that "restrictive covenants of broad or unlimited geographic

scope have been upheld where such restrictions were reasonable in view of the specific facts of

the case"); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F. Supp.

709, 728 (S.D.N.Y. 1995) ("[W]hile the geographic scope encompassing the continental United

States was rather broad, such a restriction is reasonable in light of the national scope of INI's

business."); *Business Intelligence Services, Inc. v. Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y.

1984) (finding "the worldwide scope of the noncompetition clause not unreasonable, given the

international nature of BIS's business").

    The type of business involved here, which involved highly sophisticated computer

software programs for large corporations, is international in nature. *See* Compl. ¶ 4. More

specifically, the "intellectual property management software or services" field is dominated by

four key competitors including Anaqua—Dennemeyer's chief rival. *See* Compl. ¶ 21. A

geographic limitation is simply inapposite to the type of business involved in the present case.

Accordingly, a complete geographic ban, under such circumstances, is enforceable under New

York law.

    2.    Schroeder is in Breach of the Employment Agreement.

    Under the terms of his employment contract, Schroeder agreed that, for three years

following his employment, he would not "directly or indirectly, own, manage, operate, control,

be employed by . . . or render services to any person, firm, corporation or other entity, in

whatever form, engaged in any business of the same type as any business in which

[Dennemeyer] or any of their subsidiaries or affiliates is engaged on the date of termination."

*See* Exhibit A § 11. Schroeder's recent decision to accept employment with Anaqua, a direct

10

competitor of Dennemeyer, immediately following his resignation from Dennemeyer, is in direct violation of the non-competition clause under which he agreed to be bound.

This agreement, which was executed to protect Dennemeyer's legitimate and legally protectable business interests, is fully enforceable. Under the law of the District of Columbia, such an agreement is enforceable unless: "(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." *Ellis v. James v. Hurson Associates, Inc.*, 565 A.2d 615, 618 (D.C. App. 1989); *see also Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 237 (D.D.C. 1996). Dennemeyer is likely to prevail under this standard.

*First*, Dennemeyer has a significant and legitimate interest in protecting its confidential trade information, customer lists and customer relationships through the enforcement of its non-competition agreement with the Schroeder. Over multiple years, Dennemeyer invested significant time and energy into cultivating the Schroeder's expertise in its business. *See* Compl. ¶ 10. As the President of Dennemeyer, Schroeder gained incredibly valuable knowledge about Dennemeyer's products, its business practices, and its business relationships. *See* Compl. ¶ 22. Upon information and belief, Schroeder plans to use this knowledge to the advantage of Anaqua—a direct competitor. *See id.*

In the District of Columbia, an employer has a legitimate and protectable interest in "trade secrets, confidential knowledge, expert training or fruits of employment." *Saul v. Thalis*, 156 F. Supp. 408, 412 (D.D.C. 1957). Non-competition agreements were created as a mechanism to protect an employer's legitimate interest in its confidential trade information and other proprietary information following an employee's termination. *See, e.g., Ellis*, 565 A.2d at 618-19 (noting that non-competition agreements are often defended as a means to protect an

11

employer's "confidential trade information"). Dennemeyer engages in the sensitive business of intellectual property management, which involves extensive competitive strategy. While employed with Dennemeyer, Schroeder had access to confidential information the exposure of which could greatly diminish Dennemeyer's competitive edge in the field. The non-competition agreement between Dennemeyer and Schroeder must be enforced to ensure that Dennemeyer's confidential trade information is not utilized to its detriment by competitors.

*Second*, Dennemeyer's agreement with Schroeder is no more extensive than necessary to meet is legitimate interests in confidentiality. In considering the reasonableness of this agreement, the court should consider "the nature of the business, the character of the service performed by, and the station of, the employee, in relation to the area in which the former employer seeks to be protected." *Deutsch v. Barsky*, 795 A.2d 669, 674 (D.C. Cir. 2002) (citing *Chemical Fireproofing Corp. v. Krouse*, 155 F.2d 422, 423 (D.C. Cir 1946). Here, Schroeder was a top executive with Dennemeyer, and obtained proprietary information concerning the business's strategies, approaches, products, client-development techniques and customer information. Additionally, the "nature of the business" in this case is particularly sensitive and largely strategy-based, given that Dennemeyer is engaged in the management of patents and other intellectual property matters. *See* Compl. ¶ 4. Within this context, the non-competition agreement between Dennemeyer and Schroeder was a more than reasonable means to protect its legitimate interests.

*Last*, the non-competition agreement is likely to be enforced because it is reasonable in its scope. The agreement is restricted to a period of three years. This three-year period is typical in employment non-competition agreements and ensures that the employer's confidential proprietary information is maintained in the years immediately following an employee's

12

resignation. *See Ellis*, 565 A.2d at 621 (finding that "the three year time duration of the restraining covenant was sufficiently reasonable" and that "agreements limiting competition for a period well in excess of three years have been sustained in this jurisdiction") (citations omitted). Indeed, in the District of Columbia, agreements of equal or greater length have been routinely enforced. *See, e.g., Erikson v. Hawley*, 12 F.2d 491, 491 (D.C. Cir. 1926) (enforcing covenant not to complete that was effective for ten years following termination of employment); *Meyer v. Wineburgh*, 110 F. Supp. 957, 957-58 (D.D.C. 1953) (enforcing non-competition agreement that was effective for five years following termination of employment); *Burton, Parsons & Co. v. Parsons*, 146 F. Supp. 114, 115 (D.D.C. 1956) (enforcing a ten-year non-competition agreement).

