## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DENNEMEYER & CO., LLC &
DENNEMEYER & CO., S.a.r.l.,

                Plaintiffs,

       v.

RALPH G. SCHROEDER,

                Defendant.

Civil Action No. 06-CV-2116(RMC)

## AMENDED COMPLAINT

COME NOW Plaintiffs, DENNEMEYER & CO., LLC ("Dennemeyer Americas") and

DENNEMEYER & CO., S.a.r.l. ("Dennemeyer Luxembourg") (collectively "Plaintiffs") and for

their Complaint against Defendant RALPH G. SCHROEDER ("Schroeder" or "Defendant"),

state as follows:

## PARTIES

1.     Plaintiff Dennemeyer Americas is a limited liability company organized under the

laws of the Commonwealth of Virginia with its principal place of business in Columbia,

Maryland.  Dennemeyer Americas is in the business of intellectual property asset management.

2.     Plaintiff Dennemeyer Luxembourg is a Société par Actions à Responsabilité

Limitée organized under the laws of Luxembourg with its principal place of business in

Luxembourg.  Dennemeyer Luxembourg is in the business of intellectual property asset

management.

3.     Defendant Schroeder is a citizen of the State of Illinois.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      This Court has venue over this action pursuant to Defendant's removal of the action under 28 U.S.C. § 1441 to this Court from the Superior Court of the District of Columbia.

## FACTS

6.      Dennemeyer Americas is an intellectual property management company, providing the highest quality intellectual property services to law firms and corporations throughout North Americas.  It has offices in three American cities and has both national and international clients.

7.      Vinsoft Solutions, Inc. ("Vinsoft") was a company that developed intellectual property management software.  Vinsoft's key employees were Schroeder, President and Chief Intellectual Property Strategist, Harish Sethuraman, Vice President of Development, and Hema Kadali, Chief Executive Officer.  Through his employment with Vinsoft, Schroeder gained insight into the software required for intellectual property management and dealt largely with the utilization of this software in the market.

8.      On or about July 2003, Schroeder approached Dennemeyer Luxembourg about purchasing Vinsoft.  The companies entered into negotiations and began to finalize the details of the purchase.  Before the final purchase agreement was signed between the two companies, Schroeder left his position at Vinsoft to accept employment at Dennemeyer Americas.

9.      On or about November 6, 2003, Schroeder accepted employment as President of Dennemeyer Americas by signing an Executive Employment Agreement, attached as Exhibit A.

10.    Upon joining Dennemeyer Americas, Schroeder became an integral part in the workings of the company.  Schroeder immediately became a key player in the company because of his authority as President, his extensive knowledge of the Vinsoft software, and was provided with unlimited access to the strategic insight of Dennemeyer Americas pertaining to the company's clients and projects.  Schroeder was instrumental in completing the sale of Vinsoft to Dennemeyer Luxembourg.

11.    At Dennemeyer Americas, Schroeder was able to combine the technical software expertise he obtained from employment at Vinsoft with the reputation and clients of Dennemeyer Americas to position himself favorably within the industry.  Schroeder utilized the product and marketing image of Dennemeyer Americas to gain the favor of the industry.  Dennemeyer Americas funded Schroeder's travel to various conferences and industry meetings, where Schroeder gained individual exposure and recognition.

12.    As President, Schroeder had unlimited access to all projects, client lists, business strategies, product knowledge and information of Dennemeyer Americas.  He was involved in the largest and most important business deals and in all key decisions made by Dennemeyer Americas.  Dennemeyer Americas invested significant resources in cultivating Schroeder's expertise in the business.

13.    On February 5, 2004, Vinsoft's assets were purchased by Dennemeyer Luxembourg pursuant to the Vinsoft Asset Purchase Agreement, attached as Exhibit B.

14.    The Vinsoft Asset Purchase Agreement provided for a payment of one million dollars ($1,000,000) at Closing, a second payment of five hundred thousand dollars ($500,000) at the one year anniversary of the Closing Date, and a third payment of five hundred thousand dollars ($500,000) at the two year anniversary of the Closing Date.  Exhibit B, § 2.1.

15.     Upon information and belief, multiple payments totaling nearly $446,500 were made directly to Schroeder.  While Dennemeyer Americas had requested and preferred that Schroeder sell his Vinsoft stock, Schroeder chose not to do so and remained a shareholder even after leaving his position as Vinsoft Chief Intellectual Property Strategist.  In March 2004, Vinsoft paid Schroeder $159,375 and on April 27, 2004, Vinsoft paid Schroeder $53,125.  On March 15, 2005, Vinsoft paid Schroeder $115,000.  On March 1, 2006, Vinsoft paid Schroeder $119,000.

16.     The Vinsoft Asset Purchase Agreement includes a non-competition agreement that covers Vinsoft's shareholders, officers, directors or employees for two (2) years after the completion of the Payment Schedule or post-employment relationship, whichever is longer.  The Payment Schedule was completed on February 5, 2006, which means the non-competition provision remains in effect until at least February 5, 2008.  As a shareholder when the Vinsoft Asset Purchase Agreement was signed, Schroeder is bound by the non-competition provision.

17.     Upon information and belief, in the months leading up to his resignation as President of Dennemeyer Americas, Schroeder used the corporate resources of Dennemeyer Americas to travel to the offices of Anaqua, a competitor of Plaintiffs, and discussed employment possibilities with that company.

18.     Upon information and belief, during those final weeks as President of Dennemeyer Americas, Schroeder also attempted to gain ownership in Dennemeyer Americas by threatening to leave the company unless he was given stock options.

19.     On October 16, 2006, Schroeder resigned from his position at Dennemeyer Americas.

20.    At the company's request, Schroeder agreed to stay on at Dennemeyer Americas to assist for a brief period while a new president was hired.

21.    During that time, Schroeder stated to Dennemeyer Americas executives that he did not know where he would work next and that he had promised his wife he would take six months off before starting a new position.  Additionally, Schroeder's attorney stated in an early November 2006 conversation with counsel of Dennemeyer Americas that Schroeder was not working for any other entity at the time and he was uncertain where Schroeder would work next. Upon information and belief, Schroeder was already well into negotiations with Anaqua at the time of these statements.

22.    Upon information and belief, on or about November 18, 2006, Schroeder signed an employment contract with Anaqua, a provider of intellectual asset management services, and a pricing competitor of Dennemeyer Americas.

23.    Anaqua is one of six key competitors of Dennemeyer Americas in the intellectual property management market.  In addition to Anaqua, the other top competitors of Dennemeyer Americas are CPA Software Solutions, CPI Systems, MDC, and Thomson.

24.    Upon information and belief, Schroeder's employment at Anaqua will entail substantially similar duties to those he performed at Dennemeyer Americas.  Additionally, Schroeder profited greatly from his relationship with Dennemeyer Americas, and his extensive knowledge of all aspects of the products, services, client lists, and confidential information of Dennemeyer Americas, and his use of such information at Anaqua, would result in irreparable harm to Dennemeyer Americas.

25.    Schroeder has extensive knowledge of the business processes and confidential fiduciary and proprietary information of Dennemeyer Americas, and will utilize this knowledge

on behalf of Anaqua to undermine Dennemeyer Americas in the market. While at Dennemeyer Americas, Schroeder was extensively involved in formulating the company's pricing strategy to maintain the competitive edge of Dennemeyer Americas in the limited and specialized market. His knowledge will allow him to undermine the company by enhancing Anaqua's competitive pricing to undercut the very pricing strategy he designed at Dennemeyer Americas.

## COUNT I

### (Breach of Contract)

26.    Plaintiffs incorporate herein the allegations in paragraphs 1 through 25 of this Complaint.

27.    As a condition of Schroeder's employment with Dennemeyer Americas, he entered into an Executive Employment Agreement with Dennemeyer Americas.

28.    The Executive Employment Agreement to which Schroeder agreed to be bound contained a Non-Competition clause in Section 11. Under this clause, Schroeder agreed that, during his employment with Dennemeyer Americas and for a three year period thereafter, he would not: directly or indirectly, own, manage, operate, control, be employed by (whether as an Executive, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in any business of the same type as any business in which Dennemeyer Americas or any of their subsidiaries or affiliates is engaged on the date of termination. Exhibit A, § 11.

29.    The actions of Schroeder described herein constitute a breach of this Non-Competition clause of the Executive Employment Agreement.

30.    As a proximate result of such breaches, Dennemeyer Americas have been damaged in an amount in excess of seventy-five thousand dollars ($75,000) to be proven at trial.

31.     In addition, Dennemeyer Americas has suffered, and is continuing to suffer, irreparable harm through the loss of its competitive advantage as a result of Schroeder's breach of the Non-Competition clause of his Executive Employment Agreement, for which Dennemeyer Americas lacks an adequate remedy at law.   Therefore, Dennemeyer Americas is entitled to temporary and permanent injunctive relief as set forth in the Prayer for Relief and is furthermore entitled to a declaratory judgment that declares the rights of Dennemeyer Americas and Schroeder's obligations under the Non-Competition clause of the Executive Employment Agreement.

## COUNT II

### (Declaratory Judgment)

32.     Plaintiffs incorporate herein the allegations in paragraphs 1 through 31 of this Complaint.

33.     The Vinsoft Asset Purchase Agreement provides that all disputes are subject to arbitration.  Exhibit B, § 11.4

34.     The actions of Schroeder described herein constitute a breach of this Non-Competition clause of the Vinsoft Asset Purchase Agreement.  Exhibit B, § 5.9.

35.     Dennemeyer Luxembourg has suffered, and is continuing to suffer, irreparable harm through the loss of its competitive advantage as a result of Schroeder's breach of the Non-Competition clause of the Vinsoft Asset Purchase Agreement, for which Dennemeyer Luxembourg lacks an adequate remedy at law.   Therefore, Dennemeyer Luxembourg is entitled to temporary and permanent injunctive relief as set forth in the Prayer for Relief and is furthermore entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that any dispute over the Vinsoft Asset Purchase Agreement is subject to arbitration.

## COUNT III

### (Breach of Fiduciary Duty)

36.    Plaintiffs incorporate herein the allegations in paragraphs 1 through 35 of this Complaint.

37.    While he was employed by Dennemeyer Americas, Schroeder occupied fiduciary relationships with Dennemeyer Americas.

38.    Schroeder owed—and continues to owe—fiduciary duties to Dennemeyer Americas.  These duties include, but are not limited to, the duty to act honestly and with the utmost good faith toward Dennemeyer Americas, the duty to act at all times in the best interests of Dennemeyer Americas, the duty not to misuse, misappropriate, or the proprietary and confidential information of Dennemeyer Americas, the duty to refrain from competing with Dennemeyer Americas, the duty to refrain from soliciting clients and potential clients of Dennemeyer Americas for himself and Anaqua, the duty to refrain from soliciting and recruiting employees of Dennemeyer Americas away from Dennemeyer Americas, and the duty to overall exert his best efforts on behalf of Dennemeyer Americas.

39.    Through his actions described herein, Schroeder breached his fiduciary duties to Dennemeyer Americas, and has done so with reckless indifference to the consequences and with conscious disregard for the best interests of Dennemeyer Americas.

40.    As a proximate result of such breaches, Dennemeyer Americas has been damaged in an amount in excess of seventy-five thousand dollars ($75,000) to be proven at trial.