Additionally, courts applying the law of the District of Columbia have enforced non-competition agreements which were not limited in geographic scope. *See, e.g., Parsons*, 146 F. Supp. at 116 (enforcing nationwide non-competition agreement since "reasonable interpretation of the agreement is that it was intended to protect plaintiff against competition . . . where plaintiff has done and is now doing business"); *Johnson v. MPR Associates, Inc.*, 894 F. Supp. 255, 258 (E.D. Va. 1994) (enforcing three-year non-competitive clause of employee's stock transfer agreement which contained no geographic limitation under District of Columbia law). Therefore, it is highly likely a court will determine that Schroeder's agreement was both reasonable and enforceable as applied to Schroeder.

Last, Dennemeyer's need for enforcement of the agreement will far outweigh any harm that the agreement imposes upon Schroeder. Schroeder, a top-level corporate executive, entered into the Executive Employment Agreement on his own accord, and understood the terms and conditions put forth within its provisions. The purpose of agreement was, in part, to protect

13

Dennemeyer from losing clients should Schroeder leave the company. Indeed, courts in the District of Columbia have stressed the importance of "the right to contract and the policy of the courts to see that this right is not unreasonably abridged." *Deutsch*, 795 A.2d at 674 (citations omitted). Given that Schroeder entered into the non-competition agreement on his own accord, any hardship he alleges from the enforcement of the provision will not outweigh Dennemeyer's compelling basis for the provision's enforcement. The also can be no contention that the interest of the public is in anyway harmed by the enforcement of this provision.[4]

**B.    Dennemeyer Will Suffer Irreparable Harm Without a Temporary Restraining Order.**

Dennemeyer will suffer significant irreparable harm if the temporary restraining order is not issued. With respect to Schroeder's breach of the Purchase Agreement, which is governed by New York law, "irreparable injury is presumed from the breach of a non-competition agreement entered into to protect a buyer's purchase of a business and accompanying goodwill." *Manhattan Real Estate Equities Group LLC v. Pine Equity, NY, Inc.*, 791 N.Y.S.2d 418, 419 (N.Y.A.D. 1 Dept. 2005); *see also Lund v. Agmata Washington Enters., Inc.*, 593 N.Y.S.2d 517, 518 (N.Y.A.D. 1 Dept. 1993); *Hay Group, Inc. v. Nadel*, 566 N.Y.S.2d 616 (N.Y.A.D. 1 Dept. 1991). Moreover, absent an injunction, the arbitration of this aspect of the dispute would be rendered meaningless. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d

---

[4]    Even if the non-competition agreement is overbroad, which it is not, both District of Columbia and New York courts will enforce those parts of the agreement that are unobjectionable or reform the agreement to include enforceable terms and conditions. *See Ellis*, 565 A.2d at 617 ("In keeping with the great weight of modern authority, we join those jurisdictions which have rejected the view that covenants not to compete must be enforceable in whole or not at all.") (citations and footnote omitted); *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 277 (E.D.N.Y. 2002) ("If a court finds a limitation to be unreasonable, it can 'blue pencil' the covenant to restrict the term to a reasonable geographic limitation, and grant partial enforcement for the overly broad restrictive covenant.") (citing *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1226 (N.Y. 1999)).

14

1048, 1054 (4th Cir. 1985) ("[P]reliminary injunctive relief pending arbitration furthers congressional policy by ensuring that the dispute resolution would be a meaningful process because, without such an injunction, Bradley's conduct might irreversibly alter the status quo.").

Second, with respect to breach of the Executive Employment Agreement, which is governed by District of Columbia law, irreparable harm exists because Dennemeyer is likely to face the loss of customers and goodwill. This is the quintessential irreparable injury that warrants temporary injunctive relief. *See, e.g., Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (agreeing with plaintiff that it would "suffer irreparable harm from the loss of the confidentiality of customer information and the concomitant loss of customer trust and goodwill"); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34 (D.D.C. 2002) (explaining that loss of customers and "investments that would have flowed from the customers' accounts" constituted "irreparable non-compensable harm").

Schroeder—despite making assurances to the contrary—has already accepted employment with Anaqua, one of Dennemeyer's leading competitors. *See* Compl. ¶ 19, 20. If this employment is allowed to continue, Schroeder will be able to utilize Dennemeyer's confidential proprietary information to benefit Anaqua. *See* Compl. ¶ 22, 23. Moreover, as President of Dennemeyer, and as one of its leading officers, Schroeder had unlimited access to all of the company's confidential information, business strategies and customer information. *See* Compl. ¶ 10. The exposure of this information will significantly undermine Dennemeyer's competitive position within the market for intellectual property management. *See* Compl. ¶ 25. Indeed, the damages from Schroeder's use of such information to benefit Dennemeyer's direct competition are incalculable. Accordingly, a temporary injunction is necessary to ensure that Dennemeyer does not suffer irreparable harm during the pendancy of this action.