41.     Moreover, Dennemeyer Americas is entitled to receive, as damages or restitution from Schroeder, the value of all salaries, bonuses, commissions, and benefits paid to him during the time period that he was breaching his fiduciary duties to Dennemeyer Americas.

## COUNT IV

### (Breach of Duty of Loyalty)

42.     Plaintiffs incorporate herein the allegations in paragraphs 1 through 41 of this Complaint.

43.     While he was employed by Dennemeyer Americas, Schroeder owed Dennemeyer Americas a common law duty of loyalty.

44.     Through his actions described herein, Schroeder breached his duty of loyalty to Dennemeyer Americas, and has done so with reckless indifference to the consequences and with conscious disregard for the best interest of Dennemeyer Americas.

45.     As a proximate result of such breaches, Dennemeyer Americas has been damaged in an amount in excess of seventy-five thousand dollars ($75,000) to be proven at trial.

46.     Moreover, Dennemeyer Americas is entitled to receive, as damages or restitution from Schroeder, the value of all salaries, bonuses, commissions and benefits paid to him during the time period that he was breaching his duty of loyalty to Dennemeyer Americas.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, by counsel, respectfully request that this Court enter judgment against Defendant Schroeder and grant it the following relief:

(a)     a declaratory judgment pursuant setting for the rights of the parties under the Executive Employment Agreement and the Vinsoft Asset Purchase Agreement;

(b)     a temporary and permanent injunction that: (i) enjoin Schroeder from breaching

the terms of his Executive Employment Agreement; (ii) enjoin Schroeder from breaching the

terms of the Vinsoft Asset Purchase Agreement pending final resolution through arbitration; (iii)

enjoin Schroeder from disclosing proprietary information of Dennemeyer Americas to any

person or entity who is not an employee of Dennemeyer Americas;

(c)     an award of damages in an amount in excess of seventy-five thousand dollars

($75,000) to be proven at trial against Schroeder;

(d)     an award of pre-judgment and post-judgment interest, costs and attorneys fees

against Schroeder; and

(e)     an award of such other and further relief as the Court deems just and appropriate

under the circumstances.


Respectfully submitted,

Wiley Rein & Fielding LLP


By://s _____
      Todd A. Bromberg
      Garen E. Dodge
      William S. Consovoy
      Wiley Rein & Fielding LLP
      1776 K Street NW
      Washington, DC  20006
      TEL: 202.719.7000
      FAX: 202.719.7049

      Attorneys for Plaintiffs Dennemeyer &
      Co., LLC and Dennemeyer & Co. S.a.r.l.

Dated: December 19, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2006, in accordance with D.C. R. Civ.

P. 4(c), a copy of the foregoing document was served by **FACSIMILE AND U.S. FIRST-**

**CLASS MAIL** upon the following:

Adrian Mendoza, Esq.
Lillig & Thorsness, Ltd.
1900 Spring Road
Suite 200
Oak Brook, Illinois 60523-1495

//s
_____
Todd A. Bromberg

EXECUTIVE EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is made and entered as of November _6th_, 2003 (the "Effective Date"), between DENNEMEYER & CO., LLC., located at 829 Seventh Street, N.W., Third Floor, Washington, DC 20001 (the "Company"), and Ralph G. Schroeder (the "Executive").

WITNESSETH

WHEREAS, the Company desires to employ the Executive as President of the Company's Americas affiliate business and pro tem Worldwide Director of Marketing and Sales;

WHEREAS, the Company and the Executive desire to enter into the Agreement as to the terms of his employment by the Company;

NOW THEREFORE, in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. POSITION/DUTIES

(a) During the Employment Term (as defined in Section 2 below), the Executive shall serve as the President of the Dennemeyer Americas Company currently headquartered in Washington DC. In this capacity the Executive shall have such duties, authorities and responsibilities commensurate with the duties, authorities and responsibilities of persons in similar capacities in similarly sized companies, and such other duties and, responsibilities as the Board of Directors of the Americas Company (the "Board") shall designate that are consistent with the Executive's position as President of the Americas. The Executive shall serve under and report to the Americas CEO and Board.

(b) In addition, the Executive shall serve as pro tem Dennemeyer Worldwide Director of Marketing and Sales for one year overseeing marketing and sales activities among and between the Company and affiliated Dennemeyer offices and businesses.

(c) Commensurate with Executive's position, the Company shall take such action as may be necessary to appoint or elect the Executive as a member of the Board of Directors in Washington DC. Executive will participate in Dennemeyer Luxembourg Board agendas and receive communications of Luxembourg Board resolutions including meetings transcripts, and the Americas Company and Luxembourg will consult, resolve, and undertake with Executive in matters involving Executive's duties in worldwide marketing and sales. In Executive's capacity as Company President and Board member and pro tem Worldwide Director of Marketing and Sales, Company commits to include Executive in all appropriate internal communications and initiatives related to the marketing and sales, financial, development, and operational management of the Company;

(d) During the Employment Term, the Executive shall devote all of his business time (excluding periods of vacation and other approved leaves of absence) to the performance of his duties with the Company and on behalf of the Company.

Initials _____

(e) During the employment term, Executive shall as President of the Americas be responsible for improving:

- communications among all staff and continued growth in staff responsibility;

- improved monthly departmental status reporting that accurately reflects departmental operations, sales, and costs as well as problems and related solutions;

- a vigorous permanent focus on finances;

- support and assist management of the Vinsoft relationship and project.

(g) Consistent with Executive's fiduciary responsibilities and duties to the Company, the Executive shall not be prevented from holding, either directly or beneficially, an ownership stake in Vinsoft Solutions, Inc., its predecessors, or successors provided Executive does not increase his share participation and provided that Vinsoft continues to respect a non-compete agreement with Dennemeyer's Core Businesses, and provided Vinsoft does not extend some kind of participation and/or influence to a competitor of Dennemeyer. Company acknowledges that such ownership stake is not inherently in conflict with Executive's fiduciary responsibilities and duties to Company. Notwithstanding, if a possible conflict of interest is potentially imminent, Executive must inform Company in writing without delay to discuss the situation. Merely by way of information, Company would prefer if Executive reduced his shares in Vinsoft.

## SECTION 2. EMPLOYMENT TERM

The Executive's term of employment under this Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term") shall be for a term commencing on the Effective Date and, unless terminated earlier as provided in Section 7 hereof, ending on the third anniversary of the Effective Date (the "Original Employment Term"), provided that the Employment Term shall be automatically extended, subject to earlier termination as provided in Section 7 hereof, for successive additional one (1) year periods (the "Additional Terms"), unless, at least 90 days prior to the end of the Original Employment Term or the then Additional Term, the Company or the Executive has notified the other in writing that the Employment Term shall terminate at the end of the then current term. Executive will provide Company with evidence of his qualification as an Illinois Attorney; Company wishes, for Executive to maintain his legal qualifications and Company will pay Executive's annual registration fee(s) provided such professional fee(s) payment is in the interest of the Company.

## SECTION 3. BASE SALARY

The Company agrees to pay the Executive an aggregate base salary (the "Base Salary") at an annual rate of not less than US $.145,000 (one hundred and forty-five thousand USD), payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly. Beginning in 2005, the base salary shall be subject to annual

review by the Board (or a committee thereof) and may be increased, but
not decreased, by the Board. At a minimum the Executive base salary
shall receive a minimum annual cost of living and merit adjustment of
5% (five percent) of the current annual base salary in 2005 and 2006.
Thereafter, unless otherwise agreed in writing with the Company's
Board, Executive's annual base salary shall tacitly be increased by 3%
(three percent) per annum for the years 2007 and 2008. Thereafter, no
automatic increases will be granted to Executive. No increase to Base
Salary shall be used to offset or otherwise reduce any obligations of
the Company to the Executive hereunder or otherwise. The base salary as
determined herein from time to time shall constitute "base salary" for
purposes of this Agreement.    The aggregate base salary will be
initially contributed 50/50 Americas and Luxembourg.

## SECTION 4. BONUSES

In addition to the Base Salary, Executive shall be eligible for the
following bonuses:

(a) <u>Management Shared Net Dividend Ratio Bonus</u> — Beginning in the
calendar year 2004 and each year during the Employment Term, the
Executive shall have the opportunity to earn and participate in an
annual Shared Net Dividend Ratio Bonus based on achieving positive Net
Revenue for the Americas Company. The bonus amount shall be a shared
management bonus equal to 17.5% of the total Net Dividends Revenue
available for distribution to Shareholders for the applicable calendar
year.    The bonus shall be calculated based on the audited year-end
financial results and paid within 60 days of the final audited annual
accounts for a fiscal year for the Americas Company.

(b) <u>Sales Commission Bonus</u> — Beginning as of the Effective Date and
during the Employment Term, the Executive shall be eligible to
participate in the Worldwide Company Sales Incentive Program to be
instituted by the Company and in force at that time. Any Sales
Commission Bonus paid to the Executive shall be according to the
guidelines and standards applicable to other sales and marketing
personnel.

## SECTION 5. BENEFITS

(a) <u>Benefits Plan</u> — The Executive shall be entitled to participate in
all Executive benefit plans of the Company including, but not limited
to, medical coverage, equity, pension, thrift, profit sharing,
education, or other retirement or welfare benefits that the Company has
adopted or may adopt, maintain or contribute to for the benefit of its
senior executives at a level commensurate with his positions subject to
satisfying the applicable eligibility requirements. Such benefits, in
the aggregate, shall be no less favorable than the level of benefits in
effect on the Effective Date; provided, however, that in the event
there is a reduction of Executive benefits applicable to senior
executives generally, nothing herein shall preclude the Company's
ability to reduce the Executive's benefits consistent with such general
executives' reduction.

(b) <u>Vacation and Sick Days</u> — The Executive shall be entitled to paid
Vacation and Sick Days in accordance with the Company's policy
applicable to senior executives, but in no event less than twenty (20)

Initial

days per year (as prorated for partial years), which vacation may be taken at such times as the Executive elects with due regard to the needs of the Company.

(c) _Business and Entertainment Expenses_ - Upon presentation of appropriate documentation, the Executive shall be reimbursed in accordance with the Company's expense reimbursement policy for all reasonable and necessary business and entertainment expenses incurred in connection with the performance of his duties hereunder. Such reimbursement shall include reasonable expenses related to travel, lodging and extraordinary living costs between the Executive's current residence and Company's offices. As long as Executive is not a local resident to the main Americas office, Executive will make reasonable economies in commuting and accommodations that will be paid by the Americas company.

## SECTION 6. RELOCATION

The Executive will, if determined by the Boards, be required to fulfill the Executive's duties, relocate to the vicinity of the Company's principal U.S. headquarters within a time frame mutually agreed upon between the Executive and the Boards (the "Relocation Period") and with reasonable consideration for Executive's ability to sell his current residence. The Executive shall be entitled to reasonable relocation benefits in accordance with the Company's relocation policy and such additions thereto as mutually agreed to by the Executive and the Boards (or a committee thereof). All amounts payable under this Section shall be subject to the Executive's presentment to the Company of appropriate documentation.

## SECTION 7. TERMINATION

The Executive's employment and the Employment Term shall terminate on the first of the following to occur:

(a) _Death_. This Agreement shall automatically terminate upon the death of the Executive, and upon such event, the Executive's estate shall be entitled to receive the amounts specified as if termination had occurred Without Cause (as defined below).