15

C.    **Neither Schroeder Nor the Public Will Be Harmed By Issuance of Temporary Restraining Order.**

Schroeder will not be harmed by the issuance of a temporary restraining order preventing him from breaching his contractual obligations to Dennemeyer. Prior to his departure, Schroeder told Dennemeyer's representatives that he was going to take six months off before further employment based upon a promise he had made to his wife. See Compl. ¶ 19. Moreover, there is no evidence that Schroeder will suffer any financial injury during the ten (10) day period in which the temporary injunction will be in effect. Accordingly, Schroeder will not be harmed by the issuance of a temporary restraining order.

Likewise, the public will benefit from the issuance of a temporary restraining order given that such preliminary injunctive relief will advance the fundamental principles of contract law. *De Long Corp.*, 176 F. Supp. at 122 ("Under these circumstances it would be in the public interest to have the fruits of DeLong's ingenuity, skill, enterprise, industry and capital investment protected against competition by Lucas in this restricted field rather than the contrary."). Moreover, it is well settled that under the District of Columbia law "the right to contract" is paramount. *Deutsch*, 795 A.2d at 674. Indeed, the importance of contract "has been a dominant one in the affairs of men since the beginning of recorded history." *Erikson v. Hawley*, 12 F.2d 491, 496 (D.C. Cir. 1926). It is in the public interest for contracting parties to have those reasonable contract provisions enforced. Additionally, it is in the public interest to ensure that individuals are discouraged from breaching a contract provision they wholly accepted as a condition of employment.

## III.    CONCLUSION

For all of these reasons, we ask this Court to grant Dennemeyer's Motion for a Temporary Restraining Order.

16

Respectfully submitted,

Wiley Rein & Fielding LLP

By: _____
Todd A. Bromberg
Garen E. Dodge
William S. Consovoy
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049

Attorneys for Plaintiff Dennemeyer & Co.
LLC

Dated: December 12, 2006

17

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2006, in accordance with D.C.R. Civ. P. 4(c), a copy of the foregoing document was served by **FACSIMILE AND U.S. FIRST CLASS MAIL** upon the following:

Adrian Mendoza, Esq.
Lillig & Thorsness, Ltd.
1900 Spring Road
Suite 200
Oak Brook, Illinois 60523-1495

Todd A. Bromberg

18

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DENNEMEYER & CO., LLC,

        Plaintiff,

        v.

RALPH G. SCHROEDER,

        Defendant.

Civil Action No. _____

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65(a) of the D.C. Rules of Civil Procedure, Plaintiff DENNEMEYER & CO., LLC ("Dennemeyer"), by and through its attorneys, respectfully moves this Court to issue a Preliminary Injunction enjoining Defendant RALPH G. SCHROEDER ("Schroeder") from breaching his contractual obligations with Dennemeyer during the pendency of this action.

As described more fully in Dennemeyer's Verified Complaint, the exhibits thereto, and the accompanying Memorandum of Law in Support of the Motion for Temporary Injunction, Dennemeyer states as follows:

1.      Plaintiff Dennemeyer is an intellectual property management limited liability company organized under the laws of the Commonwealth of Virginia. Defendant Schroeder is the former President of Dennemeyer.

2.      Upon information and belief, Schroeder has accepted employment with Anaqua, a leading competitor of Dennemeyer. Upon information and belief, Schroeder's duties with Anaqua will be substantially similar to his duties with Dennemeyer.

3.      As part of an Asset Purchase Agreement between Dennemeyer and Vinson Solutions, Inc., a company in which Schroeder was a major shareholder, Schroeder is precluded

1

from competing with Dennemeyer for a period of two (2) years. Schroeder also is precluded from competing with Dennemeyer for a period of three (3) years pursuant to his Executive Employment Agreement. Copies of both agreements are appended as exhibits to the Verified Complaint.

4.    As set forth in the accompanying Memorandum of Law: (1) Dennemeyer has a high likelihood of success on the merits of its claim that Schroeder is competing with Dennemeyer in breach of these Agreements; (2) Dennemeyer will suffer immediate and irreparable harm in the absence of a preliminary injunction; (3) neither Schroeder nor any interested party will suffer any harm from the requested equitable relief; and (4) the public interest demands the enforcement of the contractual obligations between Dennemeyer and the Defendant.

WHEREFORE, Plaintiff DENNEMEYER & CO., LLC respectfully requests that this Court issue the proposed Preliminary Injunction attached hereto.

Dated: December 12, 2006

DENNEMEYER & CO., LLC

By Counsel

2

Respectfully submitted,

Wiley Rein & Fielding LLP

By: _____
Todd A. Bromberg
Garen E. Dodge
William S. Consovoy
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049

Attorneys for Plaintiff Dennemeyer & Co.,
LLC

Dated: December 12, 2006

3

WRF, LLP FAX CTR        Fax:202-719-7049        Dec 12 2006  9:54    P.29

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2006, in accordance with D.C. R. Civ.

P. 4(c), a copy of the foregoing document was served by FACSIMILE AND U.S. FIRST

CLASS MAIL upon the following:

Adrian Mendoza, Esq.
Lillig & Thorsness, Ltd.
1900 Spring Road
Suite 200
Oak Brook, Illinois 60523-1495

Todd A. Bromberg

4

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

DENNEMEYER & CO., LLC,

        Plaintiff,

    v.

RALPH G. SCHROEDER,

        Defendant.

Civil Action No. _____

## PRELIMINARY INJUNCTION

This matter comes before the Court on the Verified Compliant for Breach of Contract, Declaratory Judgment, Breach of Fiduciary Duty, and Breach of Duty of Loyalty and the Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiff DENNEMEYER & CO., LLC ("Dennemeyer") alongside the supporting affidavit of HEMA KADALI.