(b) _Disability_. If the Executive is fully unable to perform the essential duties required of him under this Agreement, with or without accommodation, because of illness, incapacity, or physical or mental disability, this Agreement shall remain in full force and effect and the Company shall pay all compensation required to be paid to the Executive hereunder, unless the Executive is fully unable to perform the duties required of him under this Agreement for an aggregate of 180 days (whether or not consecutive) during any 12-month period during the Employment Term, in which event this Agreement, including, but not limited to, the Company's obligations to pay any salary or other compensation or to provide any privileges under this Agreement, shall terminate at the end of the 180 days of aggregate disability.

(c) _Cause_. The Company may terminate the Executive's employment during the Employment Term with "Cause" as that term is defined below. In the event of termination pursuant to this Section with Cause, the Company shall deliver to the Executive written notice setting forth the

____ Initial

basis for such termination, which notice shall specifically set forth the nature and circumstances of the Cause which is the reason for such termination. Termination of the Executive's employment hereunder shall be effective upon delivery of such notice of termination. For purposes of this Agreement, "Cause" shall mean: (i) the Executive's failure (except where due to a disability contemplated by Section 8(b) hereof), neglect or refusal to perform the essential duties of his position hereunder which failure, neglect or refusal shall not have been corrected by the Executive within 30 days of receipt by the Executive of written notice from the Company of such failure, neglect or refusal, which notice shall specifically and in detail set forth the nature of said failure, neglect or refusal; (ii) any willful or intentional act of the Executive that has the effect of injuring the reputation or business of the Company or its affiliates in any material respect; (iii) any continued or repeated absence from the Company, unless such absence is (A) approved or excused by the Company CEO or Board of Directors or (B) is the result of the Executive's illness, or incapacity (in which event the provisions of Section 7(b) hereof shall control); (iv) conviction of the Executive for the commission of a felony; or (v) the commission by the Executive of an act of fraud or embezzlement against the Company.

(d) Resignation - Unless otherwise provided in Section 7(f) below in the case of a termination of employment for Good Reason, the Executive shall have the right to terminate his employment at any time by giving sixty (60) days notice of his resignation to the Company.

(e) Without Cause - The Company may terminate the Executive's employment during the Employment Term "Without Cause" at any time by giving notice to the Executive. A termination of the Executive's employment "Without Cause" shall mean a termination initiated by the Company for any reason other than Cause or on account of a Disability. A termination Without Cause shall be effective immediately upon notice given by the Company to the Executive.

(f) Good Reason - The Executive shall have the right to terminate his employment for Good Reason under the following circumstances: (i) the failure by the Company to pay to the Executive the Salary and Bonus, if any, in accordance with Sections 3 and 4 hereof, except if such missed payment is legitimately caused by the financial inability to pay; (ii) the failure of the Company to provide the benefits in accordance with Section 5; (iii) a material diminution in the Executive's responsibilities or authority; (iv) failure on the part of Company to provide reasonable financial and/or human resources necessary to allow business performance success; (v) a requirement that the Executive relocate outside of the United States; or (vi) the failure of any successor to all or substantially all of the business and/or assets of the Company to assume the Agreement. The date of termination of the Executive's employment under this Section 7(f) shall be the date the Executive gives the Company written notice of a termination for Good Reason setting forth the basis for such termination.

(g) Change of Control - During the 90-day period following a Change of Control, the Executive shall have the right to immediately resign his employment. A Change of Control shall be deemed to have occurred: (i) upon the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act

of 1934, as amended (the "Exchange Act")); or (ii) upon the consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"); or (iii)upon the approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

(h) Bankruptcy or Debt Related Reorganization — In the case of bankruptcy or debt related reorganization, the Executive shall have the right to terminate his employment effective immediately upon notice.

SECTION 8. OBLIGATIONS AND RIGHTS UPON TERMINATION

(a) Upon any termination of this Agreement, all of the rights, privileges and duties of the Executive hereunder shall cease, except for his rights under this Section 8 and his obligations as defined under Sections 9, 10, 11 and 12 hereunder, except that in the case of Termination Without Cause, Termination for Good Reason or Termination Caused by Bankruptcy or Debt-Related Reorganization, Executive's obligations under Section 11 shall not apply.

(b) Termination for Cause or Upon Voluntary Resignation - In the event (i) that the Executive's employment hereunder terminates for Cause or (ii) the Executive resigns, the Company shall pay to the Executive all amounts accrued but unpaid hereunder through the date of termination in respect of salary, earned bonus(es), unused vacation or un-reimbursed expenses.

(c) Termination Without Cause - In the event (i) the Executive's employment hereunder is terminated by the Company Without Cause in addition to the amounts specified in Section 8(a) above, the Executive shall be entitled to receive a lump sum cash severance payment equal to eight (8) months of the then current annual base salary as defined in Section 3.

(d) Termination for Good Reason — In the event the Executive terminates his own employment hereunder for Good Reason, Executive shall be entitled to receive a lump sum cash severance payment equal to eight (8) months of the then current annual base salary as defined in Section 3.

(e) Termination Following Change of Control - In the event that the Executive resigns within 90 days following a Change of Control pursuant to Section 7(g) hereof, in addition to the amounts specified in Section 8(a) above, the Executive shall be entitled to receive a lump sum cash severance payment equal to twelve (12) months of the then current annual base salary as defined in Section 3. In the special case of Section 7.(g) (iii) liquidation or dissolution, Executive will receive a lump sum cash severance payment equal to three (3) months of the then current annual base salary as defined in Section 3

(f) Expiration of Employment Agreement - In the event that the Company fails to renew the Employment Term by providing to the Executive a notice of non-renewal pursuant to Section 2 herein the Executive shall receive a lump sum cash severance payment equal to six (6) months of the then current base salary.

Initial

(g) Amounts owed by the Company in respect of the Salary or reimbursement for expenses under the provisions of Section 5 hereof shall, except as otherwise set forth in this Section, be paid promptly upon any termination.

(h) If the Executive secures employment, any consulting or other similar arrangement during the period that any payment is continuing to the Executive pursuant to the provisions of this Section, then the Company shall not have the right to reduce the amounts to be paid hereunder by the amount of the Executive's earnings from such other employment, consulting or other arrangement.

SECTION 9. CONFIDENTIALITY

The Executive agrees that he shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of the Executive's assigned duties and for the benefit of the Company, either during the period of the Executive's employment or at any time thereafter, any nonpublic, proprietary or confidential information, knowledge or data relating to the Company, any of its subsidiaries, affiliated companies or businesses, which shall have been obtained by the Executive during the Executive's employment by the Company. The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to the Executive; (ii) becomes known to the public subsequent to disclosure to the Executive through no wrongful act of the Executive or any representative of the Executive; or (iii) the Executive is required to disclose by applicable law, regulation or legal process (provided that the Executive provides the Company with prior notice of the contemplated disclosure and reasonably cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information). Notwithstanding clauses (i) and (ii) of the preceding sentence, the Executive's obligation to maintain such disclosed information in confidence shall not terminate where only portions of the information are in the public domain.

The Executive agrees that his work effort is committed to the profit and benefit of Company. All work done and any information created or used, inasmuch as these are specific to Company's business, are considered the property of Company and confidential.

The Executive agrees that all Company physical and commercial resources, e.g., but not limited to, computer hardware, tools, software, leased lines, telephones, portable devices, modems and other networking devices, credit cards, automobiles, expense and business accounts are entirely the sole property and reserve of Company and may not be used for other purposes except those in the interest of the Company. The Executive also understands that it is his professional responsibility to use such resources correctly. Upon request by Company, or latest when this Agreement shall have been terminated, Executive will return to Company all physical and commercial resources that shall have been given into his care.

Executive acknowledges that Company's internal work product and information may be copyrighted, or may contain patents or be patentable; or may contain technological know-how, and/or trade secrets; and that these as well as other intellectual property rights may be reserved all to the benefit of Company.

Executive shall respect with discretion all Company's clients' private data, e.g. legal, invention, production, marketing, agent, financial, and business transactions.

Upon request by Company, or latest when this Agreement shall have been terminated, Executive will return to Company – among others – all dossiers, notes, electronic media, backup media, sources, objects, executables, documents, manuals, etc. that Executive might have had in his possession during the life of this Agreement.

## SECTION 10. NON-SOLICITATION

During the Executive's employment with the Company and for the three (3) year period thereafter, the Executive agrees that he will not, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, knowingly solicit, aid or induce (i) any employee of the Company or any of their subsidiaries or affiliates to leave such employment in order to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or knowingly take any action to materially assist or aid any other person, firm, corporation or other entity in identifying or hiring any such Executive or (ii) any customer of the Company or any of its subsidiaries or affiliates to purchase goods or services then sold by the Company or any of their subsidiaries or affiliates from another person, firm, corporation or other entity or assist or aid any other persons or entity in identifying or soliciting any such customer.

## SECTION 11. NON-COMPETITION

The Executive acknowledges that he performs services of a unique nature for the Company that are irreplaceable, and that his performance of such services to a competing business will result in irreparable harm to the Company. Accordingly, during the Executive's employment hereunder and for the three (3) year period thereafter, the Executive agrees that the Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an Executive, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in any business of the same type as any business in which the Company or any of their subsidiaries or affiliates is engaged on the date of termination. This Section shall not, however, prevent the Executive from (i) securing employment in a position that is consistent with his educational and professional credential, and career experiences, (ii) owning not more than one percent of the total shares of all classes of stock outstanding of any publicly held entity engaged in such business, or (iii) being employed by and/or retaining an ownership position in Vinsoft Solutions, Inc. or its predecessors.

## SECTION 12. NONDISPARAGEMENT

The Executive and the Company agree not to make any public statements or statements to any unassociated third parties that disparage the other party, or in the case of the Company, its respective affiliates, Executives, officers, directors, products or services. Notwithstanding

Initials

the foregoing, statements made in the course of sworn testimony in administrative, judicial or arbitral proceedings (including, without limitation, depositions in connection with such proceedings) shall not be subject to this Section 12.

## SECTION 13. GENERAL PROVISIONS

(a) Equitable Relief And Other Remedies - The Executive acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of this Section would be inadequate and, in recognition of this fact, the Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to obtain equitable relief in the form of specific performance, temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

(b) Reformation - If it is determined by the court of competent jurisdiction that any restriction in this Agreement is excessive in duration or scope or is unreasonable or unenforceable under the laws of that jurisdiction, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that jurisdiction.

(c) Survival Of Provisions - The obligations contained in this Section shall survive the termination or expiration of the Executive's employment with the Company and shall be fully enforceable thereafter.

(d) Attorney's Fees - In the event of any dispute arising out of or under this Agreement or the Executive's employment with the Company, if the arbitrator or court of competent jurisdiction, whichever is hearing the matter, determines that the Executive has prevailed on the issues in the arbitration or court proceeding, as the case may be, the Company shall, upon presentment of appropriate documentation, at the Executive's election, pay or reimburse the Executive for eighty-five percent (85%) of all reasonable legal and other professional fees, costs of arbitration and other reasonable expenses incurred in connection therewith by the Executive.

(e) No Assignments - This Agreement is personal to each of the parties hereto. No party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto. The Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company provided the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

(f) Notices - For the purpose of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of delivery if delivered by hand, (ii) on the date of transmission, if delivered by confirmed facsimile, (iii) on the first business day following the date of deposit if delivered by guaranteed overnight delivery service, or (iv) on the fourth business day following the date delivered or mailed

by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:

Ralph Schroeder
10 S 420 Drew Avenue
Burr Ridge, IL 60527

If to the Company:

Dennemeyer & Co. LLC.
829 7th Street, N.W. - 3rd Floor,
Washington, DC 20001

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

(g) Section Headings; Inconsistency - The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement. In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall control.