Having considered these materials, as well as the arguments by Defendant, RALPH G. SCHROEDER ("Schroeder"), having heard argument of counsel, and being fully advised in the premises, the Court hereby finds that (i) Dennemeyer would be irreparably injured by Defendant's breach of the non-competition clause contained within his Executive Employment Agreement; (ii) Dennemeyer would be irreparably injured by Defendant's breach of the non-competition provision contained within the Asset Purchase Agreement to which Defendant is bound as a Vinsoft Solutions, Inc. shareholder; (iii) Dennemeyer has a substantial likelihood of success on the merits; (iv) the balance of hardships favors issuance of this Temporary Restraining Order and Preliminary Injunction; and (v) the public interest supports issuance of the Order.

Therefore, it is hereby:

ORDERED, ADJUDGED and DECREED that the Motion for a Preliminary Injunction be and hereby is granted for the pendency of this action; and it is further

ORDERED, ADJUDGED and DECREED that Defendant RALPH G. SCHROEDER must cease any breach of the non-competition clause of his Executive Employment Agreement with Plaintiff;

ORDERED, ADJUDGED and DECREED that Defendant RALPH G. SCHROEDER must cease any breach of the non-competition clause of the Asset Purchase Agreement to which he is bound as a shareholder of Vinsoft Solutions, Inc.

So ordered this ____ day of _____, 2006.

_____
District of Columbia Superior Court Judge

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DENNEMEYER & CO., LLC,

Plaintiff,

v.

RALPH G. SCHROEDER,

Defendant.

Civil Action No. _____

## MOTION FOR EXPEDITED DISCOVERY
## AND FOR ORDER PRESERVING EVIDENCE

COMES NOW Plaintiff, Dennemeyer & Co., LLC ("Dennemeyer" or "Plaintiff"), by Counsel, and for its Motion for Expedited Discovery and for Order Preserving Evidence, states as follows:

1.     This Motion is made pursuant to Part 5 of the D.C. Rules of Civil Procedure, specifically, Rules 33(b)(3) and 34(b), which provide that the court may allow a shorter or longer time to respond to interrogatories and requests for production of tangible things.

2.     The underlying suit involves the breach by a former Dennemeyer employee, Defendant Ralph G. Schroeder ("Defendant"), of his Executive Employment Agreement and Vinsoft Asset Purchase Agreement with Dennemeyer.

3.     Dennemeyer also has filed a Motion for Temporary Restraining Order and has requested to be heard by the Court as soon as possible on that Motion.

4.    The nature of the matter is more fully set forth in the Complaint, and the basis for the Motion for Temporary Restraining Order is more fully set forth in the Motion.

5.    Defendant possesses relevant information, the discovery of which by Dennemeyer is relevant to the Motion for Preliminary Injunction.

6.    Plaintiff moves for an order that preserves such evidence and that orders Defendant to respond to Plaintiff's First Interrogatories and Requests for Production to Defendant (attached hereto as Exhibit A) within ten (10) days of being served therewith, and which orders the preservation of all relevant evidence possessed by Defendant, including, but not limited to, the information sought in Plaintiff's First Interrogatories and Requests for Production to Defendant. The discovery requests are narrowly tailored to discover relevant information, and good cause exists for the Court to enter the proposed order attached hereto as Exhibit B.

WHEREFORE, for the foregoing reasons, Plaintiff Dennemeyer & Co., LLC, by counsel, respectfully requests this Court to:

1.    Enter the Order attached hereto as Exhibit B;

2.    Order that Defendant respond to Plaintiff's First Interrogatories and Requests for Production of Documents within ten (10) days of being served therewith as directed in the Order attached hereto as Exhibit B; and

3.    Order that Defendant preserve all relevant information relating to the claims made in the Complaint including, but not limited to, the information sought in Plaintiff's First Interrogatories and Requests for Production of Documents.

WRF, LLP FAX CTR    Fax:202-719-7049    Dec 12 2006 10:14    P.93

DENNEMEYER & CO., LLC

By Counsel

Respectfully submitted,

Wiley Rein & Fielding LLP

By: _____
Todd A. Bromberg
Garen E. Dodge
William S. Consovoy
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049

Attorneys for Plaintiff Dennemeyer & Co.,
LLC

Dated: December 12, 2006

WRF, LLP FAX CTR        Fax:202-719-7049        Dec 12 2006 10:14        P. 94

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2006, in accordance with D.C.

R. Civ. P. 4(c), a copy of the foregoing document was served by FACSIMILE AND

U.S. FIRST-CLASS MAIL upon the following:

Adrian Mendoza, Esq.
Lillig & Thoraness, Ltd.
1900 Spring Road
Suite 200.
Oak Brook, Illinois 60523-1495

Todd A. Bromberg

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DENNEMEYER & CO., LLC,

    Plaintiff,

    v.

RALPH G. SCHROEDER,

    Defendant.