(h) Severability - The provisions of this Agreement shall be deemed severable and the invalidity of unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

(i) Counterparts - This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instruments.

(j) Arbitration - Any dispute or controversy arising under or in connection with this Agreement, other than injunctive relief or damages for breach of Sections 7 (c), 9, 10, 11 and/or 12, shall be settled exclusively by arbitration. The arbitrator will be a former or retired judge. The arbitrator will have the authority to permit discovery and to follow the procedures that he or she determines to be appropriate. The arbitrator will have no power to award consequential (including lost profits), punitive or exemplary damages. The decision of the arbitrator will be final and binding upon the parties hereto. Judgment may be entered on the arbitrator's award in any court having jurisdiction. Each party shall bear its own legal fees and costs and equally divide the forum fees and cost of the arbitrator, except that in the case of a finding in favor of Executive, such legal fees, costs, forum fees and cost of the arbitrator, shall be paid by two thirds by the Company as reasonably determined by the arbitrator's award.

(k) Indemnification - The Company hereby agrees to indemnify the Executive and hold him harmless to the fullest extent permitted by law and under the by-laws of the Company against and in respect to any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including reasonable attorney's fees), losses, and damages resulting from the Executive's good faith performance of his duties and obligations with the Company.

(l) Liability Insurance - The Company shall cover the Executive under directors and officers liability insurance both during and, while potential liability exists for the term of Executive's employment,

Initial

after the term of this Agreement in the same amount and to the same extent as the Company covers its other officers and directors.

(m) Miscellaneous - No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and such officer or director as may be designated by the Company Board and only in respect to the Company. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. This Agreement together with all exhibits, if any, hereto sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the District of Columbia, United States of America. Any court disputes arising from this Agreement shall be subject to settlement before the Superior Court of the District of Columbia.

(n) Representations - The Executive represents and warrants to the Company that he has the legal right to enter into this Agreement and to perform all of the obligations on his part to be performed hereunder in accordance with its terms and that he is not a party to any agreement or understanding, written or oral, which could prevent him form entering into this Agreement or performing all of his obligations hereunder.

(o) Withholding - The Company may withhold from any and all amounts payable under this Agreement such national and/or federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first written above.

DENNEMEYER & CO., LLC
Washington, D.C.

By: John J. Dennemeyer

_____
                              date

DENNEMEYER & CO., LLC
Washington, D.C.

By: Paul A. Dennemeyer

_____
                              date

EXECUTIVE
Burr Ridge, IL

By: Ralph G. Schroeder

_____  11-06-03
                              date

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into as of February 5, 2004, by and among:

VINSOFT SOLUTIONS, INC., a New Jersey Corporation, with offices at 1155 West Chestnut Street, Suite 2-C, Union, New Jersey 07083-6829, and represented by Hema Kadali, Chief Executive Officer (the "Seller") EIN #22-3684819;

and

DENNEMEYER & COMPANY, S.à.r.l., a limited liability company organized under the laws of Luxembourg, with offices at 55 rue des Bruyères, L-1274 Howald, G.D. of Luxembourg, Trade and Companies Register of Luxembourg registry number B21880 and TVA number 19842406849, and represented by John J. Dennemeyer, General Technical Director (the "Buyer").

### RECITALS

WHEREAS, Seller has been engaged in the business of designing, building, selling and deploying intellectual property management related software and services;

WHEREAS, Buyer is engaged globally in the business of providing state-of-the-art management solutions for legal matters, intellectual property and intellectual assets, and patent annuities portfolio management services and trademark renewal services globally;

WHEREAS, Buyer desires to acquire substantially all of the assets and operations of Seller, and Seller is willing to convey and assign the same on such terms and conditions hereinafter set forth.

### AGREEMENT

NOW THEREFORE, in consideration of the mutual agreements, representations, warranties and covenants set forth below, the parties agree with the legal and binding effect as follows:

### SECTION 1. SALE AND PURCHASE

1.1 TRANSFER OF ASSETS. Subject to the terms and conditions set forth in this Agreement, on the Closing Date, as defined below, Seller shall sell, convey, assign, grant, transfer and deliver to Buyer, and Buyer shall purchase, acquire and receive from Seller, free and clear of all

Initials

liens, mortgages, pledges, security interests, restrictions, prior assignments, encumbrances and claims of any kind, nature or character, all of the Seller's rights, title and interest, including all intellectual property rights, in and to all of Seller's assets -- except those specified as Excluded Assets -- including, but not limited to, the following assets, properties and business as the same shall exist on the Closing Date (the "Purchased Assets"):

(a) Software technology as represented by all design works, object code and source code, owned or transferable by Seller, related to Seller's software products including currently developed, in-process and planned software, and as described in APPENDIX A;

(b) System documentation, in either electronic or hard copy form, related to Seller's software technology including, but not limited to, requirements, database design, architecture design and installation guide;

(c) Intellectual Property Rights meaning all formal and informal ideas, inventions and know-how that are protected or may be protected under any applicable intellectual property laws related to Seller's products and services including, but not limited to, patents, design rights, trademarks, copyrights and trade secrets;

(d) Brand identity including the pending U.S. registered VINSOFT trademark

(e) Sales and marketing materials, including but not limited to, all brochures, web sites, whitepapers and other collateral materials as described in APPENDIX B;

(f) Goodwill meaning all customer lists, relationships, currently pending proposals, marketing materials, and other information related to Seller's technology and business;

(g) Partnerships and other business development agreements that can be transferred by Seller;

(h) Accounts receivable, notes and other receivables arising from the business;

(i) Business records including, but not limited to, all books and records of Seller to the extent relating to the Acquired Assets or the business or operations; and

(j) Tangible assets and recordings of intangible assets including, but not limited to, computer hardware, software, office furniture, business supplies or other property appurtenant to the business, operations and Purchased Assets as described in APPENDIX C.

Initials

**1.2 COMPLETE TRANSFER.** Seller expressly agrees that the sale of the Purchased Assets under this agreement constitutes a complete transfer of all its rights, title and interests with respect to the Purchased Assets and that Seller reserves no rights to market or otherwise transfer the Purchased Assets.

**1.3 EXCLUDED ASSETS.** Notwithstanding the foregoing, Seller does not hereby sell, assign, transfer or convey, and Buyer does not hereby accept or purchase any of the assets, properties, rights, contracts and claims of Seller except for the Purchased Assets, and, without limiting the generality of the foregoing, the following assets, property, rights, contracts and claims of Seller shall not be sold, assigned, transferred or conveyed to Buyer, the detailed listing of which is setout in Appendix D:

    (a)  Cash and cash equivalents including any marketable securities or certificates of deposit existing on or prior to the Closing;

    (b)  Insurance policies and any proceeds or return of premiums there under existing on or prior to the Closing;

    (c)  Tax refunds including all claims, rights and interests of Seller in and to any refunds or accrued losses for periods ending on or prior to the Closing;

    (d)  Transaction records prepared in connection with the Purchased Assets including bids received from others and analyses related to Seller, Buyer and Purchased Assets;

    (e)  All minute books, stock records, corporate seals and treasury stock;

    (f)  Those rights relating to deposits and prepaid expenses and claims for refunds and rights to offset in respect thereof, including lease security deposit;

    (g)  All personnel records and tax records that Seller is required by law to retain in its possession;

    (h)  All rights in connection with and assets of the employee health insurance plan;

    (i)  All rights of the Seller under this Agreement and the Transaction Documents (defined in Section 2.2).

**1.4 EXCLUDED LIABILITIES.** Buyer shall not assume or be obligated to pay, perform or otherwise assume or discharge any liabilities or obligations of Seller, whether direct or indirect, known or unknown, or absolute or contingent, except for the Assumed Obligation contained in this Section, all such liabilities and obligations not so assumed being referred to herein as the "Excluded Liabilities", and, without limiting the generality of the foregoing, the following obligations and

Initials

liabilities relating to the business or operations or Purchased Assets shall not be assumed by the Buyer:

(a)    Taxes relating to business or operations or Purchased Assets;

(b)    Any liability or obligation of Seller in respect of indebtedness for borrowed money;

(c)    Any liability related to Excluded Assets;

(d)    Any liability or obligations not expressly assumed by Buyer related to employee matters;

(e)    Any liability or obligation not expressly assumed by Buyer related to intellectual property;

(f)    Any liabilities or obligations related to previous consulting or other products or services provided by Seller to any third party prior to Closing.

1.5 ASSUMED OBLIGATIONS AND RESPONSIBILITIES. Notwithstanding the Excluded Liabilities contained in this Section, upon the terms and subject to the conditions of this Agreement, Buyer agrees to assume, perform, pay and discharge, in accordance with the respective terms and conditions thereof, the following limited obligations of Seller relating to or arising out of the business or operations of Seller or Purchased Assets (the "Assumed Obligations"). Buyer will assume all operational obligations and responsibilities subsequent to Closing:

(a)    All liabilities, debts, obligations, judgments, fines, penalties, claims and proceedings relating to the business or Purchased Assets, whether accrued, liquidated, contingent, matured or unmatured, arising out of events occurring after the Closing Date;

(b)    Accounts payable and accrued payment obligations of Seller to the extent relating to or arising out of the business or operations of Purchased Assets from the Closing Date and thereafter; and

(c)    All liabilities, debts, obligations, judgments, fines, penalties, claims and proceedings relating to Seller's partnerships, licenses or alliance agreements relating to the business or operations or Purchased Assets as arising out of the Closing Date and thereafter, and as specifically set out in Appendix E;

(d)    All liabilities of Seller or Hema Kadali arising in connection with the Lease, dated the Twenty-First day of august 2002 between Dimarox Realty Company of 2204 Morris Avenue Suite 307, Union, New Jersey 07083 and Hema Kadali of 8 Hampton Ct., Basking Ridge, NJ 07920 and Vinsoft Solutions, Inc. 200 Middlesex Tpk, suite 207 Iselin, NJ 08830 for the premises known

as Suite 2-C; Second/Top floor, 1155 West Chestnut St. Union, County of Union, and State of New Jersey and any renewals thereof.

**1.6 Seller Change of Name.** Subsequent to Closing, Seller will take all necessary actions to change its corporate name such as to not interfere with Buyer's acquisition of the Vinsoft brand and trademark. Seller will retain its Employee Identification Number (EIN).

## SECTION 2. PURCHASE PRICE AND CLOSING

**2.1 PURCHASE PRICE; COMPLETE PURCHASE SCHEDULE.** Subject to the terms and conditions of the Agreement, in consideration of the sale, assignment, transfer and conveyance of the Purchased Assets by Seller to Buyer, Buyer shall pay to Seller the Purchase Price of two million dollars (US$2,000,000) as Cash Consideration, in United States Dollars, according to the following schedule, such schedule representing the "Complete Purchase Schedule":

(a)    At Closing, Buyer shall pay to Seller one million dollars (US$1,000,000) in cash by wire transfer of immediately available funds as per instructions provided by Seller in advance of the Closing;

(b)    At Closing, Buyer shall deliver to Seller a promissory note, secured by a security agreement attached hereto in Appendix F, for one million dollars (US$1,000,000) payable in two installments; first at the one year anniversary of the Closing Date, Buyer shall pay to Seller an installment of five hundred thousand dollars (US$500,000) in cash by wire transfer of immediately available funds as per instructions provided by Seller in advance of the due date; and at the two year anniversary of the Closing Date, Buyer shall pay to Seller the final installment of five hundred thousand dollars (US$500,000) in cash by wire transfer of immediately available funds as per instructions provided by Seller in advance of the due date.