Civil Action No:

## ORDER FOR EXPEDITED DISCOVERY
## AND PRESERVING EVIDENCE

It appearing to the Court that it is just and proper to do so and that good cause has been shown, it is hereby ORDERED, ADJUDGED and DECREED that Plaintiff's Motion for Expedited Discovery and for Order Preserving Evidence ("Plaintiff's Motion") is granted as follows:

    1.    Defendant shall respond to Plaintiff's First Interrogatories and Request for Production of Documents attached to Plaintiff's Motion as Exhibit A within ten (10) days of being served with such discovery requests. With respect to documents and other tangible things that are responsive to the requests, Defendant shall either deliver hard copies of such materials to Plaintiff's counsel's office on the date that they are due, or shall make such materials available for inspection by Plaintiff's counsel at a location in the District of Columbia, or in another venue that is mutually agreeable to the parties.

    2.    Defendant shall immediately preserve, and shall take steps to prevent the deletion, destruction, or loss of all relevant information, documents, and other tangible materials to the claims raised in the Complaint including, but not limited to: (a)

information, documents, and tangible things that are responsive to the discovery requests attached as Exhibit A to Plaintiff's Motion; (b) information, documents, and other tangible things, including e-mail communications, and other electronic data, stored on Defendant's computer hard drives as well as the hard drives themselves; and (c) any other information, documents, or tangible things that are either relevant to the claims made in the Complaint or that may lead to the discovery of admissible evidence.

ENTERED:    /    /

_____
JUDGE

WRF, LLP FAX CTR         Fax:202-719-7049      Dec 12 2006  10:14      P.95

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DENNEMEYER & CO., LLC,

    Plaintiff,

    v.

RALPH G. SCHROEDER,

    Defendant.

Civil Action No.

## PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT

For its First Interrogatories and Requests for Production to Defendant Ralph G. Schroeder, Plaintiff Dennemeyer & Co., LLC states as follows:

### DEFINITIONS AND INSTRUCTIONS

1.    The Defendant must respond to these interrogatories and requests for production individually and separately under his own name and, in the case of the interrogatories, under oath as required by the D.C. Rules of Civil Procedure.

2.    "Document" includes writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained or translated, if necessary, though detection devices into reasonably usable form including, but not limited to, electronic data and/or communications as well as the device(s) on which such information is stored, such as a computer hard drive or diskette.

3.    "Person" means a natural person or a legal entity including, but not limited to, a corporation, professional corporation, partnership, limited partnership, limited liability partnership, limited liability company, or other legal entity or association.

4.    "Identity" or "identification" when used in reference to an individual person or entity means to state their or its full name, present home address, present business address, and present or last known place of employment or business affiliation.

5.    "Identity" or "identification" when used in reference to a document or tangible item means to state the following as to each document: the date, nature and substance of each document with sufficient particularity to enable it to be described in a request for production of documents and/or subpoena, the physical location of each such document and the name of its custodian or custodians, whether the document has been destroyed and, if so, with regard to such destruction, (i) the date thereof, (ii) the reason therefore, and (iii) the identity of the person or persons who destroyed the document.

6.    The word "communication" shall mean any exchange of words, ideas, messages, or information, whether by speech, e-mail, signal, and/or writing, and includes both telephonic and in-person conversations.

7.    To "identify" with respect to a communication means to state: (a) the name of each person who participated in or was present during such communication; (b) the nature and substance of such communication; (c) the date on which, and the place at which, such communication was made; (d) the date, nature, and substance of each document, if any, recording, memorializing, and/or pertaining to such communication with sufficient particularity to enable it to be described in a request for production of documents and/or subpoena, the physical location of each such document, and the name of its custodian or custodians.

8.    "State fully and in detail" shall mean to identify all facts — including but not limited to, the dates relevant to each event or occurrence — that relate directly or

WHF, LLP FAX CTR        Fax:202-719-7049        Dec 12 2006 10:15    P.97

indirectly to the subject matter of the Interrogatory, all persons involved directly or indirectly in the subject matter of the Interrogatory, and all communications that directly or indirectly affected the subject matter of the Interrogatory.

9. The terms "relate," "relating to," and "relates to" mean regarding, depicting, illustrating, containing, recording, discussing, mentioning, noting, summarizing, referring to, commenting upon, describing, digesting, reporting, listing, analyzing, or studying the subject matter identified in an Interrogatory or Document Request.

10. The words "you," "your," and "yours" are defined to include the persons to whom these discovery requests are directed, both individually and collectively, and any of their affiliates, subsidiaries, officers, members, employees, agents, representatives, consultants, attorneys, or anyone else acting on their behalf.

11. The term "Complaint" refers to the Complaint filed by Dennemeyer & Co., LLC initiating this litigation.

12. "Dennemeyer" means the Plaintiff in this action, Dennemeyer & Co., LLC, and any of its affiliates, subsidiaries, officers, members, employees, agents, representatives, consultants, attorneys, or anyone else acting on their behalf.

13. "Proprietary Information" means any inventions, products, processes, methods, methodologies, techniques, formulas, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, customer and supplier lists, and contacts at or knowledge of customers or prospective customers of Dennemeyer, as well as any document or communication relating to such information.

14. When asked to provide information, documents, and/or your knowledge, such request includes information, documents, and/or knowledge in the possession of your affiliates, subsidiaries, agents, employees, officers, members, directors, representatives and, unless privileged, attorneys.