**2.2 TRANSACTION TAXES.** All sales, use, transfer, recording, value added, and other transaction taxes and charges, if any, arising out of the transfer of the Purchased Assets by Seller to Buyer will be borne by the respective responsible party. Buyer and Seller agree to cooperate in obtaining any sales or transfer tax exemptions.

**2.3 CLOSING; CONSUMMATION OF TRANSACTIONS.** Subject to the terms and conditions of this Agreement, the Closing shall take place on such date, as soon as practicable, and at such location as the parties may agree, but no later than February 27, 2004, (the "Closing Date"). At the Closing, Buyer and Seller shall take such actions and execute and

Initials

deliver such agreements, bill of sale, and other instruments and documents (the "Transaction Documents") as necessary or appropriate to effect the transaction contemplated by this Agreement. With regard to Seller's Software Technology Assets and related Documentation, Seller shall provide at Closing a complete copy of the Software Technology source code and all related Documentation including, but not limited to, all test and quality related documentation and customer support feedback, if any. All acts, deliveries and confirmations comprising the Closing, regardless of chronological sequence, shall be deemed to occur contemporaneously and simultaneously upon the occurrence of the last act, delivery or confirmation of such Closing and none of such acts, deliveries or confirmations shall be effective unless and until the last of the same shall have occurred.

## SECTION 3. REPRESENTATIONS AND WARRANTIES OF SELLER

3.1 ORGANIZATION; POWER; GOOD STANDING. Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of New Jersey and has all necessary corporate power and authority to carry on the Business as presently conducted, to own and lease the assets which it owns and leases and to perform all its obligations under each agreement and instrument by which it or its assets are bound. Seller is duly qualified to do business as a corporation and is in good standing under the Laws of each jurisdiction in which it conducts business or in which it owns or leases assets. Seller has provided or will provide to Buyer the latest copy of Seller's articles of incorporation, by-laws, and shareholder agreements.

3.2 AUTHORITY, APPROVAL AND ENFORCEABILITY. Seller has full legal right, power and authority to enter into and perform its obligations under this Agreement and under all other of Seller's Transaction Documents to which Seller is a party. The execution, delivery and performance by Seller of this Agreement and Seller's Transaction Documents to which Seller is a party have been duly authorized by all necessary corporate and other action by the directors and stockholders of Seller. This Agreement has been duly and validly executed and delivered by Seller, and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms. When executed and delivered as contemplated herein, each of the other Seller's Transaction Documents to which Seller is a party shall constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or Laws affecting the rights of creditors generally.

3.3 NO CONFLICT. The execution and delivery by Seller of this Agreement and any other appendices, agreements, instruments and documents to be executed and delivered by Seller pursuant hereto do not, and the

Initials

performance and consummation by Seller of the transactions contemplated hereby and thereby will not conflict with or result in any breach or violation of or default, termination, forfeiture or lien under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach or violation of or default, termination, forfeiture or lien under) any terms or provisions of Seller's charter documents, or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which Seller is a party or to which Seller or the Purchased Assets are subject, in any manner material to the transaction contemplated under this Agreement.

3.4 NO CONSENT REQUIRED. The execution, delivery and performance of this Agreement and Seller's Transaction Documents do not and will not (in each case, with or without the passage of time or the giving of notice), directly or indirectly:

  (a) violate or conflict with the articles of incorporation, bylaws or other organizational documents of Seller or any Law applicable to Seller or by or to which any of the assets to be conveyed to Buyer is bound or subject; or

  (b) violate or conflict with, result in a breach or termination of, or constitute a default or otherwise cause any loss of benefit under any material agreement or other material obligation to which Seller or any of its Stockholders is a party or by which any of the Intellectual Property Assets are bound, or give to others any rights (including rights of termination, foreclosure, amendment, cancellation or acceleration), in any manner material to the transaction contemplated under this agreement.

3.5 COMPLIANCE WITH LAWS; AUTHORIZATIONS. Seller is, and always has been, operating the Business in compliance in all material respects with all applicable Laws (including, without limitation, all Laws relating to the protection of the environment and the use of hazardous substances), and no Selling Party has received, any notice, order or other written communication from any Governmental Authority of any alleged, actual violation of or failure to comply with any Law in connection with the Business that would materially affect the transaction contemplated under this Agreement.

3.6 NO LITIGATION OR DISPUTES. Seller has received no written notice of any material claims, actions, suits, proceedings (arbitration or otherwise) or investigations pending before any Governmental Authority, client, customer, partner, employee or other third party, or before an arbitrator or Court of any kind, that involve or affect Seller, any assets or properties of Seller or officer or stockholder of Seller in his, her or its capacity as such, that otherwise relates to or affects the Business, the asset value of the Business, questions any of the transactions contemplated by, or the validity of, this Agreement or any

Initials

of the other Transaction Documents or which, if determined adversely, could either individually or in the aggregate have a material adverse effect upon the Intellectual Property, or Seller's ability to perform its obligations under this Agreement or any of the other Transaction Documents. Seller has not received any written request from any Governmental Authority for information with respect to the transactions contemplated hereby.

3.7 TITLE TO ASSETS; NO LIMITATIONS ON ASSETS.

(a) Seller has good and marketable title to all Purchased Assets and except with respect to that software listed on Appendix G ("Third Party Software"), Seller has free and clear of all liens, encumbrances or other claims of ownership or rights that would, if existing, materially and adversely effect Buyer's ownership of Purchased Assets. Upon delivery by Seller to Buyer of the Purchased Assets at Closing, Buyer will acquire good and marketable title to the Purchased Assets free and clear of all liens, encumbrances or adverse claims of ownership rights, except for those limitations imposed upon the Third Party Software by Seller's license agreements with the vendors of the Third Party Software;

(b) Seller has not granted rights to manufacture, publish, produce, assemble, license or sell Seller's intellectual property rights or any of Seller's technology to any other entity or Person, and is not bound by any agreement which affects Seller's sole and exclusive right to manufacture, publish, produce, assemble, license, distribute or sell Seller's intellectual property rights, products and services;

(c) With respect to the transfer of rights in and to the Purchased Assets (other than the Third Party Software), Buyer will be subject to no limitations, obligations or restrictions with regard to the further development, sale, license, distribution, or any other form of exploitation of the Purchased Assets, whether in the form transferred to Buyer or after modification.

3.8 INTELLECTUAL PROPERTY.

(a) Seller is the sole owner, or has the exclusive perpetual right to use without consideration or limitation, all Intellectual Property and other proprietary rights of the Purchased Assets, and Seller shall, as part of this transaction, convey, assign, grant, transfer and deliver to Buyer such Purchased Assets free and clear of any Encumbrance, and all such Intellectual Property is licensable and/or may be freely conveyed to Buyer without the consent of any other Person. Seller has not granted or licensed to any Person any rights with respect to the Intellectual Property inconsistent with this Agreement. Upon the consummation of the transactions contemplated hereby, the rights of Buyer in and to any of the Intellectual Property conveyed to Buyer hereunder will not be limited or otherwise adversely affected by reason

Initials

of any of the transactions contemplated hereby. To Seller's knowledge, the Intellectual Property does not infringe and Seller has received no written notice that alleges any infringement of any trademark, copyright, patent or other proprietary right of any Person.

(b) Except with respect to the Third Party Software, Seller is not obligated, contingently or otherwise, to pay royalties or license or similar fees to any Person with respect to any Intellectual Property now used or to be distributed by Seller or which is proposed to be used or distributed by Seller.

(c) All employees of Seller involved with the development, implementation, use or marketing of any Seller's Intellectual Property will enter before closing into written agreements assigning to Seller all rights to inventions, patents or eventual patents, improvements, discoveries or information relating to the Vinsoft Intellectual Property listed on Appendix A, and to the knowledge of Seller, no employee or former employee of Seller, or any other Person, owns or has any proprietary, financial or other interest, direct or indirect, in whole or in part, in any of the Vinsoft Intellectual Property.

**3.9 PROTECTION OF OWNERSHIP INTEREST.** To the best of its knowledge, Seller has not disclosed the software to anyone, including but not limited to any third-party software vendor, in a manner that would materially affect Seller's ownership rights in the intellectual property transferred in accordance with this Agreement. Seller has not taken any action or, to its knowledge, failed to take action that directly or indirectly caused the proprietary information contained in or that are an inherent component of the Vinsoft Intellectual Property to enter the public domain or in any material way affect its value or Seller's absolute and unconditional ownership thereof. No source code or object code of any Vinsoft Intellectual Property is subject to escrow, and the source code has not been disclosed to any third party.

**3.10 STATE AND QUALITY OF PURCHASED ASSETS**

(a) Seller shall provide Buyer the Purchased Assets in their respective condition as of the Closing Date, and consistent with Seller's conditions of closing, shall ensure no diminution in their quality or value, as represented and warranted in this Section, prior to Closing;

(b) Seller represents and warrants that the Vinsoft Intellectual Property that has been released and the Vinsoft Intellectual Property that is in development has been professionally developed to a standard of quality and performance that, (i) is consistent with Seller's experiences in designing, developing and implementing software systems for corporate customers, and (ii) meets or exceeds the level that would be considered by an objective evaluator in the software development industry as standard to the industry and as set-out in the Vinsoft Technical Architecture document;

Initials

(c) Seller represents and warrants that the Vinsoft Intellectual Property that has been released is reasonably free from Errors, has been developed according to a methodology that calls for internal testing throughout development although Seller has not beta tested the software and has not installed the software for testing in any customer site, is stable, and will substantially conform to the specifications and functions set forth in Seller's product specifications;

(d) Seller represents and warrants that, to the best of its knowledge and industry capabilities, the Vinsoft Intellectual Property that has been released has been designed and developed in a manner which would not prevent future MICROSOFT CERTIFICATION, although Seller makes no representation or warranty that such MICROSOFT CERTIFICATION has been obtained or could be obtained. To the best of Seller's knowledge, the Vinsoft Intellectual Property and related software technology that has been released, has been designed and developed in a manner consistent with the characteristic of robustness, ease of maintainability and normal software system evolution.

**3.11 REAL PROPERTY; LEASES.** The Seller does not own, and has never owned, any real property. Seller's sole lease obligation relates to the office located in Union, New Jersey, of which a copy of the lease is contained in APPENDIX H.

**3.12 EMPLOYEES AND CONSULTANTS; EMPLOYEE BENEFIT PLANS.** At Closing, Buyer will, contemporaneously with execution of the Closing documents, execute employment agreements or consulting agreements with the then current employees or consultants of Vinsoft as listed in Appendix I. Seller shall, prior to Closing, arrange for the termination of all prior employee or consulting relationships at Closing. Except for Seller's Health Insurance Plan, Seller has no employee benefit plan(s) of Seller or any predecessor employer of any employee, including, but not limited to, employee benefit schemes, incentive compensation plans, bonus plans, pension and retirement plans, vacation, profit-sharing plans (including any profit-sharing plan with a cash-or-deferred arrangement) share purchase and option plans, savings and similar plans, dental, travel, accident, life, disability and other insurance and other plans or arrangements. Seller has not, with respect to any employee, maintained or contributed to, or been obligated or required to contribute to, any retirement or pension plan or any employee benefit plan (other than the Health Insurance Plan).