WHF, LLP FAX CTR       Fax:202-719-7049       Dec 12 2006 10:15       P. 99

## INTERROGATORIES

### INTERROGATORY NO. 1

For the time period November 16, 2006 to the present, state fully and in detail every communication, contact, or solicitation that you have made or attempted to make to any existing client, customer, or account of Dennemeyer or any prospective client, customer, or account of Dennemeyer and, for each such communication, contact, or solicitation, identify the name of the client, customer, or account; state fully and in detail the nature of the communication, contact, or solicitation, identify all documents or communications relating to such facts and all persons with knowledge of such facts.

Provide the same information for any communication, contact, or solicitation that you or anyone else made to any existing or potential clients, customers, and accounts of Dennemeyer prior to November 16, 2006 (a) relating to Anaqua; or (b) relating to your plans to terminate your employment with Dennemeyer.

### ANSWER

WRF, LLP FAX CTR      Fax:202-719-7049      Dec 12 2006 10:16    P.100

## INTERROGATORY NO. 2

State fully and in detail all actions that you have taken to develop, design, produce, market, sell, or render (or to assist others in developing, designing, producing, marketing, selling, or rendering) products or services competitive with those developed, designed, produced, marketed, sold, or rendered by Dennemeyer, including the dates of all such actions. In your answer, identify all persons with knowledge of such facts and identify all documents relating to such facts.

## ANSWER

## INTERROGATORY NO. 3

Identify all Proprietary Information of Dennemeyer that is in your possession.

### ANSWER

## INTERROGATORY NO. 4

Identify all shareholders, officers, directors, and employees of Anaqua.

## ANSWER

## INTERROGATORY NO. 5

Identify all customers, clients, and accounts of Anaqua.

### ANSWER

WRF, LLP FAX CTR    Fax:202-719-7049    Dec 12 2006 10:16    P.104

## INTERROGATORY NO. 6

For the time period January 1, 2006 to the present, state fully and in detail every communication or contact that you have had with any employee, officer, director, shareholder, or representative of Anaqua and, for each such communication or contact, identify the name of the person or persons involved, state fully and in detail the nature of the communication or contact, including the dates of all such actions, and identify all documents or communications relating to such facts, including e-mails, faxes, letters, phone records, proof of meetings, travel receipts, and all persons with knowledge of such facts.

### ANSWER

## INTERROGATORY NO. 7

For the time period January 1, 2006 to the present, state fully and in detail every communication, discussion, or negotiation that you have had with any employee, officer, director, shareholder, or representative of Anaqua regarding your prospective employment at Anaqua or your possible resignation or termination from Dennemeyer. For each such communication, discussion, or negotiation, identify the name of the person or persons involved, state fully and in detail the nature of the communication or contact, including the dates of all such actions, and identify all documents or communications relating to such facts, including e-mails, faxes, letters, phone records, proof of meetings, travel receipts, and all persons with knowledge of such facts. Include documentation of all travel expenses for such communications, discussions, or negotiations, whether paid by yourself, Dennemeyer, or Anaqua.

### ANSWER

WRF, LLP FAX CTR      Fax:202-719-7049      Dec 12 2006 10:17    P.106

## INTERROGATORY NO. 8

For the time period January 1, 2006 to the present, state fully and in detail all actions that you have taken to gain ownership in Dennemeyer or Dennemeyer & Company, S.a.r.l. stock or to gain greater influence or involvement in any aspects of Dennemeyer or Dennemeyer & Company, S.a.r.l. Include any communication that you have had with any employee, officer, director, shareholder, or representative of Dennemeyer or Dennemeyer & Company, S.a.r.l. regarding your potential stock ownership or potential influence in the company. For each such communication, discussion, or negotiation, identify the name of the person or persons involved, state fully and in detail the nature of the communication or contact, including the dates of all such actions, and identify all documents or communications relating to such facts, and all persons with knowledge of such facts. Include in your answer any threats you may have made during those conversations as well as any mention of your future employment decisions if your requests were not honored.

## ANSWER

## INTERROGATORY NO. 9

For the time period October 16, 2006 to the present, state fully and in detail all communications that you have had with any employee, officer, director, shareholder, or representative of Dennemeyer regarding your future employment plans or lack thereof. For each such communication, discussion, or negotiation, identify the name of the person or persons involved, state fully and in detail the nature of the communication or contact, including the dates of all such actions, and identify all documents or communications relating to such facts, and all persons with knowledge of such facts.

## ANSWER

## INTERROGATORY NO. 10

Describe fully and in detail your role at Vinsoft Solutions, Inc. and identify all documents or communications relating to such facts and all persons with knowledge of such facts.

## ANSWER

## INTERROGATORY NO. 11

Describe fully and in detail your role in initiating, negotiating, and completing the sale of Vinsoft Solutions, Inc. to Demmemeyer. State fully and in detail all communications, discussions, and negotiations that you had with any employee, officer, director, shareholder, or representative of Demmemeyer or Demmemeyer & Company, S.a.r.l. regarding the sale of Vinsoft Solutions, Inc. For each such communication, discussion, or negotiation, identify the name of the person or persons involved, state fully and in detail the nature of the communication or contact, including the dates of all such actions, and identify all documents or communications relating to such facts, and all persons with knowledge of such facts.

## ANSWER

## INTERROGATORY NO. 12

For the period from June 1, 2003 to February 1, 2004, state fully and in detail any changes in your role at Vinsoft Solutions, Inc., including any change in your management, employee, or shareholder status in Vinsoft Solutions, Inc. Include in your answer the dates of all such changes, and identify all documents or communications relating to such facts, including e-mails, faxes, letters, phone records, proof of meetings, proof of stock holdings or sales, and all persons with knowledge of such facts.