**3.13 TAXES.** All Taxes, including any State and Federal income, payroll or sales Tax, that are due or will be due, have been or will be paid by Seller for all periods (or portions thereof) prior to and including the Closing Date. Seller and any other person required to file returns or reports of Taxes have duly and timely filed (or will file prior to the

Initials

Closing Date or within applicable extension periods) all returns and reports of Taxes required to be filed prior to such date, and all such returns and reports are to the knowledge of Seller true, correct, and complete in all material respects. There are no liens for Taxes on any of the Purchased Assets. There are no other outstanding tax liabilities for withholding by Seller for sales tax or payroll taxes (other than those which are not yet due. Seller has complied in all material respects with all record keeping and tax reporting obligations relating to income and employment taxes due with respect to compensation paid to employees or independent contractors providing services to Seller's business. Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code. There is no pending or, to Seller's knowledge, threatened proceedings with respect to Taxes, and Seller has entered into no written agreements for waivers or extensions of statutes of limitations with respect to assessments of Taxes. No agreement or arrangement regarding compensation of any employee providing services to Seller's business provides for any payments which could result in a nondeductible expense to the Buyer pursuant to Section 280G of the Code or an excise tax to the recipient of such payment pursuant to Section 4999 of the Code.

**3.14 FINANCIAL STATEMENTS; NO UNDISCLOSED LIABILITIES.** The Financial Statements provided by Seller to Buyer, have been prepared for use by Seller's management and are prepared in a manner consistent with Seller's customary internal reports. No representation is made that such Financial Statements have been audited or reviewed or that they have been prepared in accordance with customary accounting procedures. Seller does not represent or warrant that such Financial Statements are free from error, complete, or that Seller has made any unusual efforts to check or test the data upon which such statements rely. However, Seller has no actual knowledge of any material error in such Financial Statements.

**3.15 FULL DISCLOSURE; ALL DOCUMENTATION.** Nothing in this Agreement, the Exhibits, Schedules provided by Seller to Buyer contain any materially misstated material fact, nor, to Seller's knowledge, fails to state any material fact necessary to provide a fair disclosure concerning Seller, Seller's business, or the Purchased Assets.

**3.16 NO BROKER OR AGENT.** Seller has entered into no written or verbal agreements for any brokerage commissions, finder's fees or similar compensation in connection with the transaction contemplated by this Agreement.

## SECTION 4. REPRESENTATIONS AND WARRANTIES OF BUYER

**4.1 ORGANIZATION; POWER; GOOD STANDING.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of


Initials

Luxembourg, and has all necessary corporate power and authority to carry on the Business as presently conducted, to own and lease the assets which it owns and leases and to perform all its obligations under each agreement and instrument by which it or its assets are bound. Buyer is duly qualified to do business as a foreign corporation and is in good standing under the Laws of each jurisdiction in which it conducts business or in which it owns or leases assets. Buyer has provided or will provide to Seller the latest copy of Seller's articles of incorporation, by-laws, and shareholder agreements.

**4.2 AUTHORITY, APPROVAL AND ENFORCEABILITY.** Buyer has full legal right, power and authority to enter into and perform its obligations under this Agreement and under all other of Buyer's Transaction Documents to which Buyer is a party. The execution, delivery and performance by Buyer of this Agreement and Buyer's Transaction Documents to which Buyer is a party have been duly authorized by all necessary corporate and other action by the directors and stockholders of Buyer. This Agreement has been duly and validly executed and delivered by Buyer, and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms. When executed and delivered as contemplated herein, each of the other Buyer's Transaction Documents to which Buyer is a party shall constitute the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or Laws affecting the rights of creditors generally.

**4.3 NO CONFLICT.** The execution and delivery by Buyer of this Agreement and any other appendices, agreements, instruments and documents to be executed and delivered by Buyer pursuant hereto do not, and the performance and consummation by Buyer of the transactions contemplated hereby and thereby will not, conflict with or result in any breach or violation of or default, termination, forfeiture or lien under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach or violation of or default, termination, forfeiture or lien under) any terms or provisions of Buyer's charter documents, or any statute, rule, regulation, judicial or governmental decree, order or judgment, to which Buyer is a party.

**4.4 NO CONSENT REQUIRED.** The execution, delivery and performance of this Agreement and Buyer's Transaction Documents do not and will not (in each case, with or without the passage of time or the giving of notice), directly or indirectly:

    (a) violate or conflict with the articles of incorporation, bylaws or other organizational documents of Buyer or any Law applicable to Buyer or by or to which any of the assets to be owned by Buyer is bound or subject; or

    (b) violate or conflict with, result in a breach or termination of, or constitute a default or otherwise cause any loss of benefit

under any material agreement or other material obligation to which Buyer or any of its Stockholders is a party or by which any of the Intellectual Property Assets are bound, or give to others any rights (including rights of termination, foreclosure, amendment, cancellation or acceleration).

**4.5 COMPLIANCE WITH LAWS; AUTHORIZATIONS.** Buyer is, and always has been, operating the Business in compliance in all material respects with all applicable Laws (including, without limitation, all Laws relating to the protection of the environment and the use of Hazardous substances), and no Buyer party, officer, director or shareholder has any basis to expect, and has not received, any notice, order or other communication from any Governmental Authority of any alleged, actual or potential violation of or failure to comply with any Law in connection with the Business.

**4.6 LITIGATION.** There are no claims, actions, suits, proceedings (arbitration or otherwise) or investigations pending before, or, to the knowledge of Buyer, presently threatened or contemplated by, any Governmental Authority, or before an arbitrator of any kind, that involve or affect Buyer, any assets or properties of Buyer or any director, officer or stockholder of Buyer in his, her or its capacity as such, or that otherwise relates to or affects the Business, questions any of the transactions contemplated by, or the validity of, this Agreement or any of the other Transaction Documents or which, if determined adversely, could either individually or in the aggregate have an adverse effect upon the business, or adversely effect Buyer's performance of its obligations under this Agreement or any of the other Transaction Documents. Buyer has not received any request from any Governmental Authority for information with respect to the transactions contemplated hereby.

**4.7 GOVERNMENTAL AUTHORIZATION.** Each of Buyer and its subsidiaries, affiliates or associated businesses has obtained each federal, state, county, local or foreign governmental consent, license, permit, grant, or other authorization of a Governmental Entity that is required for the operation of Buyer's or any of its subsidiaries, affiliates or associated businesses ("Buyer Authorizations"), and all of such Buyer Authorizations are in full force and effect, except where the failure to obtain or have any of such Buyer Authorizations could not reasonably be expected to have a Material Adverse Effect on Buyer.

**4.8 COMPLIANCE WITH LAWS.** Each of Buyer and its subsidiaries, affiliates or associated businesses has complied with, are not in violation of, and have not received any notices of violation with respect to, any federal, state, local or foreign statute, law or regulation with respect to the conduct of its business, or the ownership or operation of its business, except for such violations or

Initials

failures to comply as could not reasonably be expected to have a Material Adverse Effect on Buyer.

**4.9 NO BROKER OR AGENT.** There are no claims for brokerage commissions, finder's fees or similar compensation in connection with the transaction contemplated by this Agreement.

**4.10 ASSETS PURCHASED IN CURRENT STATE.** Buyer represents and warrants that it has diligently examined, used and inspected the Purchased Assets to its satisfaction and that it understands and undertakes the risks associated with purchasing the Vinsoft Intellectual Property in its current state.

## SECTION 5. COVENANTS

**5.1 ACCESS TO INFORMATION.**

(a) Consistent with Seller's Representations and Warranties, Buyer acknowledges that Seller has provided, as part of the Due Diligence process, full and complete access to Seller's business, operations and the Purchased Assets. Notwithstanding, prior and subsequent to the Closing, Seller will provide Buyer additional information as requested, and necessary access to Seller's business, operations and Purchased Assets as reasonably necessary to complete the transaction.

(b) At all times following the Closing, each party shall provide the other party (at such other party's expense) with such reasonable assistance, including the provision of available relevant records or other information and reasonable access to and cooperation of any employees, as may be reasonably requested by either of them in connection with the preparation of any financial statement or tax return, any audit or examination by any taxing authority, or any judicial or administrative proceeding relating to liability for Taxes.

**5.2 THIRD PARTY CONSENTS.** Seller and Buyer shall use commercially reasonable efforts to obtain, within the applicable time periods required, all required consents, waivers, permits, and approvals and to effect all registrations, filings and notices with or to third parties or Governmental Entities which are necessary to consummate the transactions contemplated by this Agreement so as to preserve all rights of, and benefits to, the Buyer in the Purchased Assets.

**5.3 CERTAIN NOTIFICATIONS.** At all times prior to the Closing, Seller and Buyer shall promptly notify the other party in writing of the occurrence of any event which will result, or has a reasonable prospect of resulting, in the failure to satisfy any of the conditions required for Closing or that materially adversely effect the provisions of this Agreement.

**5.4 BEST EFFORTS.** The Seller and Buyer shall each use its best efforts (i) to cause to be fulfilled and satisfied all of the conditions to the

Initials

Closing, (ii) to cause to be performed all of the matters required of it at the Closing

5.5 **SELLER'S CONDUCT OF THE BUSINESS PRIOR TO CLOSING.** During the period from the date of this Agreement to the Closing Date, Seller will conduct the Business in its ordinary and usual course, consistent with past practice, and will use all reasonable efforts to preserve intact all rights, privileges, franchises and other authority of the Business, and to maintain favorable relationships with licensors, licensees, suppliers, contractors, distributors, customers, and others having relationships with the Business. Seller shall promptly notify Buyer of any material event or occurrence or emergency not in the ordinary course of business, and any material event involving the Business or the Purchased Assets.

5.6 **NO OTHER BIDS.** Until the earlier to occur of (a) the Closing or (b) the termination of this Agreement pursuant to its terms, neither Seller or Buyer, or any of its officers, directors, employees, agents, attorneys, accountants, advisors or other representatives, will directly or indirectly, pursue negotiations or other business development related activity that would reasonably be considered in conflict with the Agreement. Seller or Buyer, as the case might be, will promptly notify the other party in writing of any material inquiry, proposal or offer relating to the foregoing that is received, including the identity and terms of such inquiry, proposal or offer.

5.7 **PUBLIC ANNOUNCEMENTS.** On and prior to the Closing Date, Buyer and Seller shall advise and confer with each other prior to the issuance of any reports, statements or releases concerning this Agreement (including the exhibits and schedules hereto) and the transactions contemplated herein. Neither Buyer nor Seller will make any public disclosure prior to the Closing or with respect to the Closing unless both parties agree on the text and timing of such public disclosure; provided, however, that nothing contained herein shall prevent either party at any time from furnishing any information to any Governmental Entity. The text of any public announcements will be reviewed by the parties prior to release.

5.8 **POST-CLOSING ACTIONS.** Subsequent to the Closing Date, Seller shall, from time to time, execute and deliver, upon the request of Buyer, all such other and further materials and documents and instruments of conveyance, transfer or assignment as may reasonably be requested by Buyer to effect, record or verify the transfer to, and vesting in Buyer or of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, other than Liens imposed or arising under the Assumed Obligations and Responsibilities, in accordance with the terms of this Agreement.