## ANSWER

## INTERROGATORY NO. 13

Identify each person who you may call as an expert witness at the trial or any hearing in this matter and, for each such person, state the subject matter upon which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and provide a summary of the grounds for each opinion.

## ANSWER

## REQUESTS FOR PRODUCTION

Produce the following materials:

1. All documents identified in response to the foregoing Interrogatories.

2. All documents relating to Anaqua that were created, drafted, or revised on or after January 1, 2006.

3. All communications relating to Anaqua that were made, drafted, transmitted, or received on or after January 1, 2006.

4. All documents relating to your resignation from Dennemeyer or the termination of your employment with Dennemeyer that were created, drafted, or revised on or after January 1, 2006.

5. All business plans, marketing plans, strategy papers, or similar documents relating to Anaqua.

6. All documents that describe Anaqua's business and/or that describe the services provided by Anaqua.

7. All copies of any agreement signed by you relating to Dennemeyer including, but not limited to, all copies of any Invention, Non-Disclosure, Non-Competition, and Non-Solicitation Non-Dealing Agreement signed by you.

8. All documents and communications relating to any agreement signed by you relating to Dennemeyer including, but not limited to, any Invention, Non-Disclosure, Non-Competition, and Non-Solicitation Non-Dealing Agreement.

9. All documents relating to Dennemeyer.

10. All communications between you and any other person relating to Dennemeyer.

11.    All documents and communications relating to any effort or attempt on your part to solicit, recruit, or hire any employee of Dennemeyer.

12.    All communications between you and any current or former employee of Dennemeyer.

13.    All documents and communications relating to developing, designing, producing, marketing, selling, or rendering (or assisting others in developing, designing, producing, marketing, selling, or rendered) products or services competitive with those developed, designed, produced, marketed, sold, or rendered by Dennemeyer, and/or all documents and communications relating to any action, effort, or attempt to do these acts.

14.    All documents and communications relating to any existing client, customer, or account of Dennemeyer or any prospective client, customer, or account of Dennemeyer contacted, solicited, or served by you while you were an employee of Dennemeyer or by those who reported to you while you were an employee of Dennemeyer.

15.    All communications between you and any existing or potential client, customer, or account of Dennemeyer.

16.    Any and all Proprietary Information of Dennemeyer or any document or communication relating to any Proprietary Information of Dennemeyer.

17.    All of your federal and state tax filings for 2003, 2004, 2005 and 2006.

DENNEMEYER & CO., LLC

By Counsel

Respectfully submitted,

Wiley Rein & Fielding LLP

By: _____

Todd A. Bromberg
Garen E. Dodge
William S. Consovoy
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049

Attorneys for Plaintiff Dennemeyer & Co.
LLC

Dated: December 12, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2006, in accordance with D.C.

R. Civ. P. 4(c), a copy of the foregoing document was served by **FACSIMILE AND**

**U.S. FIRST-CLASS MAIL** upon the following:

Adrian Mendoza, Esq.
Lillig & Thorsness, Ltd.
1900 Spring Road
Suite 200
Oak Brook, Illinois 60523-1495

_____
Todd A. Bromberg

EXHIBIT C

CIRCUIT COURT SUMMONS

3101(Rev. 07/05)

| STATE OF ILLINOIS | UNITED STATES OF AMERICA IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT | COUNTY OF DU PAGE |

RALPH G. SCHROEDER,

PLAINTIFF

**CASE NUMBER**
**2006CH002139**

VS.

DENNEMEYER & CO., LLC,

DEFENDANT

File Stamp Here

**SUMMONS**

To each defendant:   Dennemeyer & Co., LLC c/o The Corporation Trust Incorporated, Reg. Agt., 300 E. Lombard Street, Baltimore, MD 21202

You are summoned and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance in the office of the Clerk of this Court, **505 North County Farm Road, Wheaton, Illinois** within 30 days after the service of this summons, not counting the day of service.  **IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.**

**To the officer:**

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of services and fees, if any, immediately after service.  If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

WITNESS:  **CHRIS KACHIROUBAS**, Clerk of the Eighteenth Judicial Circuit Court, and seal thereof at Wheaton, Illinois.

Date          **NOV 1 6 2006**

*CHRIS KACHIROUBAS* Circuit Court Clerk

Clerk of the Eighteenth Judicial Circuit

Name: Adrian Mendoza
      Lillig & Thorsness, Ltd. ☐ PRO SE

DuPage Attorney Number: 59575

Attorney for: Plaintiff, Ralph Schroeder

Address: 1900 Spring Road, Suite 200

City/State/Zip: Oak Brook, Illinois 60523

Telephone: (630) 571-1900

NOTICE: The filing of an appearance or answer with the Circuit Court Clerk requires a statutory filing fee, payable at the time of filing.

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person.)

**CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT** ©
**WHEATON, ILLINOIS 60189-0707**

## SHERIFF'S RETURN

I certify that I served this summons on defendants as follows:
(Check appropriate box, and complete information below)

☐ (a) (Individual defendants ? personal):
By leaving a copy and a copy of the complaint with each individual defendant personally.