5.9 **NON-COMPETITION AGREEMENT.**

Initials

(a) In consideration of the Buyer entering into this Agreement and acquiring substantially all of Seller's business, operations and the Purchased Assets, Seller shall ensure that none of its shareholders, officers, directors or employees, will for two (2) years after completion of the Payment Schedule or post-employment relationship, which ever is longer: (i) participate, assist or otherwise be directly or indirectly involved or concerned, financially or otherwise, as a member, director, consultant, adviser, contractor, principal, agent, manager, beneficiary, partner, associate, trustee, financier or otherwise in any business or activity whose focus is on the development, marketing and sale or license of software products, for the purpose of intellectual property management software or services; or (ii) interfere or seek to interfere, directly or indirectly, with any relationship between Buyer and any client, customer, prospective customer, employee or supplier of Buyer's business;

(b) Seller acknowledges that: (i) the prohibitions and restrictions contained in clause (a) of this Section are reasonable and necessary; and (ii) Seller has full receipt of valuable consideration for agreeing to the covenants in clause (a) of this Section;

(c) Seller and Buyer acknowledge and agree that it will be difficult to compute the amount of damage or loss to Buyer if Seller violated any of their agreements under this Section, that Buyer will be without an adequate legal remedy if Seller violated the provisions of this Section, and that any such violation may cause substantial irreparable injury and damage to Buyer not fully compensable by monetary damages. Therefore, Seller and Buyer agree that in the event of any violation by Seller of this Section, Buyer shall be entitled (i) to recover from Seller monetary damages, (ii) to obtain specific performance, injunctive or other equitable relief, of either a preliminary or permanent type, and (iii) to seek any other available rights or remedies at law or in equity which may be exercised concurrently with the rights granted hereunder.

(d) Nothing in this Section shall prevent or prohibit Seller, or its shareholders, officers, or directors, subsequent to completion of the Payment Schedule or post-employment relationship, from working generally in the area of IT and systems related consulting, or specifically in providing consulting related services in the intellectual property field for corporations, law firms or other organizations, provided that such work is based on the development of new code for each client, and is not directly or indirectly related to creating an intellectual property software product or service that would compete with Buyer's business. Nothing in this Section shall prevent or prohibit Seller, or its shareholders, officers, or directors, from working with Seller's current clients or prospects.

Initials

## SECTION 6. EMPLOYEE AND CONSULTANT MATTERS

**6.1 HIRED EMPLOYEES OR CONSULTANTS.** Prior to the Closing, Seller shall terminate existing agreements, contracts or relationships with all employees or consultants not listed in Appendix I. Buyer, after notice to Seller as to the timing and method of contact, shall have the right to contact any or all of the employees or contractors for the purposes of making offers of employment with Buyer (or any Affiliate designated by Buyer) after the Closing Date and receiving written acceptances of such employment (in each case contingent on consummation of the transactions contemplated by this Agreement). Notwithstanding the foregoing, Buyer shall have no obligation to hire any employees of Seller after the Closing Date other than those listed in Appendix I.

**6.2 TRANSITION.** The employment by Seller of the employees or consultants shall end on or prior to the close of business on the Closing Date and the new employment or consulting arrangement with the employees or consultants by Buyer shall commence at and thereafter 12:01 a.m. on the day after the Closing Date. The terms of employment with Buyer (or Buyer's Affiliates) shall be as mutually agreed to (in the case may be). Buyer shall have no obligation with respect to payments of salary, compensation, wages, health or similar benefits, commissions, bonuses (deferred or otherwise), severance, stock or stock options or any other sums due to any employee or consultant that accrued before the Closing Date; and from and after the Closing Date, Seller shall have no obligation with respect to payment of salary, compensation, wages, health insurance or similar benefits, commissions, bonuses (deferred or otherwise), severance, stock or stock options or any other sums due to any employee or consultant that accrue after the Closing Date and do not pertain to the employees' or consultants' work with Seller prior to the Closing Date. Seller will be fully responsible for all amounts payable to any employee, including (without limitation) all termination payments, redundancy compensation, severance pay, accrued vacation pay and other amounts payable in respect of the termination of employment of any employee in connection with the sale of the Purchased Assets to the Buyer. In addition, Seller will be fully responsible for all amounts owing to employees or consultants prior to Closing.

**6.3 COMPENSATION AND BENEFITS OF TRANSFERRED EMPLOYEES.** Coverage for employees under Buyer's compensation and benefit plans and other programs shall commence at 12:01 a.m. on the day after the Closing Date. Buyer shall be free to establish its own employee benefit plans; Buyer shall have no obligation to offer benefit plans of the same type or with terms similar to or better than the terms of Seller's current employee benefit plans; provided, however, Buyer shall offer compensation packages, including salary, bonus, and other benefit plans

Initials

commensurate with the same level of Buyer's current employees. Buyer shall give each employee credit for such employee's years of most recent continuous service with Seller for purposes of determining participation and benefit levels under all of Buyer's vacation policies and benefit plans and programs.

## SECTION 7. CLOSING REQUIREMENTS - CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer under this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions, all or any of which may be waived by Buyer in writing, except as otherwise provided by law:

**7.1 REPRESENTATIONS, WARRANTIES; PERFORMANCE; CERTIFICATE.**

(a) The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as if such representations and warranties had been made or given again at and as of the Closing Date;

(b) Seller shall have performed and complied with all of its agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or on the Closing Date; and

(c) Buyer shall have received a certificate, dated as of the Closing Date, signed and verified by an officer of Seller certifying on behalf of Seller to the matters set forth in this Section are true.

**7.2 NO PROCEEDINGS OR LITIGATION.**

(a) No preliminary or permanent injunction or other order is known to have been issued by any Governmental Entity, nor has any statute, rule, regulation or executive order known to have been promulgated or enacted by any Governmental Entity which prevents the consummation of the transactions contemplated by this Agreement.

(b) No suit, action, claim, proceeding or investigation before any Governmental Entity shall have been commenced and be pending against any of the parties, or any of their respective Affiliates, associates, officers or directors, seeking to prevent the transactions contemplated by this Agreement, including, without limitation, the sale of the Purchased Assets or asserting that the sale of the Purchased Assets would be illegal or create liability for damages or which may have a Material Adverse Effect on the Business or the Purchased Assets.

**7.3 DOCUMENTS.** This Agreement, any appendices, exhibits and schedules attached hereto, and any other instruments of conveyance and transfer and all other documents to be delivered by Seller at the Closing and all actions of Seller required by this Agreement and the exhibit agreements, or incidental thereto, and all related matters, shall be in

Initials

form and substance reasonably satisfactory to Buyer and Buyer's counsel and shall be in full force and effect.

7.4 **GOVERNMENTAL FILINGS.** The Seller shall have made any required filing with Governmental Entities in connection with this Agreement and the exhibit agreements, and any approvals related thereto shall have been obtained or any applicable waiting periods shall have expired. If a proceeding or review process by a Governmental Entity is pending in which a decision is expected, Buyer shall not be required to consummate the transactions contemplated by this Agreement until such decision is reached or rendered, notwithstanding Buyer's legal ability to consummate the transactions contemplated by this Agreement prior to such decision being reached or rendered.

7.5 **NO MATERIAL ADVERSE CHANGE.** There shall have been no material adverse change in the Purchased Assets as of the Closing Date as compared with the date of this Agreement.

7.6 **REQUIRED APPROVAL.** This Agreement and the transactions it contemplates shall have been approved and adopted by Seller's 's Board of Directors and, if applicable, by such vote of the holders of the outstanding shares of Seller's capital stock entitled to vote thereon as is required to approve such transactions, and shall have otherwise been approved as required by law and the charter documents of Seller .

7.7 **TRANSFER DOCUMENTS.** Seller shall have delivered to Buyer the Bill of Sale, and in regard to Intellectual Property, an Assignment and Assumption Agreement, in each case duly executed by Seller, and in the aggregate assigning to Buyer all of Seller's 's right, title and interest, including all Seller's rights in the Intellectual Property, in and to the Purchased Assets free and clear of all Liens, other than Liens imposed or arising under this Agreement, the Transaction Documents or the Assumed Obligations and Responsibilities.

7.8 **EMPLOYEES.** Each of the employees of Seller or set forth on APPENDIX I to whom Buyer has offered employment shall have accepted the offer of employment with Buyer and shall have agreed to execute Buyer's standard form of Confidential Information and Assignment of Inventions Agreement and Buyer shall have no reason to believe that each of such Employees would not commence employment with Buyer as of the Closing Date or remain an employee of Buyer for at least six months following the Closing Date.

## SECTION 8. CLOSING REQUIREMENTS - CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller  under this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions, all or any of which may be waived in writing by Seller, except as otherwise provided by law:

Initials

**8.1 REPRESENTATIONS AND WARRANTIES; PERFORMANCE; CERTIFICATE.**

(a) The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as if such representations and warranties had been made or given again at and as of the Closing Date;

(b) Buyer shall have performed and complied with all of its agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or on the Closing Date;

(c) Seller shall have received a certificate, dated as of the Closing Date, signed and verified by an officer of Buyer on behalf of Buyer certifying that the matters set forth in this Section are true.

**8.2 NO PROCEEDING OR LITIGATION.**

(a) No preliminary or permanent injunction or other order shall have been issued by any Governmental Entity, nor shall any statute, rule, regulation or executive order be promulgated or enacted by any Governmental Entity which prevents the consummation of the transactions contemplated by this Agreement.

(b) No suit, action, claim, proceeding or investigation before any Governmental Entity shall have been commenced and be pending against any of the parties, or any of their respective Affiliates, associates, officers or directors, seeking to prevent the sale of the Purchased Assets or asserting that the sale of the Assets would be illegal or create liability for damages.

**8.3 DOCUMENTS.** This Agreement, any other instruments of conveyance and transfer and all other documents to be delivered by Buyer to Seller at the Closing and all actions of Buyer required by this Agreement or incidental thereto, and all related matters, shall be in form and substance reasonably satisfactory to Seller and Seller's counsel.

**8.4 GOVERNMENTAL FILINGS.** The Buyer shall have made any filing required with Governmental Entities, and any approvals shall have been obtained or any applicable waiting periods shall have expired. If a proceeding or review process by a Governmental Entity is pending in which a decision is expected, Seller shall not be required to consummate the transactions contemplated by this Agreement until such decision is reached or rendered, notwithstanding Seller's legal ability to consummate the transactions contemplated by this Agreement prior to such decision being reached or rendered.

## SECTION 9. INDEMNIFICATION

**9.1 SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** All covenants to be performed prior to the Closing Date, and all representations and

Initials

warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the consummation of the transactions contemplated hereby and continue until the second anniversary of the Closing Date (the "Survival Date"); provided that if any claims for indemnification have been asserted with respect to any such representations, warranties and covenants prior to the Survival Date, the representations, warranties and covenants on which any such claims are based shall continue in effect until final resolution of any claims.

### 9.2 INDEMNIFICATION.

(a) Subject to the limitations set forth in this Section, from and after the Closing Date, Seller shall indemnify and hold Buyer, its Affiliates and their respective officers, directors, members, stockholders, employees and agents (collectively, "Buyer Indemnified Parties") harmless against and in respect of any and all losses, costs, expenses, claims, damages, obligations and liabilities, including interest, penalties (but excluding any attorneys fees and disbursements and costs of investigation and defense) (collectively, "Damages"), which any Buyer Indemnified Party may suffer, incur or become subject to arising out of any material breach of any representation or warranty of Seller made in or pursuant to this Agreement or any Transaction Document— provided that Buyer notifies Seller in writing within thirty (30) days of the claim. Seller will undertake to acquire suitable professional liability insurance during the term of this Agreement.