☐ (b) (Individual defendants ? abode):
By leaving a copy and a copy of the complaint at the usual place of abode of each individual defendant with a person of his family, of the age of 13 years or upwards, informing that person of the contents and also by sending a copy of the summons in a sealed envelope with postage fully prepaid, addressed to each individual defendant at his usual place of abode.

☒ (c) (Corporation defendants):
By leaving a copy and a copy of the complaint with the registered agent, officer or agent of each defendant corporation.

☐ (d) (Other services):

☐ (e) (Unable to serve): By _____ , Deputy, Badge No. _____

Name of Defendant _Deun p meyer + Co._    Name of Defendant _____

Name of Person
Summons given to _Regina Lynch_    Name of Person
Summons given to _____

Sex _F_ Race _W_ Approx. Age ____    Sex ____ Race _____ Approx. Age _____

Place of Service _300 E Lombard St._
_Balto. MD._    Place of Service _____
_____

Date of Service _11/29/06_ Time _12:21_    Date of Service _____ Time _____

Date of Mailing _____    Date of Mailing _____

_____    Sheriff of _____ County

By _J. Wanton_ , Deputy

**Baltimore City Sheriff's Office**
**100 North Calvert Street, Room 104**
**Baltimore, Maryland 21202**

EXHIBIT D

JUDGE RONALD GUZMAN

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MAGISTRATE JUDGE ASHMAN

RALPH G. SCHROEDER,

Plaintiff

v.

DENNEMEYER & CO., LLC, a
Virginia limited liability company,

Defendant.

Civil Case No. _____

**RECEIVED**

DEC 1 2 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## 06C 6854

**NOTICE OF REMOVAL**

Defendant Dennemeyer & Co., LLC ("Defendant") by and through its attorneys, petition this Court for the removal of this action pursuant to 28 U.S.C. § 1441 et seq.  In support of this petition, Defendants state as follows:

1.     Plaintiff Ralph G. Schroeder is a resident of Illinois.

2.     Defendant Dennemeyer & Co., LLC, is a limited liability company organized under the laws of the Commonwealth of Virginia and has its principal place of business in Columbia, Maryland.

3.     The Defendant is not a citizen of Illinois within the meaning of 28 U.S.C. § 1332.

4.     This is a civil action in which the District Courts of the United States have original jurisdiction based on diversity of citizenship as provided in 28 U.S.C. § 1332(a).  The amount in controversy in this action exceeds the sum or value of seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

5.     Pursuant to the provisions of 28 U.S.C.§ 1441 et seq., Defendant has the right to remove this action from the Circuit Court for the Eighteenth Judicial District, County of DuPage, to the United States District Court for the Northern District of Illinois, Eastern Division, which embraces

DuPage County.

6.      On November 27, 2006, Plaintiff's counsel provided a courtesy copy of the Complaint in this action to Defendant's counsel by e-mail. In accordance with the requirements of 28 U.S.C. § 1446, therefore, this Notice of Removal is filed within thirty (30) days after notice of this action.

7.      Pursuant to 28 U.S.C. § 1446, Defendant is filing with this pleading a copy of all pleadings provided to them by Plaintiff's counsel in the state court action. Copies of all such papers are attached as Exhibit "A".

8.      Written notice of this filing will be provided to the adverse party as required by law.

9.      A true copy of this Notice will be filed with the Clerk of the Circuit Court for the Eighteenth Judicial District, DuPage County, Illinois, as required by law.

Wherefore, Defendant Dennemeyer & Co., LLC respectfully requests that this action be removed to this Court and that this Court accept jurisdiction of this action and place it on this Court's docket for further proceedings, the same as though this action had originally been instituted in this Court.

Dated: December 12, 2006

                        Respectfully submitted,

                        DENNEMEYER & CO., LLC
                        By Counsel

                        WILEY REIN & FIELDING LLP

**RECEIVED** By: _____

DEC 1 2 2006            Jody H. Schwarz (ARDC # 6270583)
                        Garen E. Dodge (*pro hac vice*)
MICHAEL W. DOBBINS      Todd A. Bromberg (*pro hac vice*)
CLERK, U.S. DISTRICT COURT   Wiley Rein & Fielding LLP
                        1776 K Street NW
                        Washington, DC 20006
                        Tel: (202) 719-7000
                        Fax: (202) 719-7049
                        Attorneys for Defendant

Local Counsel:
Todd A. Rowden (ARDC #6201929)
Riffner, Barber, Rowden & Manassa LLC
1834 Walden Office Square, Suite 500
Schaumburg, IL 60173
Phone: (847) 303-0107
Fax: (847) 303-6621

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

Dennemyer & Co., LLC

**DEFENDANTS**

Ralph G. Schroeder
10 S420 South Drew
Burr Ridge, IL 60527

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Todd A. Bromberg
Wiley Rein & Fielding LLP
1776 K Street, NW
Washington, DC 20006

ATTORNEYS (IF KNOWN)

Jeremy
Thomp
Two La
1133 2
Suite 4
Washin

CASE NUMBER   1:06CV02116

JUDGE:  Rosemary M. Collyer

DECK TYPE:  Contract

DATE STAMP:  12/13/2006

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP** FOR PLAINTIFF AND

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**   **OR**   **○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding   ● 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Removal pursuant to 28 USC 1441 of state court action alleging breach of contract, breach of fiduciary duty and breach of duty of loyalty

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   *not here*   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE 12/13/06   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.