(b) Buyer shall indemnify and hold Seller, its Affiliates and their respective officers, directors, stockholders, employees and agents (collectively, "Seller's Indemnified Parties") harmless against and in respect of any and all Damages which any Seller Indemnified Party may suffer, incur or become subject to arising out of, based upon or otherwise in respect of any inaccuracy in or breach of any representation or warranty of Buyer made in or pursuant to this Agreement or any Transaction Document.

### 9.3 INTER-PARTY CLAIMS.
Any Party seeking indemnification pursuant to this Section (the "Indemnified Party") shall notify the other Party from whom such indemnification is sought (the "Indemnifying Party") of the Indemnified Party's assertion of such claim for indemnification, specifying the basis of such claim ("Claim"). The Indemnified Party will promptly and with due diligence provide all material and supporting evidence and such other information as required by the Indemnifying Party. If the Indemnifying Party, within 15 business days after the receipt of such notice by the Indemnified Party, has not given written notice to the Indemnified Party either announcing its intention to contest such assertion by the Indemnified Party or asserting material absence of information, such assertion by the Indemnified Party shall be deemed provisionally accepted and the Claim

Initials

shall be acted upon as if it were deemed a valid Claim. In the event, however, that the Indemnifying Party contests the assertion of a Claim by giving such written notice to the Indemnified Party within such 15 business day period, and if the Parties, acting in good faith, cannot reach an agreement with respect to such Claim within 15 business days after such notice, the contested assertion of the Claim shall be referred to arbitration in New York, New York, in accordance with the then current rules of the American Arbitration Association. · The determination made in accordance with such rules shall be delivered in writing to the Parties and shall be final and binding and conclusive on the Parties and the Performance Remedy and/or the amount of the Claim, if any, determined to exist shall be a valid Performance Remedy and/or Claim. Each Party shall pay its own legal, accounting and other fees in connection with such a contest

9.4 THIRD PARTY CLAIMS.

(a) Each Indemnified Party shall promptly notify the Indemnifying Party of the assertion by any Person of any claim with respect to which the indemnification set forth in this Section relates; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and solely to the extent) the Indemnifying Party is prejudiced thereby. The Indemnifying Party shall have the right, upon notice to the Indemnified Party within 10 business days after the receipt of any such notice, to undertake the defence of or, with the consent of the Indemnified Party, to settle or compromise such Claim. The failure of the Indemnifying Party to give such notice and to undertake the defence of or to settle or compromise such a Claim shall constitute a waiver of the Indemnifying Party's rights under this Section and, in the absence of gross negligence or wilful misconduct on the part of the Indemnified Party, shall preclude the Indemnifying Party from disputing the manner in which the Indemnified Party may conduct the defence of such Claim or the reasonableness of any Performance Remedy and/or amount paid by the Indemnified Party in satisfaction of such Claim.

(b) The election by the Indemnifying Party, pursuant to this Section, to undertake the defense of a third-party claim shall not preclude the Party against which such claim has been made also from participating or continuing to participate in such defense, so long as such Party bears its own legal fees and expenses for so doing.

9.5 Limitation on Amount.    Seller shall have no liability (for indemnification or otherwise) and Buyer shall not offset payments under the Promissory Note with respect to claims under Section 9.2 until the total of all damages with respect to such matters exceeds seventy five thousand dollars ($75,000) and then only for the amount by which such damages exceed seventy five thousand dollars ($75,000).

Initials

## SECTION 10. TERMINATION

**10.1 TERMINATION OF AGREEMENT PRIOR TO CLOSING.** This Agreement may be terminated at any time prior to the Closing:

(a) By mutual written consent of both Buyer and Seller; or

(b) By Buyer or Seller, if the other party goes into liquidation, has an application or order made for its winding up or dissolution, has a resolution passed or steps taken to pass a resolution for its winding up or dissolution, becomes unable to pay its debts as and when they fall due, or has a receiver, receiver and manager, administrator, liquidator, provisional liquidator, official manager or administrator appointed to it or any of its assets; or

(c) By Buyer or Seller if any Governmental Entity shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

**10.2 TERMINATION OF AGREEMENT SUBSEQUENT TO CLOSING.**

Should either party be found to have committed a material breach in their warranty or representations, the other party may, at its option, terminate this Agreement upon sixty (60) calendar day's written notice to the other party. Such notice shall identify and describe the default upon which termination is based. The defaulting party shall have sixty (60) calendar days after notice to cure such default which, if cured, shall prevent termination by such uncured default

**10.3 PROCEDURE AND EFFECT OF TERMINATION.**

In the event of termination of this Agreement by either Buyer or Seller pursuant to this Section, written notice shall be given to the other parties specifying the specific termination provision invoked. In the case of termination, there shall be no liability on the part of Buyer or Seller, or their respective officers, directors, partners or Affiliates, except as a result of any breach of this Agreement by such party or to the extent such party is entitled to specific performance, indemnification or other equitable remedies as defined in this Agreement;

**10.4 TERMINATION FOR BUYER'S FAILURE TO PAY PROMISSORY NOTE.**

(a) If termination is for Buyer's failure to pay on the promissory note, beyond all applicable cure periods, Seller shall have, in addition to any other rights and remedies it may have under this Agreement or at law, the right to return of the Purchased Assets, including the software technology assets in their then current state, free and clear of all claims by Buyer or other liens or encumbrances. Buyer shall cooperate in execution of any documents necessary to

Initials

effectuate the transfer of the Purchased Assets to Seller, and shall pay all legal fees and expenses in connection with such transfer. Buyer shall establish at Closing an escrow of the design works, object code and source code included in the Purchased Assets with a third party escrow agent. Such escrow to be governed by an agreement acceptable to both Seller and Buyer providing for release of the escrow to Seller upon default of Buyer on any payment on the Promissory Note beyond applicable cure periods.

(b) Upon termination and return of assets under this Section 10.4, Buyer shall receive an ownership interest in Seller's business equal to 35% of Seller's controlling voting shares plus the following additional non-controlling, non-voting shares:

(1) If Buyer has paid $1,000,000 of Purchase Price, Buyer shall receive 40% of Seller's non-controlling, non-voting shares;

(2) If Buyer has paid $1,500,000 of Purchase Price, Buyer shall receive 60% of Seller's non-controlling, non-voting shares.

## SECTION 11. MISCELLANEOUS

**11.1 AMENDMENTS AND WAIVERS.** Any term of this Agreement may be amended or waived with the written consent of the parties or their respective successors and assigns. Any amendment or waiver affected in accordance with this Section shall be binding upon the parties and their respective successors and assigns.

**11.2 SUCCESSORS AND ASSIGNS.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**11.3 GOVERNING LAW; JURISDICTION.** This Agreement shall be construed in accordance with and governed by the Laws of New York and any claims and/or disputes arising in respect to this Agreement shall be settled according to New York Law

**11.4 DISPUTE RESOLUTIONS: ARBITRATION.**

(a) Any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination or validity thereof, except any request for immediate injunctive relief necessary to prevent disclosure of confidential information, protect intellectual property rights or preserve the status quo pending arbitration hereunder, shall be finally settled in accordance with the commercial arbitration rules of the American Arbitration Association (the "AAA") then obtaining, by

Initials

two Arbitrators selected each by one of the Parties knowledgeable in the computer software industry appointed from the list of arbitrators supplied to the parties by the AAA, by a selection procedure determined by the AAA, and where the Arbitrators preferably have been judges. In case of further required mediation, a third Arbitrator agreeable to both Parties may be chosen.

(b) The place of arbitration shall be New York, New York, USA. The Arbitrators shall determine all questions of arbitral review, scope of arbitral authority, and arbitral procedure, and further shall determine the rights of the Parties in the event of termination including, but not limited to, interpretation of all termination-related provisions of this Agreement.

(c) The Parties agree that the award of the Arbitrators shall be the sole and exclusive remedy between them regarding any claims, counterclaims, issues or accountings presented or pled to the Arbitrators, that the award shall be made and shall be promptly payable in U.S. Dollars, free of any tax, deduction or offset, and that any costs, fees or taxes instant to enforcing the award shall, to the maximum extent permitted by law, be charged against the Party resisting such enforcement.

(d) The award shall include interest from the date of damages incurred for breach or other violation of this Agreement, and from the date of the award until paid in full, at a rate to be fixed by the Arbitrators.

**11.5 FORCE MAJEURE.** The Party claiming delay, difficulty, duress, or inability in the performance of any of its obligations under this Agreement by reason of Force Majeure shall use all reasonable endeavours and resources to perform throughout the continuance of Force Majeure.

**11.6 COUNTERPARTS.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

**11.7 TITLES AND SUBTITLES.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**11.8 NOTICES.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or forty-eight (48) hours after being deposited in the regular mail as certified or registered mail (airmail if sent internationally) with postage prepaid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth on the signature page hereto, or as subsequently modified by written notice.

Confidential

Initials

**IF TO BUYER:**

URGENT: To ALL Directors
DENNEMEYER & CO. S.à.r.l.
55 rue des Bruyères,
L-1274 Howald, G.D. of Luxembourg,
Facsimile: ++352-499-841-200

**Attn:** John Dennemeyer or Successor

With a copy to (which shall not
constitute Notice:

Linklaters
Rue Carlo Hemmer 4
L-1734
Luxembourg
Tel: (352) 2608-1
Fax: (352) 2608-8888

**IF TO SELLER:**

Hema Kadali
8 Hamption Ct.
Basking Ridge, NJ 07920

With a copy to (which shall not
constitute Notice):

Paul D. Wigg-Maxwell
44 Pittsford Way
New Providence, NJ 07974-2429
Tel: (908) 464-4421
Fax: (908) 464-6046

**11.9 SEVERABILITY.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each party as close as possible to that under the provision rendered unenforceable. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

**11.10 ENTIRE AGREEMENT.** This Agreement, together with the exhibits and other documents referred to herein are the product of both of the parties hereto, and constitute the entire agreement between such parties pertaining to the subject matter hereof and thereof, and merges all prior negotiations and drafts of the parties with regard to the transactions contemplated herein and therein. Any and all other written or oral agreements existing between the parties hereto regarding such transactions are expressly canceled.

**11.11 ADVICE OF LEGAL COUNSEL.** Each party acknowledges and represents that, in executing this Agreement, it has had the opportunity to seek advice as to its legal rights from legal counsel and that the person signing on its behalf has read and understood all of the terms and provisions of this Agreement. This Agreement shall not be construed against any party by reason of the drafting or preparation thereof.

Initials

11.12 FEES AND EXPENSES. Each party shall bear its own fees and expenses (including the fees and expenses of its financial, legal, accounting and other advisors) incurred in the negotiation, documentation and delivery of the Agreement and the transactions

[End of Document - Signature Pages Follow]

Initials

This Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

On Behalf of
Dennemeyer & Company S.a.r.l

_____
John J. Dennemeyer
General Technical Director

_____
Date: February 5 2004

On Behalf of
Vinsoft Solutions, Inc.

_____
Rama Kadali
Chief Executive Officer

_____
Date: 02/05/2004

Initials